CASE NO. 18-2268
CASE NO. 18-2269

---

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

vs.

MICHAEL KENNETH RICH,

*Defendant-Appellant*.

---

On Appeal from the United States District Court
for the Eastern District of Michigan
Southern Division,

Case Nos. 11-cr-20129 and 11-cr-20066

---

**APPELLANT'S BRIEF FOR MICHAEL KENNETH RICH (CORRECTED)**

---

**ORAL ARGUMENT REQUESTED**

---

Robert M. Morgan
615 Griswold St., Suite 1125
Detroit, MI  48226
(313) 961-7070
Attorney for Defendant
morgancrdefense@ameritech.net

December 3, 2019

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT .........................................vi

STATEMENT OF SUBJECT MATTER AND APPPELLATE JURISDICTION ..1

STATEMENT OF ISSUES FOR REVIEW ...........................................................2

STATEMENT OF THE CASE.................................................................................3

STATEMENT OF THE FACTS ..............................................................................4

SUMMARY OF THE ARGUMENT .......................................................................9

ARGUMENT ...........................................................................................................9

    I.    THE DISTRICT COURT COMMITTED REVERSIBLE ERROR AND VIOLATED APPELLANT'S SIXTH AMENDMENT RIGHT OF CONFRONTATION BY THE ARBITRARY IMPOSITION OF A BLANKET RULE IMPAIRING CROSS EXAMINATION AND PREVENTING CROSS EXAMINATION ON BIAS ..............................9

        A.    The Court Erred by Preventing Cross-Examination of Government Witness, Ronald Roberts, About His Potential Motive to Fabricate, That Is, His Potential Liability For Homicide ...................................................................................11

        B.    The Court Erred by Preventing Cross-Examination of Another Witness, Anthony Clark, With an Open Potential Homicide Charge Which Was Excluded From His Cooperation Agreement With the Government .............................................12

        C.    The Court Erred by Preventing Cross Examination About the Case Agent's Role in Obtaining False Confessions to First Degree Murder From Two Teenage High School Dropouts, an Event Which Another District Judge Described as Suitable for a Jury to Conclude There Was a Conspiracy to Violate Their Civil Rights ..............................................................................14

    II.    THE DISTRICT COURT ERRED BY ALLOWING THE ADMISSION OF EXHIBIT 13-10 (AN EMAIL FROM SOMEONE NAMED BIG RON) ADDRESSED TO DDMC MEMBERS INCLUDING DEFENDANT REGARDING THE BOX CANYON INCIDENT. .........21

III.  THE DISTRICT JUDGE ERRED IN DENYING APPELLANT'S RULE 29 MOTION WHERE THE EVIDENCE IN TRIAL 2 DID NOT PROVE THE EXISTENCE OF A "CONTINUING UNIT" AS REQUIRED BY THE STATUTE. ..................................................................23

IV.  THE DISTRICT COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL RELATING TO THE JURY FINDING OF DRUG QUANTITY ................................................32

V.  MICHAEL RICH'S SENTENCE WAS PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE ................................................36

    A.  The Guideline Calculation of "Life" Was Wrong Because it was Predicated on the Erroneous Thinking that a Club Member was Responsible for Every Single Act Perpetrated by any Other Member Anywhere in the Country ...........................................37

    B.  The District Judge Punished Rich for Exercising his Constitutional Right to a Trial ....................................................46

    C.  The District Judge Imposed a "*de facto*" Life Sentence of 30 Years Which Was not Individualized and Ignored the Statutory Mandate to Impose a Sentence Sufficient but not Greater than Necessary ....................................................................................47

CONCLUSION AND RELIEF SOUGHT ..............................................................49

CERTIFICATE OF COMPLIANCE .......................................................................50

CERTIFICATE OF SERVICE ...............................................................................51

ADDENDUM ..................................................................................... A-1

ii

# TABLE OF AUTHORITIES

**Cases**

*Alford v. United States*,
  282 U.S. 687 (1931)..................................................................................... 13

*Ali v. Federal Bureau of Prisons*,
  128 S.Ct. 831 (2008)................................................................................... 24

*Boggs v. Collins*,
  226 F.3d 728 (6th Cir. 2000) ...................................................................... 19

*Bordenkircher v. Hayes*,
  434 U.S. 357 (1978).................................................................................... 47

*Bullcoming v. New Mexico*,
  131 S.Ct. 2705 (2011)................................................................................. 20

*Davis v. Alaska*,
  475 U.S. 673 (1986).................................................................................... 19

*Delaware v. Van Arsdall*,
  475 U.S. 673 (1996).................................................................................... 19

*Gall v. United States*,
  522 U.S. 38, 51 (2007)................................................................................ 38

*Jackson v. Virginia*,
  443 U.S. 307 (1979).................................................................................... 31

*Simmons v. United States*,
  390 U.S. 377 (1968).................................................................................... 20

*United Stares v. Reyes*,
  313 F.3d 1152 (9th Cir. 2002) .................................................................... 49

*United States v. Adamo*,
  742 F.2d 927 (6th Cir. 1984), cert denied, 469 U.S. 1193 (1985)............. 32

*United States v. Banks*,
  514 F.3d 959 (9th Cir. 2008) ...................................................................... 32

*United States v. Barahona-Montenegro*,
  565 F.3d 980 (6th Cir. 2009) ...................................................................... 38

*United States v. Beddow*,
  957 F.2d 1330 (6th Cir. 1992) ............................................................. 23, 32

*United States v. Bowlson*,
  240 F. Supp. 2d 678 (E.D. Mich. 2005)..................................................... 15

*United States v. Campbell*,
  279 F.3d 392 (6th Cir. 2002) ...................................................................... 35

*United States v. Castro*,
  908 F.2d 85 (6th Cir. 1990) ........................................................................ 23

*United States v. Collado*,
　975 F.2d 985 (3rd Cir. 1992) ................................................................... 46

*United States v. Conaster*,
　514 F.3d 508 (6th Cir. 2008) ................................................................... 49

*United States v. Cruz*,
　877 F.2d 732 (2nd Cir. 1992) .................................................................. 47

*United States v. Darwich*,
　337 F.3d 992 (6th Cir. 1998) ................................................................... 23

*United States v. Green*,
　202 F.3d 869 .............................................................................................. 9

*United States v. James*,
　510 F.2d 546 (5th Cir. 1975) ................................................................... 22

*United States v. Jenkins*,
　854 F.3d 181 (2nd Cir. 2019) .................................................................. 49

*United States v. Johnson*,
　378 F.3d 230 (2nd Cir. 2004) ..................................................... 43, 44, 45

*United States v. Johnson*,
　71 F.3d 539 (6th Cir. 1995) ..................................................................... 21

*United States v. Klups*,
　514 F.3d 532 (6th Cir. 2008) ................................................................... 49

*United States v. Manske*,
　185 F.3d 770 (7th Cir. 1999) ................................................................... 11

*United States v. Melton*,
　131 F.3d 1400 (10th Cir. 1997) ............................................................... 46

*United States v. Mulder*,
　273 F.3d 91 (2nd Cir. 2001) .............................................................. 43, 45

*United States v. Nagi*,
　541 F. App'x 556 (2013) .......................................................................... 31

*United States v. Parrish*,
　915 F.3d 1043 (6th Cir. 2019) ................................................................. 36

*United States v. Perez*,
　989 F.2d 1574 (10th Cir. 1993) ............................................................... 22

*United States v. Robertson*,
　309 Fed. Appx. 918 (6th Cir. 2009) ........................................................ 48

*United States v. Saro*,
　24 F.3d 283 (D.C. Cir. 1994) .................................................................. 39

*United States v. Shores*,
　33 F.3d 438 (4th Cir. 1994) ..................................................................... 21

iv

*United States v. Thai*,
29 F.3d 785 (2nd Cir. 1994) ........................................................................ 32

*United States v. Thomas*,
498 F.3d 336 (6th Cir. 2007) ...................................................................... 48

*United States v. Turkette*,
452 U.S. 576 (1981) ..................................................................................... 23

*United States v. Watts*,
519 U.S. 148 (1997) ..................................................................................... 45

*United States v. Wilson*,
614 F.3d 219 (6th Cir. 2010) ...................................................................... 49

*United States v. Wolf*,
839 F.2d 1387 (10th Cir. 1988) .................................................................. 22

*V.I. v. Walker*,
261 F.3d 370 (3rd Cir. 2001) ...................................................................... 47

*Wright v. Dallman*,
999 F.2d 174 (6th Cir. 1993) ........................................................................ 9

## Statutes

18 U.S.C. § 1962(d) ........................................................................................ 3
18 U.S.C. § 3231 ............................................................................................. 1
18 U.S.C. § 3553(a) ...................................................................................... 47
18 U.S.C. §§ 2, 371, 876, 1503, 1513, 1622 ............................................... 3
21 U.S.C. §§ 846, 841(a)(1) .......................................................................... 3
28 U.S.C. § 1291 ............................................................................................. 1

## Rules

28 C.F.R. §§ 16.21-16.26 .............................................................................. 20
U.S.S.G. § 1B1.3 ........................................................................................... 45
U.S.S.G. § 1B1.3(a)(1) .................................................................................. 39
U.S.S.G. § 1B1.3(a)(1)(B) ............................................................................ 39

v

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendant-Appellant Michael Kenneth Rich respectfully requests oral argument in this matter because he likely cannot survive the sentence imposed and argument in combined appeals from two separate trials will aid with the decisional process.  Fed. R. App. P. 34(a).

## STATEMENT OF SUBJECT MATTER
## AND APPPELLATE JURISDICTION

The indictments in which Michael Kenneth Rich were charged stated offenses against the United States, defined in Titles 18 and 21, United States Code, (Case Nos. 11-cr-20129 and 11-cr-20066). The trial court had subject matter jurisdiction over the proceeding under 18 U.S.C. § 3231. Defendant-Appellant appeals from final judgments of the district court which disposed of all claims of all the parties to this appeal which were ripe for adjudication as of the time of their entry. Sentences were imposed October 26, 2018. Notices of Appeal therefrom were filed on October 28, 2018, R. 2321 and R. 2395. This Court is vested with appellate jurisdiction over this appeal under the provisions of 28 U.S.C. § 1291.

1

## STATEMENT OF ISSUES FOR REVIEW

I.    WHETHER THE DISTRICT COURT COMMITTED REVERSIBLE ERROR AND VIOLATE APPELLANT'S SIXTH AMENDMENT RIGHT OF CONFRONTATION BY

    A.    Preventing Cross-Examination of Government Witness, Ronald Roberts, About His Potential Motive to Fabricate, That Is, His Potential Liability For Homicide?

    B.    Preventing Cross-Examination of Another Witness, Anthony Clark, With an Open Potential Homicide Charge Which Was Excluded From His Cooperation Agreement With the Government?

    C.    Preventing Cross Examination About the Case Agent's Role in Obtaining False Confessions to First Degree Murder From Two Teenage High School Dropouts, an Event Which Another District Judge Described as Suitable for a Jury to Conclude There Was a Conspiracy to Violate Their Civil Rights?

II.    WHETHER THE DISTRICT COURT ERRED BY ALLOWING THE ADMISSION OF EXHIBIT 13-10 (AN EMAIL FROM SOMEONE NAMED BIG RON) TO DDMC MEMBERS INCLUDING DEFENDANT REGARDING THE BOX CANYON INCIDENT?

III.    WHETHER THE DISTRICT JUDGE ERRED IN DENYING APPELLANT'S RULE 29 MOTION WHERE THE EVIDENCE IN TRIAL 2 DID# NOT PROVE THE EXISTENCE OF A "CONTINUING UNIT" AS REQUIRED BY THE STATUTE?

IV.    WHETHER THE DISTRICT COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL RELATING TO THE JURY FINDING OF DRUG QUANTITY?

V.    WHETHER MICHAEL RICH'S SENTENCE WAS PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE

## STATEMENT OF THE CASE

Michael Kenneth Rich was one of eleven persons charged in 11-cr-20066 Indictment, R. 3, Page ID# 7 *et seq.* with violations of 18 U.S.C. §§ 2, 371, 876, 1503, 1513, 1622 (conspiracy to suborn perjury and obstruction of justice, subornation of perjury, obstruction of justice) and violation of 21 U.S.C. §§ 846, 841(a)(1) (conspiracy to distribute marijuana). Rich was one of nineteen persons charged July 13, 2012 with alleged violations of 18 U.S.C. § 1962(d) (Racketeer Influenced Corrupt Organization – conspiracy) 11-cr-20129 Indictment, R. 72, Page ID# 590 *et seq*.

The cases were consolidated. There were two trials with Rich in Trial 2 beginning September 30, 2015. He was convicted of the RICO conspiracy, obstruction and perjury counts. He was found Not Guilty on the conspiracy to distribute marijuana. Jury Verdict Form, R. 1939, Page ID## 29449-29452.

On October 26, 2018 the district court sentenced Defendant. Judgment R. 2325. Rich was sentenced 30 years on the RICO conspiracy (11-cr-20129) concurrent with the terms of imprisonment in 11-cr-20066, 60 months on Counts 1 and 2 (conspiracy and perjury) and 120 months on Count 3 (obstruction of justice) all to be served concurrently and concurrent with that in 11-cr-20129.

Notices of Appeal were filed, Notice, R. 395 (11-cr-20066) and Notice, R. 2325 (11-cr-20129) on October 28, 2018.

3

## STATEMENT OF THE FACTS

**WITNESS JOHN RIEDE**

John Riede, a member of the Devils Disciples for over 40 years was President of the Bay City Chapter.  R. 1617, Page ID## 20504, 20506, 20519.[1]  It evolved from a different club, Tri-City Henchmen.  R. 1617, Page ID# 20526.  He had been involved in stealing motorcycles maybe 10 times with a nonmember and sold drugs.  R. 1617, Page ID# 20576.  He had a prior federal conviction for the latter and cooperated against everybody.  R. 1617, Page ID## 20579, 20580.  After prison he began selling drugs (marijuana) which he got from Mexicans ("citizens" – not club members) R. 1617, Page ID# 20589.  He bought meth from Michael Mastromateo (Iron Mike) R. 1618, Page ID# 20625.

Michael Rich (Tatu) was a member of Tri-City, R. 1618, Page ID# 20695, and Riede kicked him out of the club because he liked to drink, someone may have "tabbed" him with a drug, where he didn't really realize what he was doing.  R. 1618, Page ID# 20696.  Riede "heard" Rich talked to members of the Outlaws and took them to Devils Diciples' bars, homes or girlfriends' homes.  R. 1618, Page ID# 20697.

---

[1] All witness testimony referenced will have a citation to the Record number and Page ID#s.  Reference to one specific pleading, order or document will include a title of same.

4

A problem in the club was guys bragging.  R. 1618, Page ID# 20708.  There was a lot of gossip and a lot of rumors.  R. 1618, Page ID# 20713.  It was someone named Mallard, an Outlaw, who enjoyed needling Riede and told him the stuff about Rich.  R. 1618, Page ID# 20713.  Rich was in the Coast Guard; his girlfriend was a nurse or restaurant worker.  R. 1618, Page ID# 20700.  From Bay City Rich went to Port Huron, then to Alabama.  R. 1618, Page ID# 20700.  Riede couldn't name the Anniston Chapter where Rich was and Riede had only "recently" heard of it.  R. 1618, Page ID# 20719, 20720.  Alabama had a different set of rules "so to speak than any other place in the country.  R. 1618, Page ID# 20725.  Riede bought and sold to whoever he could, both club members and not.  R. 1618, Page ID# 20717.  Riede denied selling drugs to Highwayman "Mad" Anthony Clark.  R. 1618, Page ID# 20718, 20719.

The Court refused to permit cross examination regarding its own previous proffer (detention) that Riede was involved in the sale of large quantities of meth to "Mad" Anthony Clark.  R. 1618, Page ID# 20771.

**WITNESSES KEITH MCFADDEN AND STELLA HERRON**

Keith McFadden plead guilty to a conspiracy to distribute marijuana.  R. 1627, Page ID# 22366, 22367.  He sold meth which he got from a non club member.  R. 1627, Page ID# 22360.  When he became a club prospect he was "86ed" (had to stop selling)  R. 1627, Page ID# 22369.  He continued anyway.

5

At some point he went to Alabama where he met Stella Herron, the guys from three separate chapters, Birmingham, Sand Mountain and Anniston. R. 1627, Page ID# 22419.[2] He did not sell drugs on clubhouse property. R. 1627, Page ID# 22390. Anniston members included "Tatu" (Michael Rich). R. 1627, Page ID# 22418. Tatu was older, had partied hard, had a massive coronary and was kind of "mellow." R. 1627, Page ID# 22447)

McFadden and Herron stayed in a camper behind the clubhouse but he couldn't remember if it was for months or years. R. 1627, Page ID# 22484. He claimed he was afraid of Tatu. R. 1627, Page ID# 22585.

After Victor Castano was arrested for marijuana and a gun in a truck, McFadden and Herron met with Agent Fleming to tell a false story about the gun belonging to her and to get the gun charge dropped. R. 1627, Page ID## 22547-22549. Tatu and Gun Control didn't have much input about the story. R. 1627, Page ID# 22553. Then he said it was their idea. R. 1627, Page ID# 22603. The FBI didn't drop the charge so there was discussion about testifying. R. 1627, Page ID# 22551. McFadden testified at Castano's trial and later in May 2009 called Agent Fleming and said he lied. R. 1627, Page ID# 22578; R. 1628, Page ID# 22624. He told Stella Herron to call Fleming.

---

[2] Specific dates or precise time frames were generally lacking in all witness testimony.

Much of McFadden's and Herron's testimony conflicted. McFadden denied ever putting a gun in Stella Herron's mouth. R. 1628, Page ID# 22616. On direct examination he said he slapped her one time and the next day admitted it was a fist but to him they're the same thing. R. 1628, Page ID# 22643. He punched her and choked her but did not put a gun to her head. R. 1628, Page ID# 22643, 22644.

He never took advantage of her or doled out an allowance of the money she earned dancing. R. 1628, Page ID# 22644, 22645. He did not recall if he perpetrated any acts of violence on her close in time to presentation of "the story;" he only recalled arguments. R. 1628, Page ID# 22648. She never said "Don't hit me no more;" he never head butted her. R. 1628, Page ID# 22649. He never told her "we are both victims." R. 1628, Page ID# 22656.

Stella Herron explained the "procedure," putting her earnings in a certain way in his money clip. R. 1629, Page ID# 23204. He always made the decision about whether she needed anything. R. 1629, Page ID# 23205.

The more she resisted participating in the "story" the angrier and more physical McFadden got. He punched her, choked her, head butted her and put a gun to her head. R. 1629, Page ID# 23209. He told her, not only "tell the story" but also "we" "are the victim." R. 1629, Page ID# 23211. McFadden had told her that he would kill her if she ever caused him to go to jail. R. 1629, Page ID# 23212.

7

Stella Herron has used cocaine, meth, marijuana, on occasion Xanax.  R. 1629, Page ID# 23084.  When she was interviewed by who she had referred to as a "little short dude" (Fleming) she acknowledged she had a problem with alcohol and had blackouts but denied being an alcoholic.  R. 1629, Page ID# 23206.

Herron tried to work seven days a week.  R. 1629, Page ID# 23101.  She said she did not have a good relationship with Tatu and acknowledged that Rich's girlfriend who worked for a car manufacturer looked down her nose at her.  R. 1629, Page ID# 23106.  In her mind, she held Tatu responsible for one of the beatings by McFadden.  R. 1629, Page ID# 23118, 23119.

Gun Control (VanDiver) made threats about her resisting the story about the gun but she didn't recall where because "we were partying."  R. 1629, Page ID# 23138.  She claimed Tatu made insinuations that her 16 year old daughter could be a pretty good club whore but she didn't know how drunk he was at the time.  R. 1629, Page ID# 23137.  She didn't think he would have really done it and she thought he wanted her to "step up," i.e., to testify.  R. 1629, Page ID# 23143.  She said she was sure Rich was aware of the plan to use her to lie.  R. 1629, Page ID# 23145)

Other relevant facts will be included in pertinent sections of the legal arguments.

8

## SUMMARY OF THE ARGUMENT

Appellant's right of confrontation was violated in various ways. Prejudicial hearsay was admitted against him. His Rule 29 motions were erroneously denied. And his sentence was procedurally and substantially unreasonable in addition to punishing him for exercising his right to trial.

## ARGUMENT

**I.   THE DISTRICT COURT COMMITTED REVERSIBLE ERROR AND VIOLATED APPELLANT'S SIXTH AMENDMENT RIGHT OF CONFRONTATION BY THE ARBITRARY IMPOSITION OF A BLANKET RULE IMPAIRING CROSS EXAMINATION AND PREVENTING CROSS EXAMINATION ON BIAS**

## STANDARD OF REVIEW

Limitations on cross-examination are reviewed for an abuse of discretion. *United States v. Green*, 202 F.3d 869, 873.

A trial court is accorded discretion to restrict cross-examination but may not bar examination which would allow the fact finder to infer bias, prejudice or lack of credibility. *See e.g., Wright v. Dallman*, 999 F.2d 174, 179 (6th Cir. 1993). Here, the district judge impaired cross-examination by overly stringent and wooden directives to limit cross-examination by not exceeding the scope of direct. R. 1614, Page ID## 19652-19664; R. 1615, Page ID## 19788-19790. Counsel for Castano objected. R. 1615, Page ID# 19788. (An objection by one defendant constituted an objection by all unless a defendant opted out. R. 1615, Page ID# 19796.)

9

The district judge knew from the earlier trial that the case agent, Special Agent Fleming, would be called to the stand repeatedly, that he was the first government person to confront and interview most club members and associates who became witnesses and, therefore, was in a position to potentially influence their decisions to cooperate and their accounts of events.[3]  The district judge also knew there was a government motion *in limine* pending to preclude relevant cross-examination.  Section A, *infra*.

A glimpse of the interaction between Jeffrey Armstrong and SA Fleming dribbled out on redirect examination.  Fleming told him ". . . hey, your name is all over the book" . . . "you might be the next one sitting on the other sider of the bench for perjury."  R. 1615, Page ID# 19913.  Armstrong's remarks led to a demonstration that the scope of any re-cross examination would be even more restricted.  R. 1615, Page ID## 19922, 19923.  Thus, Armstrong could not even be asked if he was ever confronted with the possibility he could be a RICO defendant.  R. 1615, Page ID## 19923, 19924.

The court's pattern entirely insulated witnesses in general and Fleming in particular from significant cross-examination.

---

[3] Courts have noted the potential danger of proceeding in this manner.  *See e.g. United States v. Puckett*, 147 F.3d 765, 770 (8th Cir. 1998).  Compare *United States v. DeLuna*, 763 F.2d 897, 911-912 (8th Cir. 1985); *United States v. Baker*, 2010 WL 3173036, *4 (N.D. Illinois, 2010).

A.    **THE COURT ERRED BY PREVENTING CROSS-EXAMINATION OF GOVERNMENT WITNESS, RONALD ROBERTS, ABOUT HIS POTENTIAL MOTIVE TO FABRICATE, THAT IS, HIS POTENTIAL LIABILITY FOR HOMICIDE**

The government objection to cross-examination of Ronald Roberts about his participation in the murder of a Native American man was sustained. R. 1621, Page ID# 21170. The government claimed there was "no evidence" of his involvement and insinuated bad faith. R. 1621, Page ID# 21174-21176.

Roberts had been implicated by at least 3 individuals in the uncharged homicide R. 1619, Page ID# 20805. Roberts had accepted a Rule 11 which was essentially an adhesion agreement with life guidelines in order to get a government promise of a recommendation of 15 to 23 years. R. 1619, Page ID# 20805. His reliance upon a government substantial assistance motion did not end the issue of motive and bias. A potential for a separate murder charge is an incentive to curry the most favor with the government possible. Bias is an important and acceptable method of attacking the credibility of a witness. *United States v. Manske*, 185 F.3d 770 (7th Cir. 1999).

It should be no acceptable answer to say that the information regarding a potential murder charge was speculative or unreliable when some portion of the evidence came from Michael Mastromatteo and Anthony Clark, witnesses deemed

11

by the government as so reliable they were called in both trials.[4]  As represented by counsel for Drozdowski, a Notice of Good Faith Basis for Questioning Ronald Roberts Regarding Uncharged Murder was later filed with relevant attached witness interviews information.  Notice, R. 1936, Page ID# 29434-29442.

**B.  THE COURT ERRED BY PREVENTING CROSS-EXAMINATION OF ANOTHER WITNESS, ANTHONY CLARK, WITH AN OPEN POTENTIAL HOMICIDE CHARGE WHICH WAS EXCLUDED FROM HIS COOPERATION AGREEMENT WITH THE GOVERNMENT**

Anthony Clark, a RICO convicted Highwayman, testified in an effort to further reduce his sentence.  He had been previously implicated by his club bodyguard, a government witness against Clark and other Highwaymen.  R. 1636, Page ID# 24379-24380.  Government counsel read the pertinent language in Clark's cooperation agreement:

> MR. STRAUS:  So it's not off limits.  It is simply, and this is the language in the cooperation agreement:  "The defendant is aware of an ongoing investigation being conducted by Detroit Field Office of the FBI involving the murder of Lon Butler a/k/a Runaway.  Defendant acknowledges there are no promises or other agreements regarding the disposition of that matter by the United States Attorney's Office.
>
> (Page ID# 24381)

The district judge had banned a full inquiry in Trial 1 and limited reference to a "serious offense" which Defendant Rich suggests was actually misleading.  R.

---

[4] The government only called some witnesses in Trial 1 (like Billy Wadd Smith and Lori Mayday) strategically holding others like Ronald Roberts in reserve for Trial 2.  This of course can minimize contradictory testimony.

1636, Page ID# 24377-24383.  The district judge precluded what it deemed "inflammatory."[5]  So, he ruled that any question mentioning "homicide, murder, death, killing assault, and the like are to be avoided."  Page ID# 24381, 24383.

Defendants, as they were during Roberts' testimony, were prevented from raising an issue of extreme bias or motive.  The court's distilling the referenced homicide to a near meaningless "serious" or even "very serious" trivialized the Sixth Amendment.  Rich's right to cross-examine is fundamental and demands respect.  *Alford v. United States*, 282 U.S. 687, 691 (1931).

For the same reasons and based on the same authorities set forth earlier there is reversible error.  There is no statute of limitations for murder.  The possibility of avoiding the charge by testifying for the government constitutes motive and bias.[6]  A jury could have reasonably concluded Clark, like Roberts, was inclined to testify falsely in favor of the government.  The characterization of the open murder investigation as something merely "serious" or "very serious" is, sadly, a judicially created fiction tending to mislead and impair the truth seeking function.

---

[5] And lacked that same concern about Box Canyon, hearsay about two murders, etc.

[6] Clark's sentence was reduced to 96 months a few weeks after his testimony. (Case 2:06-cr-20465, ECF No. 2761, 12/22/15.)

13

**C.** **THE COURT ERRED BY PREVENTING CROSS EXAMINATION ABOUT THE CASE AGENT'S ROLE IN OBTAINING FALSE CONFESSIONS TO FIRST DEGREE MURDER FROM TWO TEENAGE HIGH SCHOOL DROPOUTS, AN EVENT WHICH ANOTHER DISTRICT JUDGE DESCRIBED AS SUITABLE FOR A JURY TO CONCLUDE THERE WAS A CONSPIRACY TO VIOLATE THEIR CIVIL RIGHTS**

Before Trial 2 the government filed a sealed motion *in limine,* Motion, R. 1443, Page ID## 17378-17411, it was a paean to non-disclosure, insecurity and implacability.[7]  It was also laced with hyperbolic righteousness, personalized ad hominem attack and even asserted a violation of the Michigan Rules of Professional Responsibility.

Defendants had also sought any disciplinary records of Special Agent Fleming as well as, and more importantly, the opportunity to cross-examine regarding his manner of the Kaled/Kuecken interviews and other interviews. Defendants' response was supported by a lengthy Affidavit of an attorney in the *Kaled* case, transcript from the "Walker hearing" and a history from one of the boys' mothers.  Response, R. 1453, Exhibits 1-3, Page ID## 17529-17647.

Defendants' request was reasonable and should have been granted given SA Fleming's conduct in the homicide case.  His credibility was an important issue. He was the face of the investigation and guiding hand in how it was conducted. Additionally, a district judge in *United States v. Bowlson*, 240 F. Supp. 2d 678, 684

---

[7] The sealing of this and necessarily Defendants' Response, R. 1453, Page ID## 17520-17526 runs contrary to public policy.

14

(E.D. Mich. 2005) had earlier credited the defendant over Fleming regarding whether there was actually a "blurt out" making a statement admissible.

The government in its motion mischaracterized SA Fleming's involvement in the murder case suggesting his involvement was "peripheral" and Defendants were engaging in speculation.[8] There was nothing speculative about the youth Kaled's account of what the government claims was merely initial investigation or peripheral. Kaled was in an interrogation room with SA Fleming and a Sgt. Bugbee. Response, R. 1453, Page ID# 17548. His testimony laid out Fleming's critical role.

> A.  The tone in the voice started going up a little.
>
> Q.  How do you mean the tone started to go up?
>
> A.  They started raising their voice a little bit.
>
> * * *
>
> A.  At first it was Sergeant Bugbee and Agent Fleming was remaining calm and just sitting back, and then Agent Fleming got a little heated when I told him I'm telling the truth, I'm not lying.
>
> Q.  Describe for us more particularly what you mean when you say Special Agent Fleming became heated?
>
> A.  It appeared to me that he became angry, raising his --
>
> Q.  How is that shown?

---

[8] The government persisted during trial suggesting Fleming's role was "peripheral." R. 1638, Page ID# 25265. The district judge, ignoring the exhibits supporting Defendants' responsive pleading accepted the government's mischaracterization.

15

A.    <u>He raised his voice and slammed his notebook down</u>.

Q.    This is still Special Agent Fleming?

A.    Yes.

Q.    Slammed his notebook down?

A.    Yes, sir.  And he raised his voice to me and told me I was a liar. And that appeared to me that they, he was getting angry with me.

R. 1453, Page ID## 17552, 17553.

Later,

A.    I had told them repeatedly that I wanted to call my mother.

Q.    Did you ask to speak to anyone other than your mother?

A.    After I had finally said I would like to talk to my mother to see about getting a lawyer, they told me I can't because my mother said she did not want to talk to me.

Q.    How long had you been at Chesterfield when that statement was made?

A.    A good three, three and a half hours.

R. 1453, Page ID# No. 17558.

∗ ∗ ∗

A.    Calling me a liar, telling me they have evidence that I was, I had bought drugs from Mancino's.

Q.    How many times do you think between 8:00 p.m. and let's say midnight would you state that you were called a liar by either Sergeant Bugbee or Special Agent Fleming?

A.    Well over a hundred.

Q.    What was your reaction to that?

16

A.      I became scared, frantic, panicked, confused.  I was crying, and I kept putting my head down and <u>every time I put my head down they said I'm replaying what I did at Mancino's.</u>

R. 1453, Page ID# No. 17560 (emphasis supplied).

Kaled invoked his right to silence, an act that SA Fleming, a trained lawyer, ignored.[9]  Response, R. 1453, Page ID## 17560, 17561.  SA Fleming's conduct was neither honorable, faithful to the Constitution or any genuine truth seeking effort.  *Id. Page* ID# 17607.  Instead, he was feeding his already formulated conclusion.

Incredibly, the government touted the fact that a state court judge found law enforcement credible and disbelieved Kaled and the other boy although the whole world now knows the confessions were false.

There is no question Jonathan Kaled and Frank Kuecken made false confessions to murder and SA Fleming played a role far greater in that process than the government claimed.  The words of Judge Zatkoff remain:

> The Court disagrees with Defendants Bugbee and Horton, and finds that there is sufficient **circumstantial evidence to allow a jury to find that Defendants Bugbee and Horton conspired with the other Defendants to violate Plaintiff Kaled's and Plaintiff Kuccken's constitutional rights.**  For example, the fact that Plaintiff Kaled's confession and Plaintiff Kuccken's confession are somewhat consistent—their confessions agree on the basic facts that both Plaintiff Paled and Plaintiff Kuccken drove to the store together, and Plaintiff Kaled actually went into the store itself and killed Mellow— could lead the jury to believe that the members of the task force had

---

[9] SA Fleming has been a lawyer since 1987.  R. 1613, Page ID# 19471.

17

worked together to ensure that the stories that they fed Plaintiffs Kaled and Kuccken were consistent. This highlighted by the fact that **a jury could find that Defendants Esser and Borowicz told Plaintiff Kaled which facts to confess, and that Defendants Bugbee and Horton gave Plaintiff Kuccken the facts that he should confess.** Moreover, given the undisputed high-profile nature of this murder, the jury could find that **the task force** was under public pressure to find someone—anyone—to blame for this murder, and that these Plaintiffs seemed like good people to blame.

*Kaled, et al. v. Bugbee, et al.*, No. 01-73996; *Kuecken v. Bugbee, et al.*, No. 01-74138. (Opinion p. 20 (emphasis added) Response, R. 1453, Page ID# 17521, Exhibit 4, Page ID# 17650-17694.)

It was of no moment that SA Fleming had the good fortune of not being named in the lawsuit. He was in the same type of position as the often found "unindicted co-conspirators" in criminal cases. Cross examination should have been permitted. When a law enforcement officer (state or federal) attaches an assumption or conclusion to a narrative or puts words in the interviewee's mouth it may bend the narrative, it may shape the interview or the statement. It may lead to an inaccurate statement, a false statement, an embellishment. A gap in memory may be filled in incorrectly.

SA Fleming had interviewed, sometimes repeatedly, virtually every "cooperator" witness. To suggest that he enjoyed some sacrosanct position and had to be shielded from cross-examination in this area was wrong. It violated

18

Defendants' right of confrontation.[10]  *Delaware v. Van Arsdall*, 475 U.S. 673 (1996); *Davis v. Alaska*, 475 U.S. 673, 679 (1986); *Boggs v. Collins*, 226 F.3d 728 (6th Cir. 2000).

Recall the trial testimony of witness Jeffrey Armstrong who claimed at trial he "fronted" Appellant "eight balls" (an eighth of an ounce) two or three times.  R. 1615, Page ID# 19853.  He initially told Fleming he didn't know anything and this was during a "couple of hours" of conversation.  R. 1615, Page ID# 19887.  He did not acknowledge even knowing Appellant until a phone conversation in 2015 when he merely said he had "used" meth with him.  Page ID## 19894-19895.  The first time he ever mentioned the fronting of the small quantity was the day before his Trial 2 testimony.  R. 1615, Page ID# 19895.  He could not even make a courtroom identification and instead identified a photograph.  (Exhibit 62-52).  R. 1615, Page ID# 19835.[11]  The first time he ever saw the photo was the day before.  R. 1615, Page ID# 19892.

---

[10] Additionally, in R. 1453 Page ID# 17522. Defendants adopted and incorporated the averments and exhibits in Co-Defendant Victor Castano's Petition for a Writ of Error Coram Nobis in Criminal No. 05-cr-80554.  Those pleadings were under seal however Rich's counsel understood they would be made part of the record here by counsel for Castano.  In simple terms the Petition dealt with the conduct of the government and SA Fleming and nondisclosure of Brady Giglio material.

[11] Vern Rich testified Michael Rich and another club member named "Reverend" were "twins" in appearance.  "He was – him and Reverend are – looked like twins."  R. 1625, Page ID# 21940.

19

Jeffrey Young "Jethro" testified that SA Fleming had been "relentless." R. 1616, Page ID# 20113.

Michael Rich, like every accused, had the Sixth Amendment right to directly confront every witness. It is no acceptable answer to say all the cooperators could be examined and therefore that dispenses with the right to confront SA Fleming. See *Bullcoming v. New Mexico*, 131 S.Ct. 2705, 2716 (2011).

From the beginning SA Fleming was shielded each time he took the stand. Early on, Defendants filed a Notice of Objection to Limitation of Cross-Examination. Notice, R. 1577 Page ID# 19056. As the end of trial neared, the district judge suggested Defendants could call Fleming as a defense witness. This was not a fair suggestion nor did it preserve Rich's Sixth Amendment right. It violates due process for a defendant to be forced to sacrifice one constitutional right to enforce another. *Simmons v. United States*, 390 U.S. 377, 393-4 (1968).

When counsel for Castano advised the government he would call Fleming and two other agents the government actually invoked the Touhey regulations. R. 1637, Page ID# 25001. (28 C.F.R. §§ 16.21-16.26[12] requiring an affidavit, or if not feasible, a summary of proposed testimony.) This tack completed the diminishment of Appellant's Sixth Amendment right. It had been rendered meaningless.

---

[12] Erroneously cited as "2E" in transcript.

20

## II.   THE DISTRICT COURT ERRED BY ALLOWING THE ADMISSION OF EXHIBIT 13-10 (AN EMAIL FROM SOMEONE NAMED BIG RON) ADDRESSED TO DDMC MEMBERS INCLUDING DEFENDANT REGARDING THE BOX CANYON INCIDENT.

### STANDARD OF REVIEW

Decisions on the admissibility of hearsay are reviewed *de novo United States v. Johnson*, 71 F.3d 539, 543 (6th Cir. 1995).

Defendant made a timely objection in writing to the proposed exhibit. Notice, R. 1551, Page ID# 18683, 84. The admitted exhibit was prejudicial to Michael Rich because it linked him to extreme acts of violence in Arizona which were spontaneous and unplanned according to the government's own witnesses who participated or were present.[13]

Exhibit 13-10, R. 2500, Page ID# 42047 filed 11/21/19 was seized from the residence of Jeff Smith (Fat Dog) on February 19, 2004 and it was hearsay. It did not come under the exception for statements which are not hearsay, i.e., FRE 801(d)(2(E). It was a mere narrative.

Chatter about past events is not admissible. See e.g., *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994). The email, as vague as it was, did not "further" the conspiracy. The "in furtherance" requirement is necessary and not all co-conspirator statements are necessarily in furtherance. Mere conversations

---

[13] See factual discussion in issue regarding the improper inflation of Defendant's guidelines to life. Issue V, *infra*.

21

between conspirators or narrative declarations are not admissible.  *United States v. James*, 510 F.2d 546, 549 (5th Cir. 1975).

The email was sent <u>after</u> the Box Canyon events, albeit closely after.  There were no specifics and no description of the violence.  It was some kind of cheerleading for the expulsion of some members without explanation why.

SA Fleming's own seeming disinterest in the sender or most of the recipients gives pause.  R. 1627, Page ID# 22322.  As he told the jury, the sender was not germane only that it was sent, who received it and where hard copies were found.  R. 1627, Page ID# 22323.  He only "checked" some recipients, not all, assumed it was actually read by recipients and had no thought whether, given the "subject" header, i.e., "Assholes," it had been kicked into any spam folder.  R. 1627, Page ID## 22324-22328.[14]  Nor did SA Fleming even know the correct number of recipients.  R. 1627, Page ID## 22332, 22333.

"Mere narratives" are statements related to past events.  They are mere conversations and may be some form of casual admission.  The "in furtherance" test should be narrow.  *United States v. Perez*, 989 F.2d 1574 (10th Cir. 1993); *United States v. Wolf*, 839 F.2d 1387 (10th Cir. 1988).  The "in furtherance" requirement in Rule 801(d)(2)(E) is intended in part to protect the accused against

---

[14] The district judge impeded cross-examination regarding "assuming" and gave a spontaneous instruction to the jury, which may have caused the jury to think counsel's cross-examination was improper.  R. 1627, Page ID## 22328, 22329.

22

idle chatter of criminal partners as well as misreported information. *United States*

*v. Perez, supra.* See *United States v. Darwich*, 337 F.3d 992, 1009 (6th Cir. 1998).

*Cf. United States v. Castro*, 908 F.2d 85, 91 (6th Cir. 1990).

**III.  THE DISTRICT JUDGE ERRED IN DENYING APPELLANT'S RULE 29 MOTION WHERE THE EVIDENCE IN TRIAL 2 DID NOT PROVE THE EXISTENCE OF A "CONTINUING UNIT" AS REQUIRED BY THE STATUTE.**

<u>**STANDARD OF REVIEW**</u>

The court reviews sufficiency-of-the evidence claims *de novo* and evidence

is viewed in the light most favorable to the government. *United States v. Beddow*,

957 F.2d 1330 (6th Cir. 1992).

The term "enterprise" embraces both legitimate and illegitimate

organizations. *United States v. Turkette*, 452 U.S. 576 (1981). A motorcycle club

is not an illegitimate organization per se.[15]  If the contrary were true there would

not have been the instruction by the Court that mere simple membership alone is

not sufficient to prove guilt.  Nor does the longevity of the club constitute the

requirement of structure with necessary features of common purpose and

relationship.

---

[15] This is so even if some members use drugs, are misogynist or as individuals act in a bad or illicit manner sometimes.

23

The government's witness Keith McFadden testified that not every member of the Devils Diciples Motorcycle Club (DDMC) had engaged in criminal acts. R. 1628, Page ID# 22660. That was a certainty. *Id.*

Anthony Clark, a Highwayman, referred to his club as an "elite" group but Devil Disciples were less so because their motorcycles were "raggedy." R. 1636, Page ID# 24522, 24523. The pejorative "bug eaters," in Appellant's view extends beyond motorcycles. R. 1636, Page ID# 24522. It goes to the lack of a cohesive functioning organization. For example, John Riede said, when he was recently involved working on, processing, changing over stolen motorcycles it was with a nonmember. R. 1617, Page ID# 20576. Many criminal acts were done for individual, not club, purposes.

Admittedly, any group of individuals associated in fact has a wide reach. See e.g., *Ali v. Federal Bureau of Prisons*, 128 S.Ct. 831 (2008). Nevertheless, there was an essential additional requirement, i.e., that members, actually functioned or agreed to function with others as a continuing unit to achieve a common purpose over the span of the conspiracy. Here, there was no continuing unit acting to achieve a common purpose. Rather, it was a disparate collection of individuals with individual acts, agendas, goals and purposes. The club members were clearly a dysfunctional group.

24

There was a lack of meaningful evidence of "leaders" directing other members to carry out illegal acts. Each DDMC chapter had distinct ways of doing things, separate and apart from other chapters. For instance, there was no consistency in application of punishments.[16] Jeffrey Armstrong testified that the Port Huron chapter did not utilize the "black eye" policy. R. 1615, Page ID# 19828. Clearly different chapters functioned independently and differently. John Riede testified "Alabama" (without even differentiating the three separate chapters) had a different set of rules than any other place in the country. R. 1618, Page ID# 20725. Former member, Jeffrey Arnold, like Jeffrey Young, also testified that the club was in no way a fraternal organization. There was:

> A.    No brotherhood, like a bunch of wolves snapping at a carcass all the time.

R. 1615, Page ID# 19960. (Emphasis supplied.)

When the National Vice President Paul Darrah, a supposed leader of this "continuing unit" [sic] was arrested, DDMC member, Darren Sloan, a/k/a/ "Bullet", came to steal his motorcycle, his wallet and his money. R. 1616, Page ID# 20323.

Paul Darrah and Jennifer Cicola, like the Caseys, used the proceeds of their drug transactions for personal gain. Cicola testified that Darrah obtained a zip lock

---

[16] The district judge put great misplaced emphasis on just the opposite.

bag of methamphetamine for resale and the money generated from the drug transaction was used to pay their rent and other bills:

"For mine and Pauli, in our home together."

R. 1616, Page ID# 20237.

Jeffrey Armstrong testified he only sold methamphetamine to people he personally knew for a long, long time and many of those he sold to were not involved with the club R. 1615, Page ID# 19876.  Admittedly, most of his drugs came from club members, but certainly not exclusively.  *Id*. at Page ID# 19876. Contrary to any organized or common purpose, there was nothing organized or set in stone about it.  *Id*. at Page ID# 19877.  It was an individual thing and the selling and buying were individual as well.  *Id*. at Page ID# 19877.  In other words, club "brotherhood" did not suffice to guarantee a transaction. It was an individual issue and not a club issue. *Id*. at Page ID# 19876.

An example of individual drug business, not club business, was the arrest of members Cary Van Diver (Gun Control) and "Trouble" along with a "civilian," for a bag of methamphetamine.  Earlier they had been in the Port Huron clubhouse and evidently kept secret their possession of the meth.  R. 1625, Page ID# 21899-21901.

Self-interest, lack of continuing unit and lack of common goal was demonstrated by Ronald Roberts with respect to both his club and familial brother,

David Roberts. When given a motorcycle to generate bond money for David Roberts, Ronald Roberts sold the Harley Davidson for cash and drugs. R. 1620, Page ID# 20977.  Ronald Roberts "did" the drugs and spent the money, giving nothing to David Roberts.  *Id.* at Page ID# 20977.

Similarly, crimes committed were often personal and not club related. Ronald Roberts' motorcycle theft was an example.  R. 1619, Page ID# 20963.

> "... it's not like it was the club that did it. It was more of a <u>personal thing. We as people</u> did it...."

R. 1619, Page ID# 20963) (Emphasis supplied.)

> "So, therefore, we shouldn't be dragging the chapter into <u>our personal business</u> in that aspect."

Page ID# 20963.  (Emphasis supplied.)

Just like the motorcycle theft by Ronald Roberts, Keith McFadden's insurance fraud and his drug dealing were personal and conducted without overarching common club purpose, or as a "continuing unit."

No better example of the "we as people," separate and apart from the club, was the business activity of Karen Casey and her husband Charles. Karen Casey testified that:

> "<u>I</u> was the first methamphetamine lab that was busted."

R. 1619, Page ID# 20030.

Notwithstanding the seeming personal pride in Karen Casey's testimony it became clear that the drug business was *hers and her husband's* and not the

DDMC's. R. 1615, Page ID# 20046-20049, R. 1743, Page ID# 26876, 26900-26930)[17]  The Caseys dealt with a "Mr. Bill" who was not a member, as well as many others to succeed in their business venture.  *Id.* at Page ID# 26927.  There was nothing to indicate the club as an entity benefited in any way by their separate and personal drug organization.

Club member, John Riede, (Bear) and member, Vernon Rich, routinely dealt with each other but Bear had a partner, "Hank," who was a member of the Vietnam Vets Motorcycle Club. R. 1625, Page ID# 21956. Similarly, the 400 pound marijuana transaction where a buyer reneged was between Vern Rich and Iron Mike (Mastromatteo) personally and was not related in any way to the club or club business. R. 1625, Page ID# 21986.

Michael Mastromatteo, a/k/a/, Iron Mike, had multiple sources including club member "Sleepy," the member that the National President, Jeff Smith, had refused to pay, so Sleepy told Mastromatteo he would give Smith no more.  R. 1638, Page ID## 25126, 25127.  So much for discipline.  Mastromatteo's sources were not always affiliated with, nor members of the Devils Diciples.  R. 1638, Page ID# 25093, 25094, 25096, 25101.[18]

---

[17] Casey's testimony also undermined the government's bald theory that the club as a whole harbored fugitives.  R. 1743, Page ID# 26906.  "Alabama" didn't let Casey, as a fugitive, even come there.  Page ID## 26906, 26907.
[18] There was even a female source, "Teri."  R. 1638, *Id.* at Page ID## 25100, 25101.

The incident where club member "Little Dog" told Mastromatteo he could no longer sell dope in this town apparently because he never got along with Fat Dog (Smith) and the intercession by "Magoo" contradicts any notion of structure and continuing unit.  R. 1638, Page ID## 25120-25123.  Mastromatteo had been selling dope his whole life and wasn't going to stop.  (*Id.*)  Moreover, the fact Mastromatteo steadfastly refused to give money to National President, Smith, flatly contradicts the notion of an enterprise.  R. 1638 Page ID# 25125.  When Mastromatteo made road trips to pick up dope he had a "navigator" as companion, but they did not know about the transactions.  R. 1638 Page ID# 25107-25109, 25111.

Perhaps recognizing the contradictions, inconsistencies and incongruities the government was constrained to prejudice Defendants with hearsay "evidence" of murders introduced by witnesses relating what they heard and understood.  See as an example the testimony of Michael Mastromateo.  R. 1638, Page ID## 25127-25132.  The repeated use of hearsay is exemplified in the question to Tami Allard: "This is things witnessed, learned about, heard from others."  R. 1634 Page ID# 24001, 24002.

Further, there was the prejudicial pervasive evidence of misogyny and abuse of women.  Appellant suggests that even these opprobrious acts were on an individual basis. As in every other aspect there were *individual* acts and not acts of

29

a continuing unit.  Tami Allard was questioned about the treatment of women in "the" Alabama chapter.[19]  Allard testified that Alabama had a higher respect for women.  R. 1635, Page ID# 24095.

Melissa Gordon, a/k/a Little Bit, attempted to bolster the stereotype that club members lived off the earnings of strippers. She claimed Victor Castano *ordered* her to become a stripper in Florida and that he had no job.  R. 1637, Page ID# 24705-24707.   However, she admitted on cross-examination that she was employed as a house cleaner at a condominium complex and in fact, was arrested at that place of employment while cleaning condos.  *Id*. at Page ID# 24781.  Furthermore, she admitted on cross-examination that Victor Castano in fact, was employed as an independent contractor hanging drywall while the two stayed in Florida.  *Id*. at Page ID# 24780.

If diverse acts of drug dealing were on an individual ad hoc basis, so too were the acts of manufacture for personal consumption, simple possession and use.[20]

In the first instance virtually every user brought a history of use of virtually every type of drug before becoming or associating with any club members.  For example, Heather Kaster, who was addicted to crack cocaine and heroin dated

---

[19] There were multiple chapters and Anniston was least mentioned except for McFadden and Stella Herron.

[20] Michael Rich was not charged in a methamphetamine distribution conspiracy count and was acquitted in the marijuana conspiracy count.

Mark Wenglacz, a member of the Vigilante Motorcycle Club and had a "using buddy" with no apparent connection to the DDMC.  R. 1634, Page ID# 23855, 23857, 23865.

Similarly, Melissa Gordon grew up around DDMC members for most of her adult life, but testified that she could not say if drug activity was considered a part of club business.  R. 1637, Page ID# 24654, 24770.

In direct contradiction to a continuing unit with a hierarchical leadership structure, David Drozdowski and Chad Allard refused to provide methamphetamine to "Snake," the President of the Detroit chapter.  R. 1635 Page ID# 24110.

Even the gambling machines were individually owned, first by Michael Mastromatteo (Iron Mike), and then Vern Rich when Mastromatteo was incarcerated. Mastromatteo was in business solely for Mastromatteo and he kept all the proceeds that emanated from his criminal activities for himself.  R. 1625, Page ID# 21941.

When the evidence is viewed as a whole, even in a light favorable to the government, a reasonable mind cannot conclude beyond a reasonable doubt the existence of a continuing unit with common purpose. That is the test. *Jackson v. Virginia*, 443 U.S. 307 (1979); *United States v. Nagi*, 541 F. App'x 556, 569 (2013).

31

A string of unrelated violent acts does not supplant the evidentiary requirement. Any number of acts here were animated by personal animosities. See e.g., *United States v. Banks*, 514 F.3d 959 (9th Cir. 2008). Violent acts here were not an integral aspect of the membership in the club. *United States v. Thai*, 29 F.3d 785 (2nd Cir. 1994). The testimony of Doug "The Thug" Smith is clear that the robbery and kidnapping of Higgins and others and Box Canyon was merely a spontaneous act for individual purpose and gain. *See* Issue V, *infra*.

## IV. THE DISTRICT COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL RELATING TO THE JURY FINDING OF DRUG QUANTITY

### STANDARD OF REVIEW

The test is whether after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the necessary elements beyond a reasonable doubt. The Court reviews denial of a Rule 29 motion under the same standard as the district court. *United States v. Beddow*, *supra*; *United States v. Adamo*, 742 F.2d 927 (6th Cir. 1984), cert denied, 469 U.S. 1193 (1985).

Appellant preserved his right to challenge the jury finding that he was responsible for at least 50 grams of methamphetamine or 500 grams or more of a mixture or substance containing a detectable amount of meth.[21] A written pleading was filed January 1, 2016. Motion, R. 1678, Page ID# 26072, *et seq.* The district

---

[21] Again, he had not been charged in Count 3.

judge ruled in open court more than 2 ½ years later just moments before Appellant's sentence hearing.  R. 2422, Page ID# 35321, Page ID## 35325-35327.

Some evidence alleging Michael Rich dealt in methamphetamine was adduced from Jeffrey Armstrong. Armstrong, from his admitted, "kind of foggier," memory testified on direct examination that Michael Rich was a member of the Port Huron Chapter for "about a year, year and a half."  R. 1615, Page ID# 19833. This was <u>sometime</u> during the late 1980s or early 1990s. R. 1615, Page ID# 19834. The witness could not even make a courtroom identification. *Id.* at Page ID# 19835.  Instead, he identified a photograph which he was shown for the very first time the day before he testified.  (Exhibit 62-52, R. 1615, Page ID# 19835)

Armstrong also testified that he had fronted some drugs "here or there, not large amounts."  R. 1615, Page ID# 19853.

Q. So an eighth of an ounce?

A. Yeah.

Q. And how often did you front him an eighth of an ounce?

A. I couldn't say it was a lot. I'd say it <u>only</u> maybe happened with me and him maybe a couple times, <u>a couple</u>, <u>two or three times</u>.

Q. Okay.

A. When he came from Bay City, he didn't have a job. And there was a few times he approached me and said, hey, could you help me out here so I can get a few dollars in my pocket.

Q. Okay.

A. And I did.

*Id.* at Page ID# 19853. (Emphasis supplied.)

That testimony never had apparently been mentioned in Grand Jury testimony, prior trial testimony, recorded interview or prior telephone interviews. R. 1615 Page ID# 19890. He did not even acknowledge knowing Appellant until a phone conversation in 2015 when he merely said he had "used" meth with him. R. 1615, Page ID## 19894, 19895. The first time he ever mentioned "fronting" the small quantity was October 6, 2015, the day before he testified. R. 1615, Page ID# 19895.

The small amount of drugs attributed to Appellant by Armstrong fails to come close to any necessary threshold amount to support the jury finding. Nor did the testimony of other meth dealers (Karen Casey, John Riede, Vern Rich, Michael Mastromatteo) provide any additional support whatsoever. Moreover, the fact that all these dealers had sources of supply or customers who were not club members, often acted in secret and Michael Rich's geographical separation further clouds issues of quantity and knowledge. Nor was Appellant ever linked to any specific event involving significant distribution or manufacture of methamphetamine.

In the district court the government touted the "evidence as a whole" ignoring the reality that the evidence as a whole had little to do with Appellant individually. Rich was in Anniston, Alabama for the vast majority of the relevant timeframe.

34

As noted by one of the government's witnesses, Vern Rich, on direct examination by the prosecutor:

Q.    All right. And do you have an understanding of what he was doing in Alabama?

A.    Absolutely nothing.

* * *

Q.    All right. Do you know why he was there?

A.    I guess no other place -- you know, what better place to go hang out if he was going to do nothing.

R. 1625 Page ID# 21941.  (Emphasis supplied.)

The district judge's partisan conclusion was that Rich had a "low level of energy" . . . an accusation of "laziness."  R. 2422, Page ID# 35326.

The only witness directly implicating Michael Rich was Jeffrey Armstrong. Vern Rich's testimony calls into question even the accuracy of these small amounts.  Vern Rich described Armstrong as dealing in half eight balls (a sixteenth of an ounce).  R. 1625, Page ID## 21902, 21904.

The drug dealing was like so many other crimes, on ad hoc individual basis. The government employed and the district judge approved the "dragnet conspiracy" approach rejected by this Court in *United States v. Campbell*, 279 F.3d 392 (6th Cir. 2002).

The government likes to tout Michael Mastromatteo regarding quantities but ignores Vern Rich's testimony that Iron Mike was secretive.  R. 1625, Page ID#

35

21908. Ronald Roberts testified that the two biggest distributors who were Devils Diciples were Mastromatteo and Vern Rich. R. 1621, Page ID# 21258, 21259. More importantly, with regard to simple drug use Roberts could not even say how many times he <u>may have</u> merely used meth with Michael Rich. R. 1620, Page ID# 21112. Significantly, in the important larger context, use at parties according to Roberts, was "secluded" – not done in the wide open. R. 1620, Page ID# 21112.

In the last analysis the government is constrained to rely on Michael Rich's longtime membership and the unsupported conclusion that he must have known everything happening in Michigan, California or Ohio. This is the same inadequate conclusion they used to justify life guidelines. (Issue V, *infra*) This, for the man who Vern Rich said, did absolutely nothing, and Ronald Roberts said did not even use drugs after his heart attack in 2001.

## V. MICHAEL RICH'S SENTENCE WAS PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE

### <u>STANDARD OF REVIEW</u>

The district court's interpretation of guidelines involve mixed questions of law and fact and are review *de novo*. *United States v. Parrish*, 915 F.3d 1043 (6th Cir. 2019).

### A.    THE GUIDELINE CALCULATION OF "LIFE" WAS WRONG BECAUSE IT WAS PREDICATED ON THE ERRONEOUS THINKING THAT A CLUB MEMBER WAS RESPONSIBLE FOR EVERY SINGLE ACT PERPETRATED BY ANY OTHER MEMBER ANYWHERE IN THE COUNTRY

It is no small irony that seven weeks after imposing a sentence upon Michael Rich that he cannot likely survive, the district judge at Victor Castano's sentence, referred to Rich as:

> ". . . hidden out down in the woods in Alabama, had one foot either out the door or in the grave, I'm not sure which, maybe both analogies would be appropriate, and was less active as years went on . . . but he struck me as being more or less of retirement age." R. 2429, Page ID# 36153, 35154)[22]

Following his conviction and remand in December 2015 Defendant, adhering to the Court's directed format, filed objections with the Probation Department totaling 114 pages.[23] First Presentence Report and Addendum. Then the process stopped. A conference with counsel for defendants from both trials, all Probation Officers and supervisors and the government was conducted in June 2016 (there is no Record number). Defendants were required to make common objections jointly. Order Resolving General Sentencing Issues For Trial Defendants R. 2127, Page ID## 30765-30774, October 16, 2017. On November 9, 2017 the government filed a sealed Memorandum Specifying Racketeering

---

[22] With due respect to the court the recollection of "plenty active and being involved in "some pretty disgusting violent behavior" is inaccurate.

[23] Length due in part to the Court's specific form which required a line by line, paragraph by paragraph reiteration.

Activities of 321 pages R. 2142, Page ID# 30828 *et seq.*[24]  The pleading later referred to by the government as a "treatise," is in spite of length, easily distilled to the notion that accountability for diverse acts all over the country often perpetrated for individual motive and purpose is reduced to chronology of membership.  R. 2142, Page ID# 30828 *et seq*.  In other words, if a defendant was a member at the time of the act he is automatically responsible.  A sincere application of the requirements of knowledge or reasonable foreseeability was unnecessary.  The law that mere membership is not evidence of guilt was a nullity.

The district judge accepted the government's suggestion August 17, 2018.  Order, R. 2268, Page ID## 31867-31883.  Respectfully, the Order trivialized the doctrines of reasonable foreseeability and jointly undertaken activity with regard to the subjects of methamphetamine, the so called Box Canyon and two homicides which drove the life guidelines calculation as well as other diverse personal acts.  The district judge erred.  Appellant's guidelines of "life" were grossly miscalculated.

A sentence is procedurally unreasonable if the district court incorrectly calculates the guidelines or bases it on erroneous facts.  *Gall v. United States*, 522 U.S. 38, 51 (2007); *United States v. Barahona-Montenegro*, 565 F.3d 980 (6ᵗʰ Cir. 2009).  In order to hold a defendant responsible for the conduct of others, the trial

---

[24] A pleading that the government wrote "is not likely to be repeated any time soon . . . God willing."  R. 2142, Page ID# 30829.

court must find that the conduct was: (1) <u>within the scope</u> of the jointly undertaken criminal activity, (2) <u>in furtherance</u> of that jointly undertaken criminal activity, <u>and</u> (3) reasonably foreseeable as part of the criminal activity.  U.S.S.G. § 1B1.3(a)(1), commentary, application note 3(A).    Moreover, there is <u>no</u> automatic accountability.  *United States v. Saro*, 24 F.3d 283 (D.C. Cir. 1994).

It is well-established that the scope of others' conduct for which an individual defendant may be held accountable at sentencing is significantly narrower than the scope of a conspiracy at trial.  *United States v. Swiney*, 203 F.3d 397 (6th Cir. 2000), cert. denied, 530 U.S. 1238 (2000).  An examination of the so-called "Box Canyon" incident which took place approximately 1,734 miles from Rich in Anniston, Alabama is illustrative of the district judge's faulty thinking.

The government had two (2) separate theories for liability for those members of the club at the time of the events.  The government argued that defendants McKeoun, Darrah, Van Diver and Rich, are liable under U.S.S.G. § 1B1.3(a)(1)(B) (jointly undertaken criminal activity).  While Defendants Smith and Witort were liable under U.S.S.C.G. § 1B1.3(a)(1)(A) (aiding and abetting).

There were multiple examples throughout Rich's trial showing the reality that mere membership alone did not demonstrate accountability.

The record evidence in general showed a disparate collection of individuals often animated, sometimes spontaneously, by purely individual agendas, purposes,

motives, and goals.  Many acts were spontaneous and unplanned.  This is the opposite of jointly undertaken activity.[25]  Former member Jeffrey Arnold provided insight.  The club was:  "No brotherhood, like a bunch of wolves snapping at carcass all the time."  R. 1615, Page ID# 19960 (emphasis supplied).  After finding that "bylaws" impacted foreseeability.  Order, R. 2268 at Page ID# 31875.  The court was constrained to turn the legal concept of foreseeability on its head by essentially suggesting that completely unpredictable violence was "jointly undertaken activity."  Order, R. 2268, Page ID## 31867-31883.

The testimony of actual Box Canyon participants proves the point.  John Altman described the five members who were assaulted because of their role, and alleged torture of a woman as "a special clique"  R. 1622, Page ID# 21364.  They were a bunch of bums without a lot of organization at all.  R. 1622, Page ID# 21405.  Altman's understanding, as he said on direct examination, as a member, of what was to happen, was far different from what actually occurred.  R. 1622, Page ID# 21373.  He was shocked.  *Id.* Page ID# 21381.  The incident was an unexpected escalation.  *Id.* Page ID# 21381.  If that is the case, then how could it be jointly undertaken activity in furtherance, or reasonably foreseeable to others in other parts of the country, especially in the absence of evidence of knowledge of the precipitating event or any plan to depatch.

---

[25] Rich adopts and incorporated facts referenced elsewhere in his brief in the Statement of Facts, Issue II, III and IV, *supra*.

40

Altman's expectation was that the five were to have their colors and patches taken and they might be beaten a little bit. R. 1622, Page ID# 21417. In fact, there was <u>no</u> plan before the event. *Id.* at Page ID# 21417. This expectation was based on his own experience in the club. What happened greatly surprised him. *Id.* Page ID# 21417. It shocked other members there as well. *Id.* His belief was reasonable because "that's what they do." R. 1622, Page ID## 21417, 21418. The prosecutor's re-direct direct examination did not contradict Altman's expectation but rather confirmed the reasonableness of it. When a member is "run down the road" (kicked out) they <u>might</u> get a black eye. R. 1622, Page ID## 21420, 21421 (emphasis supplied).

Doug Smith's testimony did not prove joint undertaking, or reasonable foreseeability either. He figured they might go to Tucson and hear a bunch of denials.

So, there is good chance we would have went down there for nothing.

\* \* \*

It wasn't like. Go down there, and, beat these guys to pulps and take their patches off." R. 1622, Page ID# 21471.

Smith explained, for California chapters, that for other punishments besides getting kicked out of the club you could lose the center rocker from colors, lose the wheel and be demoted to "prospect" *Id.* Page ID# 21529.

41

The bottom line was that no one had set out to Tucson at the time "to kill anyone." R. 1623, Page ID# 21484. They went down to "peel" several patches off. R. 1623, Page ID# 21596. Smith didn't go with an understanding to rob anyone of money. *Id.* Page ID# 21597. But, that is what happened. *Id.* Page ID## 21597, 21598.

Moreover, Cuz had his own personal motive to inflict violence. R. 1622, Page ID# 21484. He was upset because he got ousted and his wife was reportedly sexually assaulted by the five. R. 1622, Page ID# 21563. The Arizona members who took over had their own motives and "they really took advantage of the situation." *Id.* Page ID# 21484.

> We were going to go to the Arizona clubhouse and remove five guys
> and their patches from that establishment. *Id.* Page ID# 21476.

The government touted a post event email (inadmissible hearsay) (Issue II, *supra)* which contained no specifics of what had actually occurred. The email was sent to more than twenty (20) persons, many of which the FBI apparently did not even try to identify.

The email (13-10) R. 2500 was also sent to William, "Billy Wadd", Smith, amongst others, because he was "boss of the west side" (Detroit). Trial 1 Transcript, R. 1113, Page ID# 9785. The subject was a rather generic pejorative

("ass holes").[26]  He apparently had <u>no</u> understanding of what had happened from the content of the email when he received it.  R. 1113, Page ID# 9793.

Instead, Billy Wadd Smith drew some understanding <u>later</u>, probably in the summer, from a state meeting that Big Rigs, Two Dogs, Pan Head, Golf Club, and Johnny Old School had done something to a Hell's Angels old lady and it had been "dealt with."  R. 1113, Page ID# 9794.  This was "brief."  *Id*. Page ID# 9795.  Still later, while picking Cuz up at the airport Cuz asked Smith and Dino if they had knowledge of what had happened in Arizona.  Their answer "Not really."  R. 1113, Page ID# 9797.  He said "I heard there was a little trouble, huh?" and only then got an explanation.  R. 1113, Page ID# 9797.  The later, after the fact description in the context of William Smith's earlier testimony serves only to show the events were not reasonably foreseeable.  *Id*. Page ID## 9801-9804.

The errors here are the same as those in *United States v. Mulder*, 273 F.3d 91 (2nd Cir. 2001); *United States v. Johnson*, 378 F.3d 230 (2nd Cir. 2004).

In *United States v. Mulder*, *supra*, the defendants belonged to a "labor coalition" [sic], which engaged in extortion of money and no-show jobs from contractors.  The entity was known as Brooklyn Fight Back ("BFB").  They had a reputation for violence.  A co-conspirator, Mulder, shot a member of a rival coalition so many times that he was unrecognizable.  The district court judge found

---

[26] Smith was not called in Trial 2, perhaps a reflection of how poor his demeanor had been.

43

that the murder was relevant conduct for all defendants and that it came within the scope of jointly agreed upon conduct which was reasonably foreseeable.

The Second Circuit, after noting that some of the no-show jobs were for a member of the Gambino crime family, vacated one defendant's sentence with a directive to resentence him, not at level 43 and not taking into account the murder. All of the defendants had 17-20 year sentences, which the Second Circuit described as "harsh" even when driven by the murder. "Mere knowledge of another participant's criminal acts" or "of the scope of the overall operation" will not make a defendant responsible. The Court made clear that the murder was not foreseeable solely because BFB members committed other acts of violence. On remand, the district court was directed not to find that Riddick's murder was foreseeable to McCall and Johnson solely because BFB members committed other acts of violence. *Id*. 157.

At resentencing, the district judge erred again. In *U.S. v Johnson*, *supra*., the successor appeal, the Second Circuit reviewed the two prongs, i.e. scope of agreement and foreseeability. The murder could not be considered when sentencing Johnson. Even the "particularized" findings by the district judge were inadequate. Johnson was not part of an agreement to kill Riddick. Nor was it foreseeable. There had to be a "closer link."

44

Recognizing the preponderance standard. "generally" satisfies due process, a higher standard may be necessary, as here, where the "tail" of relevant conduct "wags the dog of the substantive offense."  See generally *United States v. Watts*, 519 U.S. 148, 156 and fn.2 (1997).

The district judge's attempt to distinguish *Mulder* and *Johnson* because they were "not RICO conspiracy cases" (Page ID# 31876) is superficial and simply ignores that the Second Circuit correctly set forth critical legal principles about foreseeability, accountability and jointly undertaken activity.  There is no special exception for RICO to evade those legal principles, the Constitution or the provisions of the sentence guidelines.  The district judge's reliance on "culture" and rules inconsistently applied or ignored does not justify the assorted calculations here.  The district judge's bad thinking is encapsulated in the chart of entry dates to the club at page 13.  Order, R. 2268, Page ID# 31879.

The district judge, contrary to U.S.S.G. § 1B1.3, even extended the miscalculations to assorted acts in 2014 and 2015 occurring <u>after</u> the end of the conspiracy and post-indictment.  Appellant had been arraigned and living peacefully in Alabama on bond with not a hint of any communication with co-defendants, many of whom he did not even know.  These included threats in jails like Anthony Clark's alleged "shiv" testimony contradicted by a sworn affidavit by

45

the non-club member.  *See e.g. United States v. Melton*, 131 F.3d 1400 (10th Cir. 1997); *United States v. Collado*, 975 F.2d 985 (3rd Cir. 1992).

The government demonstrating its penchant for going in opposite directions at the same time earlier withdrew the assertion that Appellant was accountable for one such alleged post indictment threat by Castano to member Darren Sloan or witness Melissa Gordon.  R. 2268, Page ID# 31883.  At sentencing Appellant Rich observed that they had given no reason for withdrawing it and Defendant asked the Court to inquire.  The government's response was:

> MR. STRAUS:  I think there's a mixed reason there.  I don't think it adds anything to the analysis, but there's most definitely a personal aspect to – R. 2422, Page ID# 35352).  (Emphasis supplied.)

There were "personal aspects" to most of the other various acts Michael Rich was held responsible for.  Just a single good example was the incident involving Jeff Smith and Jeffrey Young (Jethro) precipitated by jealousy and the desire of each to be with some woman named "Christine."  Addendum to Presentence Report A32.  Personal aspect was ignored and the incident swept under the generalized category of "endemic" violence.  R. 2422, Page ID# 35354.

**B.    THE DISTRICT JUDGE PUNISHED RICH FOR EXERCISING HIS CONSTITUTIONAL RIGHT TO A TRIAL**

Aside from the battery of miscalculation the district judge asked the following question at the conclusion of counsel's allocation:

46

THE COURT:  I do have one question before you sit down.  Of course, the defendant has a constitutional right to test the Government's case at tiral.  He's exercised that right, longstanding under the Constitution and the common law.  He was, though, offered an opportunity to concede his guilt in advance and to receive a recommendation, and perhaps a limitation on sentencing?  R. 2422, Page ID# 35386.

* * *

THE COURT:  And the conclusion is the defendant rested upon his right to test the proofs at trial?  R. 2422, Page ID# 35387.

What permissible reason was there for this initial question and the rhetorical question which followed?  Appellant contends there is no acceptable explanation. The court evinced the intent to punish, in some measure, the failure "to concede his guilt . . . ."  (*Id.*)  "Punish[ing] a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort."  *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978); *V.I. v. Walker*, 261 F.3d 370 (3rd Cir. 2001); *United States v. Cruz*, 877 F.2d 732 (2nd Cir. 1992).  This, separately rendered the sentence procedurally unreasonable.

**C.    THE DISTRICT JUDGE IMPOSED A "*DE FACTO*" LIFE SENTENCE OF 30 YEARS WHICH WAS NOT INDIVIDUALIZED AND IGNORED THE STATUTORY MANDATE TO IMPOSE A SENTENCE SUFFICIENT BUT NOT GREATER THAN NECESSARY**

Moreover, Appellant contends the district judge failed to consider other factors under 18 U.S.C. § 3553(a) or adequately articulate his reasoning for imposing a 30 year sentence on this particular offender.  Appellant filed a

47

Sentencing Memorandum, R. 2285 and a Sealed Motion for Variance From

Advisory Guideline Range, R. 2284 which presented an offender who:

1.  Served 14 years in the United States Coast Guard earning four Good Conduct Medals, including outstanding evaluation.  R. 2285, Page ID## 31927, 31928.

2.  Has a veteran's disability pension and longtime treatment history for Posttraumatic Stress Disorder and Major Depressive.  R. 2284.

3.  Has a longtime permanent coronary condition, congestive heart failure, and defibrillator since 2002.  The court was provided with a summary of medical records from the U.S. Bureau of Prisons since the date of remand in December 2015.  Motion, R. 2284, Page ID## 31924-31926.

4.  Had a number of other acts and circumstances in his papers, R. 2284 and R. 2285, which as his longtime companion Eleanor Shiner, a Honda employee, show that he "is not like so many others."  R. 2285-Exhibit 3, Page ID #31965, 31966.

5.  During trial he left court in an ambulance because of heart issues and subsequently waived his presence in the future in the event of another incident.  R. 2422, Page ID# 35378.

The district judge's error is the same made in *United States v. Thomas*, 498

F.3d 336 (6th Cir. 2007).  Respectfully, this Court cannot be satisfied there was a

reasoned basis for the sentencing judge's own legal decision making.  *United*

*States v. Robertson*, 309 Fed. Appx. 918 (6th Cir. 2009).

This was a one size fits all mechanical process which ignored not only the

above circumstances but also the information from Appellant's longtime

companion who works at Honda and his neighbors in Anniston which served to put

him in a position distinct and separate from club members in general.

48

The sentence imposed was for many of the same reasons substantively unreasonable.  It was arbitrary, and unreasonably weighted by mere membership. *United States v. Conaster*, 514 F.3d 508 (6th Cir. 2008).  The length of the sentence which will likely end only by death should be considered.  *United States v. Klups*, 514 F.3d 532 (6th Cir. 2008).  It was a defacto death sentence.  *Cf. United States v. Jenkins*, 854 F.3d 181 (2nd Cir. 2019).

As Judge Martin, Jr. noted in *United States v. Wilson*, 614 F.3d 219 (6th Cir. 2010) sentencing should be an "intensely human exercise."  It should not be a mechanical *auto-de-fé*.  For all the reasons the sentence should be vacated and remanded for resentencing before a different judge.  *Cf. United Stares v. Reyes*, 313 F.3d 1152 (9th Cir. 2002).

## <u>CONCLUSION AND RELIEF SOUGHT</u>

In light of the foregoing arguments, Appellant, Michael Kenneth Rich asks this Court to vacate his conviction and sentence and remand for a new trial and/or for resentencing.

Dated:   December 3, 2019                    Respectfully submitted,

                                             s/ Robert M. Morgan
                                             Robert M. Morgan (P23144)
                                             615 Griswold St., Suite 1125
                                             Detroit, MI  48226
                                             (313) 961-7070
                                             morgancrdefense@ameritech.net
                                             *Attorney for Defendant-Appellant*
                                             *Michael Kenneth Rich*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

 X    This brief contains 11,855 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

 ___   This brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because:

 X    This brief has been prepared in a proportionally spaced typeface using Microsoft Word with 14 Times New Roman.

 ___   This brief has been prepared in a monospaced typeface using _____ with _____.

Dated:   December 3, 2019              Respectfully submitted,

                                       s/ Robert M. Morgan
                                       Robert M. Morgan (P23144)
                                       615 Griswold St., Suite 1125
                                       Detroit, MI  48226
                                       (313) 961-7070
                                       morgancrdefense@ameritech.net
                                       *Attorney for Defendant-Appellant*
                                       *Michael Kenneth Rich*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 3, 2019, I electronically filed the foregoing paper using the Court's ECF system, which will send notification of such filing to all counsel of record.

<div style="margin-left: 50%;">

s/ Robert M. Morgan

Robert M. Morgan (P23144)

*Attorney for Defendant-Appellant*

*Michael Kenneth Rich*

</div>

## ADDENDUM – CASE NOS. 18-2268 & 18-2269

*United States of America v. Michael Kenneth Rich*
**Defendant-Appellant Michael Kenneth Rich's**
**Designation of Relevant District Court Documents**

| Description of Entry | Record Entry Number | Page ID# Range |
|---|---|---|
| Indictment (11-cr-20066) | 3 | 7-20 |
| Third Superseding Indictment (11-cr-20129) | 72 | 590-672 |
| Judgment (11-cr-20129) | 2305 | 32799-32806 |
| Judgment (11-cr-20066) | 397 | 17497-17503 |
| Notice of Appeal (11-cr-20066) | 395 | 17494, 14795 |
| Notice of Appeal (11-cr-20129) | 2321 | 32715-32716 |
| Trial Transcript Vol. 3 | 2431 | 36276-36480 |
| Trial Transcript Vol. 5 | 1615 | 19784-20060 |
| Trial Transcript Vol. 7 | 1616 | 20062-20344 |
| Trial Transcript Vol. 8 | 1617 | 20346-20597 |
| Trial Transcript Vol. 9 | 1618 | 20599-20776 |
| Trial Transcript Vol. 10 | 1619 | 20777-20964 |
| Trial Transcript Vol. 11 | 1620 | 20966-21164 |
| Trial Transcript Vol. 12A | 1621 | 21166-21339 |
| Trial Transcript Vol. 13 | 1622 | 21340-21578 |
| Trial Transcript Vol. 15A | 1623 | 21581-21758 |
| Trial Transcript Vol. 16A | 1625 | 21837-22048 |
| Trial Transcript Vol. 18 | 1627 | 22285-22594 |
| Trial Transcript Vol. 19 | 1628 | 22595-22927 |
| Trial Transcript Vol. 6A | 1743 | 26860-26951 |
| Trial Transcript Vol. 20 | 1629 | 22934-23254 |
| Trial Transcript Vol. 24 | 1634 | 23825-24053 |
| Trial Transcript Vol. 25 | 1635 | 24055-24373 |
| Trial Transcript Vol. 26 | 1636 | 24374-24620 |
| Trial Transcript Vol. 27 | 1637 | 24622-25008 |
| Trial Transcript Vol. 28 | 1638 | 25010-25270 |
| Sentence Hearing | 2422 | 35318-35404 |
| Trial 1 Transcript Vol. XXI | 1113 | 9760-9981 |

A-2

| Notice of Good Faith | 1936 | 29434-29442 |
|---|---|---|
| Motion in Limine by Government | 1443 | 17378-17411 |
| Defense Response | 1453 | 17520-17757 |
| Notice of Objection | 1551 | 18683-18684 |
| Exhibit 13-10 | 2500 | 42047 |
| Joint Motion for Acquittal | 1735 | 26651-26663 |
| Appellant Rich's Motion for Acquittal re: Drug Amount | 1678 | 26072-26078 |
| Order Regarding Sentence Issues | 2127 | 30765-30774 |
| Government Sealed Memorandum | 2142 | 30828-31148 |
| Order | 2268 | 31867-31883 |
| Sentencing Memorandum | 2285 | 31949-31968 |
| Sealed Motion for Variance | 2284 | 31923-31948 |