**Nos. 18-2323/2324/2342/2364/2365/2401/2407/2408/2410**

In the United States Court of Appeals
for the Sixth Circuit

---

**United States of America,**

Plaintiff-Appellee,

v.

**Cary Dale Vandiver (18-2323/2324), Patrick Michael McKeoun (18-2342), Jeff Garvin Smith (18-2364/2365), David Randy Drozdowski (18-2401), Paul Anthony Darrah (18-2407/2408), and Vincent John Witort (18-2410),**

Defendants-Appellants.

---

On Appeal from the United States District Court
for the Eastern District of Michigan
Nos. 11-cr-20129; 11-cr-20066 (Hon. Robert H. Cleland)

---

**Brief for the United States**

---

Matthew Schneider
United States Attorney

Sheldon Light
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9574
Sheldon.Light@usdoj.gov

# Table of Contents

Table of Authorities ........................................................................ vi

Request for Oral Argument ........................................................ xvii

Introduction ..................................................................................... 1

Issues Presented .............................................................................. 4

Statement of the Case .................................................................... 14

I.    The Devils Diciples Motorcycle Club: bad to the bone ................. 18

II.   Devils Diciples: Meth R Us ............................................... 24

III.  Devils Diciples: Violence with a purpose ..................................... 34

IV.   Devils Diciples: Gambling and motorcycle theft ......................... 42

V.    Devils Diciples: Evading and obstructing justice ........................ 43

Summary of the Argument ................................................................ 45

Argument ........................................................................................ 52

I.    The evidence supported the defendants' convictions .................... 52

    A.    Count 1: RICO Conspiracy (Smith, Darrah, Witort, McKeoun) ............................................................ 53

    B.    Count 2: Illegal gambling business (Smith, +Darrah) ........ 67

    C.    Count 3: Narcotics conspiracy (Smith, Darrah, Witort) ...... 70

    D.    Count 5: Distribution of methamphetamine (Darrah) ........ 72

    E.    Count 26: Conspiracy to obstruct justice by witness tampering (Smith, +Darrah) ............................................. 74

i

F.    Count 29: Assault in aid of racketeering activity—
      Michele Richards (Smith) .................................................... 76

G.    Count 30: Assault in aid of racketeering activity—
      Scott Perkins (Smith, Darrah) ............................................ 80

H.    Count 36: Assault in aid of racketeering activity—
      Robert McClure (Drozdowski) .............................................. 81

I.    Count 37: Felon in possession of ammunition
      (Drozdowski) ...................................................................... 86

J.    Part II, Count 1: Conspiracy to suborn perjury and
      obstruct justice (Smith, +Darrah) ........................................ 88

II.   The district court did not err in its jury instructions (Smith,
      +McKeoun, +Darrah, +Vandiver, +Witort) .................................. 90

A.    The RICO conspiracy instructions were correct .................. 91

B.    The interstate commerce instruction was correct .............. 96

C.    The Michigan murder instructions were correct ................. 97

D.    The RICO unanimity instruction was correct, and the
      district court did not abuse its discretion in declining
      to submit special interrogatories on racketeering acts
      or overt acts (Smith, McKeoun, +Darrah, +Vandiver,
      +Witort) ............................................................................ 100

E.    The district court did not abuse its discretion by
      departing from the Sixth Circuit pattern instruction
      on reasonable doubt (Smith, Vandiver, +McKeoun,
      +Darrah, +Witort) ............................................................. 102

F.    The district court correctly declined to give a
      cautionary instruction regarding the Cadillac murder ..... 105

G.    The district court did not abuse its discretion by
      declining to give an addict-informant instruction ............. 107

H.    The district court gave proper supplemental instructions to address the jury's questions on conspiracy to manufacture, distribute, and possess with intent to distribute controlled substances................. 109

I.    The district court was permitted to send the redacted indictment to the jury, including overt acts alleging how the enterprise operated and committed its racketeering activities ..................................................... 115

III.    The district court did not abuse its discretion in its evidentiary rulings, and any errors that may have occurred were harmless............................................................................ 118

A.    The case agent's lay opinion testimony was properly admitted, and any mistakes were harmless (McKeoun, Vandiver, Witort, +Smith, +Darrah)............... 119

B.    The district court did not abuse its discretion by admitting co-conspirators' statements under Fed. R. Evid. 801(d)(2)(E) (Smith, +McKeoun, +Darrah, +Witort)............................................................................. 129

C.    The district court did not abuse its discretion by admitting testimony about the Cadillac murder under Rule 801(d)(2)(E), and any error in this regard was harmless (McKeoun)...................................................... 137

D.    It was not plain error to admit evidence of the Cadillac murder and the Box Canyon beatings, which was relevant evidence of the enterprise's operations and racketeering activities. (Vandiver, +McKeoun, +Smith +Darrah, +Witort)................................................ 141

E.    Reference to a polygraph report found in a search of a DDMC leader's house was not error, much less plain error (Witort)................................................................. 145

iii

F.    The district court did not abuse its discretion in admitting, over a Rule 403 challenge, a photograph of Drozdowski brandishing handguns (Drozdowski)............ 147

IV.   The wiretap affidavits provided a substantial basis for the issuing judge's findings of probable cause and need, and Darrah was not entitled to a *Franks* hearing (Darrah, +McKeoun, +Smith, +Vandiver, +Witort) ................................. 150

A.    The affidavits established probable cause that the wiretap would reveal evidence of a listed crime................ 152

B.    The affidavits met the statutory "needs" requirement...... 162

C.    There was no basis for a *Franks* hearing. ......................... 164

V.    The prosecutor's remarks in her rebuttal argument were not improper, were not flagrantly improper, and were not plain error (McKeoun, Vandiver, +Smith, +Drozdowski)........... 166

VI.   The prosecutor reviewed the terms of cooperating witnesses' plea agreements during their testimony. This was not vouching for their credibility, nor was it plain error. (Witort)................................................................. 179

VII.  The government provided discovery materials fully and timely to the defense. (Vandiver, Witort) .................................. 184

VIII. Defendants made a perfunctory motion for new trial. It was denied by the district court. Defendants' appeal of this ruling is similarly perfunctory, and should be rejected. (Vandiver, +McKeoun, +Smith, +Darrah, +Witort) ................... 191

IX.   The district court reasonably accommodated Witort's right to his counsel of choice by permitting the lawyers his family retained just two months before trial to join his defense, but not to replace the appointed counsel, and Witort waived any objection to that resolution (Witort)........................................... 193

iv

X.    The district court imposed procedurally and substantively
reasonable sentences (Smith, Darrah, Witort, McKeoun).......... 202

    A.    Relevant conduct............................................................ 203

    B.    Smith: offense level 57, criminal history I......................... 210

    C.    Darrah: offense level 56, criminal history III.................... 211

    D.    Witort: offense level 48, criminal history I....................... 214

    E.    McKeoun: offense level 50, criminal history III ................ 216

XI.    Adoption has limits (McKeoun, Smith, Darrah, Vandiver,
Witort)................................................................................. 218

Conclusion................................................................................. 221

Certificate of Compliance with Rule 32(a).......................................... 222

Certificate of Service................................................................... 223

Relevant District Court Documents ................................................. 224

# Table of Authorities

**Cases**

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ...................................... 205

*Black v. Ryder/P.I.E. Nationwide, Inc.*,
    15 F.3d 573 (6th Cir.1994) ...................................................... 143

*Bourjaily v. United States*, 483 U.S. 171 (1987) ................................. 133

*Boyle v. United States*, 556 U.S. 938 (2009) ..............................54, 55, 59

*Burton v. Renico*, 391 F.3d 764 (6th Cir. 2004) ..................................... 99

*Callanan v. United States,* 881 F.2d 229 (6th Cir.1989) ..................... 206

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) ...................152, 161

*Franks v. Delaware,* 438 U.S. 154 (1978) ............................151, 164, 165

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
    492 U.S. 229 (1989)................................................................62, 63

*Illinois v. Gates*, 462 U.S. 213 (1983)................................................ 152

*Jackson v. Virginia*, 443 U.S. 307 (1979).........................................52, 89

*Kotteakos v. United States*, 328 U.S. 750 (1946)................................. 141

*Molina-Martinez v. United States*, 136 S. Ct. 1338 (2016).................. 125

*Morris v. Slappy*, 461 U.S. 1 (1983).................................................... 201

*Northland v. Stewart Title Guar. Co.*,
    327 F.3d 448 (6th Cir. 2003)...............................................192, 193

*People v. Dillard,* 303 Mich. App. 372 (Mich. Ct. App. 2013)................ 86

*People v. Stevens*, 858 N.W. 2d 98 (Mich. 2014) ................................... 79

## Cases

*Rita v. United States,* 551 U.S. 338 (2007) .......................................... 203

*Salinas v. United States*, 522 U.S. 52 (1997).................................passim

*Sanabria v. United States*, 437 U.S. 54 (1978)..................................... 68

*United States v. Albertelli,* 687 F.3d 439 (1st Cir. 2012)..................... 124

*United States v. Alfano,* 838 F.2d 158 (6th Cir. 1988)..........152, 159, 162

*United States v. Angel,* 576 F.3d 318 (6th Cir. 2009) .......................... 203

*United States v. Aparco-Centeno,* 280 F.3d 1084 (6th Cir. 2002)........ 200

*United States v. Applins*, 637 F.3d 59 (2d Cir. 2011) .......93, 95, 100, 101

*United States v. Ashrafkhan,* 964 F.3d 574 (6th Cir. 2020) ................ 104

*United States v. Atchley*, 474 F.3d 840 (6th Cir. 2007)....................... 125

*United States v. Bailey*, 553 F. 3d 940 (6th Cir. 2009) .......................... 86

*United States v. Banks*, 514 F.3d 959 (9th Cir. 2008) ........................... 78

*United States v. Bateman,* 945 F.3d 997 (6th Cir. 2019)..................... 165

*United States v. Bell,* 516 F.3d 432 (6th Cir.2008).............................. 148

*United States v. Bonds,* 12 F.3d 540 (6th Cir.1993)............................ 186

*United States v. Boyd,* 640 F.3d 657 (6th Cir. 2011) .......................... 166

*United States v. Brown*, 946 F.2d 1191 (6th Cir. 1991)....................... 108

*United States v. Canales Gomez,* 358 F.3d 1221 (9th Cir. 2004)......... 164

*United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994)....................... 182

## Cases

*United States v. Charles*, 138 F.3d 257 (6th Cir. 1998)....................... 203

*United States v. Chavez*, 951 F.3d 349 (6th Cir. 2020)....................... 117

*United States v. Christian*, 925 F.3d 305 (6th Cir. 2019).....141, 160, 161

*United States v. Clark,* 18 F.3d 1337 (6th Cir. 1994)...................134, 186

*United States v. Clark,* 385 F.3d 609 (6th Cir. 2004)......................... 186

*United States v. Combs*, 369 F.3d 925 (6th Cir. 2004)........................ 109

*United States v. Cooper*, 893 F.3d 840 (6th Cir. 2018) ....................... 163

*United States v. Cornell*, 780 F.3d 616 (4th Cir. 2015)....................... 100

*United States v. Corrado*, 227 F. 3d 543 (6th Cir. 2000)..62, 63, 163, 207

*United States v. Corrado*, 304 F.3d 593 (6th Cir. 2002)...............206, 208

*United States v. Curro*, 847 F.2d 325 (6th Cir. 1988)...................135, 136

*United States v. Dado,* 759 F.3d 550 (6th Cir. 2014)............................ 73

*United States v. Davis*, 397 F.3d 340 (6th Cir. 2005) ........................... 52

*United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001) .......................... 78

*United States v. Dominguez Benitez*, 542 U.S. 74 (2004) .................... 125

*United States v. Donadeo*, 910 F.3d 886 (6th Cir. 2018) ..............202, 208

*United States v. Elder*, 90 F.3d 1110 (6th Cir. 1996) ...192, 218, 219, 220

*United States v. Emuegbunam*, 268 F.3d 377 (6th Cir. 2001)............. 167

*United States v. Enright,* 579 F.2d 980 (6th Cir. 1978)................133, 136

*United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) .................. 95

viii

**Cases**

*United States v. Fisher*, 648 F. 3d 442 (6th Cir. 2011) .....................73, 89

*United States v. Francis*, 170 F.3d 546 (6th Cir. 1999) 179, 180, 182, 183

*United States v. Franklin*, 415 F.3d 537 (6th Cir. 2005).............134, 140

*United States v. Frazier*, 595 F. 3d 304 (6th Cir. 2010)........................ 68

*United States v. Freeman*, 730 F.3d 590 (6th Cir. 2013) ...............passim

*United States v. Gardiner*, 463 F.3d 445 (6th Cir. 2006)..................59, 64

*United States v. Ghazaleh*, 58 F.3d 240 (6th Cir. 1995)..................... 114

*United States v. Giacalone*, 853 F.2d 470 (6th Cir. 1988) ............151, 159

*United States v. Gibbs*, 797 F.3d 416 (6th Cir. 2015)........................ 148

*United States v. Gills*, 702 F. App'x 367 (6th Cir. 2017)...................... 58

*United States v. Giordano*, 416 U.S. 505 (1974)................................ 162

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006).........193, 194, 201

*United States v. Griffin*, 382 F.2d. 823 (6th Cir. 1967) ...................... 109

*United States v. Hackett*, 762 F.3d 493 (6th Cir. 2014)..............77, 78, 85

*United States v. Hadley*, 431 F.3d 484 (6th Cir. 2005)........................ 87

*United States v. Hamilton*, 689 F.2d 1262 (6th Cir. 1982).................. 134

*United States v. Hamm*, 952 F.3d 728 (6th Cir. 2020) ...............68, 85, 89

*United States v. Harris*, 695 F.3d 1125 (10th Cir. 2012)..................93, 94

*United States v. Henley*, 766 F.3d 893 (8th Cir. 2014) ....................... 101

*United States v. Henry*, 545 F.3d 367 (6th Cir. 2008)...........166, 167, 183

## Cases

*United States v. Hill,* 142 F.3d 305 (6th Cir. 1998)............................. 87

*United States v. Hitow,* 889 F.2d 1573 (6th Cir. 1989)....................... 134

*United States v. Hough,* 276 F.3d 884 (6th Cir. 2002)........................ 220

*United States v. Hughes,* 895 F.2d 1135 (6th Cir.1990)...........59, 64, 114

*United States v. Kalustian,* 529 F.2d 585 (9th Cir. 1975) ................... 163

*United States v. Kamahele,* 748 F.3d 984 (10th Cir. 2014) .................. 78

*United States v. Keller,* 498 F.3d 316 (6th Cir. 2007)......................... 202

*United States v. Kelly,* 204 F.3d 652 (6th Cir. 2000) .......................... 125

*United States v. Kelsor,* 665 F.3d 684 (6th Cir. 2011) ......................... 91

*United States v. Kilpatrick,*798 F.3d 365 (6th Cir. 2015).....119, 123, 129

*United States v. Kincaide,*145 F.3d 771 (6th Cir. 1998)....................... 87

*United States v. Kirkland,* 637 F.2d 654 (9th Cir.1980)...................... 172

*United States v. Landmesser,* 553 F.2d 17 (6th Cir. 1977)...........162, 163

*United States v. Maliszewski,*
      161 F.3d 992 (6th Cir. 1998)............................... 114, 115, 135, 136

*United States v. Martinez,* 430 F.3d 317 (6th Cir. 2005)..............135, 136

*United States v. Maslenjak,* 821 F.3d 675 (6th Cir. 2016).................... 90

*United States v. McGhee,* 882 F.2d 1095 (6th Cir. 1989).................... 109

*United States v. Mendez-Ortiz,* 810 F.2d 76 (6th Cir.1986)................ 143

*United States v. Miner,* 774 F.3d 336 (6th Cir.2014)......................... 119

## Cases

*United States. v. Merrell,* 701 F. 2d 53 (6th Cir. 1983)......................... 68

*United States v. Monus,* 128 F.3d 376 (6th Cir. 1997).................134, 140

*United States v. Moss,* 9 F.3d 543 (6th Cir. 1993) ................117, 135, 136

*United States v. Nagi,* 541 F. App'x 556 (6th Cir. 2014),
    *vacated on other grounds*, 134 S.Ct. 2288 (2014) ......................... 58

*United States v. Nicholson,* 716 F. App'x 400 (6th Cir. 2017) .............. 58

*United States v. Noble,* 762 F.3d 509 (6th Cir. 2014) ......................... 201

*United States v. Nunez,* 889 F.2d 1564 (6th Cir.1989) ....................... 112

*United States v. Odum,* 878 F.3d 508 (6th Cir. 2017),
    *vacated on other grounds*, 139 S. Ct. 319 (2018) ......................... 58

*United States v. Olano,* 507 U.S. 725 (1993) ...............................119, 200

*United States v. Owens,* 426 F.3d 800 (6th Cir. 2005).................179, 181

*United States v. Patel,* 579 F. App'x 449 (6th Cir. 2014).................... 162

*United States v. Poulsen,* 655 F.3d 492 (6th Cir. 2011)...................... 151

*United States v. Powell,* 847 F.3d 760 (6th Cir. 2017)........................ 194

*United States v. Presser,* 844 F.2d 1275 (6th Cir. 1988)..................... 185

*United States v. Prince,* 214 F.3d 740 (6th Cir. 2000) .......................... 91

*United States v. Qaoud,* 777 F.2d 1105 (6th Cir. 1985)........................ 55

*United States v. Ramamoorthy,* 949 F.3d 955 (6th Cir. 2020) ............ 151

*United States v. Randall,* 661 F.3d 1291 (10th Cir. 2011) ................. 100

*United States v. Rice,* 478 F.3d 704 (6th Cir. 2007)........................... 162

## Cases

*United States v. Richards*, 659 F.3d 527 (6th Cir. 2011)..................... 186

*United States v. Riddle*, 249 F.3d 529 (6th Cir 2001)......................96, 97

*United States v. Rios*, 830 F.3d 403 (6th Cir. 2016) .......64, 100, 101, 118

*United States v. Rios,* 842 F.2d 868 (6th Cir. 1988) ........................... 134

*United States v. Robinson*, 390 F.3d 853 (6th Cir. 2004) .................... 133

*United States v. Rugerio*, 20 F.3d 1387 (6th Cir. 1994)................114, 115

*United States v. Saadey*, 393 F.3d 669 (6th Cir. 2005)......................... 63

*United States v. Sanchez*, 928 F.2d 1450 (6th Cir. 1991) ................... 115

*United States v. Schrock,* 855 F.2d 327 (6th Cir. 1988)...................... 143

*United States v. Shenberg*, 89 F.3d 1461 (11th Cir. 1996) ................. 101

*United States v. Shryock,* 342 F.3d 948 (9th Cir. 2003) ........................ 97

*United States v. Smith*, 419 F.3d 521 (6th Cir. 2005) ..................117, 199

*United States v. Solano-Rosales*, 781 F.3d 345 (6th Cir. 2015)........... 203

*United States v. Spearman,* 186 F.3d 743 (6th Cir. 1999)..................... 52

*United States v. Sullivan*, 431 F.3d 976 (6th Cir. 2005) ..................... 201

*United States v. Svoboda*, 633 F.3d 479 (6th Cir. 2011)....................... 91

*United States v. Swingler,* 758 F.2d 477 (10th Cir. 1985)................... 220

*United States v. Tasis,* 696 F.3d 623 (6th Cir. 2012).......................... 200

*United States v. Taylor*, 800 F.3d 701 (6th Cir. 2015).......................... 90

*United States v. Thomas*, 875 F.2d 559 (6th Cir. 1989) ..................... 117

## Cases

*United States v. Thompson,* 515 F.3d 556 (6th Cir.2008).................... 203

*United States v. Thornton*, 609 F.3d 373 (6th Cir. 2010) ................... 182

*United States v. Tocco ("Tocco II"),* 306 F.3d 279 (6th Cir. 2002)........ 208

*United States v. Tocco,* 200 F.3d 401 (6th Cir. 2000) .....................passim

*United States v. Townsend*, 796 F.2d 158 (6th Cir. 1986).................. 182

*United States v. Trujillo*, 376 F.3d 593 (6th Cir. 2004)...................... 181

*United States v. Turkette,* 452 U.S. 576 (1981)...................................... 54

*United States v. Tyus*, 379 F. App'x 450 (6th Cir. 2010) ....................... 87

*United States v. Ursery,* 109 F.3d 1129 (6th Cir.1997)....................... 186

*United States v. Vannerson*, 786 F.2d 221 (6th Cir. 1986)................... 52

*United States v. Vinson*, 606 F.2d 149 (6th Cir. 1980)....................... 133

*United States v. Vonner*, 516 F.3d 382 (6th Cir. 2008).................125, 183

*United States v. Vowell,* 516 F.3d 503 (6th Cir. 2008)....................... 203

*United States v. Voyles*, 995 F.2d 91 (6th Cir.1993) ........................... 208

*United States v. Warner*, 690 F.2d 545 (6th Cir. 1982) .................71, 115

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010)..............189, 190

*United States v. Weiner*, 988 F.2d 629 (6th Cir. 1993) ....................... 146

*United States v. Whittington*, 455 F.3d 736 (6th Cir 2006)..........143, 149

*United States v. Wilson*, 168 F.3d 916 (6th Cir. 1999) .................115, 133

*United States v. Wilson,* 579 F. App'x 338 (6th Cir 2014)............100, 101

xiii

## Cases

*United States v. Word*, 806 F.2d 658 (6th Cir. 1986)........................... 133

*United States v. Wright*, 16 F.3d 1429 (6th Cir. 1994) ......................... 52

*United States v. Young*, 470 U.S. 1 (1985)........................................... 167

*United States v. Young*, 847 F.3d 328 (6th Cir. 2017) ..........151, 153, 164

*United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990) ......................... 192

*Waucaush v. United States*, 380 F.3d 251 (6th Cir. 2004)..................... 97

*Wright v. Spaulding*, 939 F.3d 695 (6th Cir. 2019) .............................. 93

## Statutes

18 U.S.C. §  371.............................................................................passim

18 U.S.C. § 1503...................................................................15, 16, 88

18 U.S.C. § 1622.........................................................................15, 88

18 U.S.C. § 1955...............................................................15, 16, 67, 150

18 U.S.C. § 1959.............................................................................passim

18 U.S.C. § 1961........................................................................54, 61

18 U.S.C. § 1962.............................................................................passim

18 U.S.C. § 1963(a) ........................................................................ 205

18 U.S.C. § 2510, *et seq.*.................................................................. 150

18 U.S.C. § 2518.......................................................................152, 162

18 U.S.C. § 3006A(f).......................................................................... 196

18 U.S.C. § 3500................................................................................ 185

## Statutes

18 U.S.C. § 3553(a) ...............................................................50, 202, 203

21 U.S.C. § 841................................................................................passim

21 U.S.C. § 846................................................................................passim

E.D. Mich. L. Cr. R. 57.1(a)............................................................ 197

Mich Crim JI 16.5.........................................................................98, 99

Michigan Penal Code Section 750.84................................................ 79

## Rules

Fed. R. Evid. 103(a)....................................................................122, 125

Fed. R. Evid. 401............................................................................. 142

Fed. R. Evid. 403.........................................................................passim

Fed. R. Evid. 701....................................................................123, 124

Fed. R. Evid. 801(d)(2)(E) .........................................................passim

Fed. R. App. P. 28(a)(8)................................................................. 192

Fed. R. App. P. 28(i)...............................................................13, 51, 218

Fed. R. Crim. P. 29.......................................................................... 52

Fed. R. Crim. P. 52(a) ..................................................................... 119

## Guidelines

USSG § 1B1.3.............................................................................. 207

USSG § 2E1.1.............................................................................. 206

## Other Authorities

E.D. Mich. L. Cr. R. 57.1(a).............................................. 196

Mich. Crim. Jury Instruction 16.5..................................98, 99

Mich. Crim. Jury Instruction 17.3...................................... 99

Robert M. Grass, Note, *Bifurcated Jury Deliberations in Criminal RICO Trials,* 57 Fordham L.Rev. 745 (1989).............. 101

Sixth Circuit Criminal Pattern Jury Instruction 1.03....................... 103

Sixth Circuit Criminal Pattern Jury Instruction 1.04....................... 104

Sixth Circuit Criminal Pattern Jury Instruction 3.08....................... 110

Sixth Circuit Criminal Pattern Jury Instruction 3.09....................... 110

Sixth Circuit Criminal Pattern Jury Instruction 7.06B..................... 108

## Request for Oral Argument

This is a consolidated, six-defendant appeal from a three-month racketeering trial. Given the voluminous factual record and the variety of issues that the defendants have raised, this appeal would benefit from oral argument. So the government concurs in the defendants' requests for oral argument.

## Introduction

A self-proclaimed outlaw motorcycle club, the Devils Diciples Motorcycle Club (DDMC) had chapters in many locations around the United States, national and local officers, written and unwritten rules and bylaws, and often-violent disciplinary procedures to enforce those rules. Its life blood was methamphetamine: manufacturing meth, moving meth, selling meth, and sharing it. Members worked together and in loose coordination with the club's leadership, often kicking back proceeds—"taxes"—to the leaders. The DDMC had other illegal activities too: violent crime, including murder, to support the club's authority and its members' reputation; theft of motorcycles and motorcycle parts; illegal gambling in chapter clubhouses; and obstruction of justice and witness intimidation to protect the club and its members from law enforcement.

The defendants here were among the DDMC's leaders, who oversaw and participated in those and other crimes. After a three-month trial, a jury convicted them of RICO conspiracy and numerous related and ancillary crimes. The district court sentenced them to lengthy terms of imprisonment.

These convictions and sentences should be affirmed. The DDMC had all the earmarks of a RICO enterprise, these defendants were associated with it through formal and informal leadership roles, and it operated through a variety of racketeering activities, including the separately charged drug conspiracy, gambling conspiracy, violent crimes, and obstruction of justice. The district court's jury instructions and evidentiary rulings tracked the law, and at the very least were not an abuse of discretion or plain error. The prosecutor's rebuttal argument was forceful, but not improper: it responded appropriately to the defendants' closing arguments, in which they personally attacked the prosecutors' integrity and motivation—one defense lawyer even turned to the prosecutors during argument and, reading from his client's correspondence to a suspected "snitch," repeated the words: "fuck you." And any mistakes in any of these areas could not have affected the verdict given the strength of the evidence.

The defendants' pretrial arguments do not demonstrate reversible error, either. The wiretaps of Darrah's phone satisfied all of the requirements in Title III. The district court carefully managed the discovery process to provide defendants with effective access to the

2

materials they were entitled to, while protecting the integrity and safety of the evidence and witnesses. The district court also properly accommodated defendant Witort's late request for substitution of retained counsel, by allowing new counsel to fully participate in the trial and sit at counsel table—which was all that Witort requested.

The defendants' sentences should likewise stand. The district court properly found under the sentencing guidelines that the DDMC's meth distribution was foreseeable and within the scope of each defendant's conspiratorial agreement during the time of his full membership in the enterprise. And although their within-guidelines sentences were substantial, their conduct justified it.

## Issues Presented

I.    Sufficiency of evidence. Viewed in the light most favorable to the government, was the evidence sufficient for a rational juror to find defendants guilty?

A.    The Devils Diciples Motorcycle Club (DDMC) existed for decades, had an organized structure with both written and unwritten rules, had a pattern of common aims and racketeering activities, and involved these defendants in both official and unofficial leadership roles. Was this and other evidence sufficient to convict them of RICO conspiracy?

B.    At least nine DDMC members had active roles in installing, operating, and maintaining unlawful gambling machines at DDMC clubhouses. Could a reasonable jury find that five or more individuals conducted the club's illegal gambling business?

C.    Methamphetamine manufacture, distribution, and use was a central focus of the DDMC, with club members and associates performing different aspects of this multifaceted activity and proceeds going to support the club. Was the evidence sufficient to show a single overall conspiracy?

D.    Defendant Paul Darrah was convicted of distribution of methamphetamine based on testimony from a cooperating witness who made controlled buys from Darrah and other DDMC members. Darrah challenged the witness's credibility at trial and now on appeal. Is such a challenge any basis for finding the evidence insufficient?

E.    DDMC member Danny Burby left the DDMC after National President Jeff Smith assaulted his girlfriend at a club event. Smith and Darrah subsequently labeled Burby a "snitch" and circulated threatening posters, leading to an assault on Burby by DDMC members. Was this evidence sufficient to show that they conspired to obstruct justice by intimidating Burby?

F.    The reason Smith assaulted Burby's girlfriend was because she disrespected the club's patch, and Smith escalated the assault after she insulted him in view of other club members and leadership. Was this sufficient to show that an animating purpose of the assault was to preserve Smith's position in the DDMC enterprise?

G.    Defendants Smith, Darrah, and Vandiver—the DDMC's President, Vice President, and Warlord—went to a DDMC member's house and threatened to beat him with a metal bar unless he kicked a

5

member of a rival outlaw motorcycle club out of the house. Was this sufficient for a reasonable juror to find that an animating purpose of the assault was to maintain their roles in the DDMC enterprise?

H.    Defendant David Drozdowski, a recently "patched" member of the DDMC, had leadership ambitions in the Blue Water chapter of the club. One night at a Detroit area club called "New York New York," Drozdowski and another Diciple saw a man wearing what they thought were colors of a rival outlaw motorcycle club. Drozdowski violently assaulted the man, and he and his club "brother" took the man's vest and other items. Was an animating purpose of the assault to maintain or increase Drozdowski's position in the enterprise?

I.    In a search of Drozdowski's residence, a trailer, the FBI found shotgun ammunition in a closet and rifle ammunition in plain view on a display case in the living room. Was the evidence sufficient to establish Drozdowski's actual or constructive possession of the ammunition?

J.    Smith, Darrah, and Vandiver were charged with conspiracy to suborn perjury and obstruct justice by pressuring other club members to lie to the FBI and give false testimony during DDMC

6

member Victor Castano's federal trial on drug-related gun charges. Smith and Darrah now claim that, as previous perjurers, those who lied for Castano lack sufficient credibility to support their convictions for inducing that perjury. Is such a challenge any basis for finding the evidence insufficient?

II.    Did the district court abuse its discretion in crafting jury instructions?

A.    The defendants were charged with RICO conspiracy, not a substantive RICO offense. So the gist of the charge was the agreement to commit the offense, not the offense itself. Was it an abuse of discretion to instruct the jury that it could convict if it found agreement either to the existence of a RICO enterprise or that such an enterprise would exist?

B.    Given that the RICO conspiracy involved committing crimes that were inherently economic activities, was it correct to instruct the jury that the DDMC's enterprise need only have a minimal effect on interstate commerce?

C.    Was it correct to instruct the jury on the elements of murder under Michigan law (a racketeering act) using Michigan's Model

7

Criminal Jury Instructions, while omitting unsupported instructions on justification, excuse, or mitigation?

D.    Was it correct to instruct the jury that, as to the racketeering activities alleged, it need only be unanimous as to which type of racketeering activity a defendant agreed would be committed during the conspiracy?

E.    Did the district court abuse its discretion by using a jury instruction on reasonable doubt that this Court has now endorsed in a published opinion, omitting problematic language relating the concept to the jurors' hesitation to act in their own personal decisions?

F.    Did the district court err in declining to give a limiting instruction regarding the evidence of a DDMC murder in Cadillac, Michigan, given that the murder showed the enterprise's inner workings and racketeering activity?

G.    Did the district court abuse its discretion in declining to give an addict-informant instruction, where the substance of the instruction was addressed in numerous other ways?

H.    The district court gave without objection a multiple conspiracy instruction. During deliberation the jury asked a series of

8

questions indicating confusion about the concept of multiple versus single conspiracies. Did the district court abuse its discretion by giving a detailed clarification to the jury?

I.     The RICO conspiracy count of the indictment included numerous overt acts. Those overt acts included allegations of how the agreed-upon enterprise worked and committed its various racketeering activities. Did the district court abuse its discretion by giving the jury, at the end of the trial, a redacted list of those overt acts for which there was some evidence at trial, while instructing them that those overt acts (like the rest of the indictment) were not evidence of guilt?

III.   Did the district court abuse its discretion in its evidentiary rulings?

A.     The FBI case agent gave lay opinion testimony, based on his personal investigation and knowledge, which included limited interpretation of some of the recorded conversations played for the jury. He explained the bases for his interpretations without relying on "the investigation as a whole" or suggesting access to other information. Did the district court abuse its discretion by admitting this testimony? Further, was any error in this regard harmless?

B.    The district court admitted statements of co-conspirators, some as non-hearsay under Rule 801(d)(2)(E) and others under other exceptions to the rules against hearsay. Did the court abuse its discretion in admitting this evidence?

C.    Did the district court abuse its discretion by admitting, under Rule 801(d)(2)(E), testimony of a DDMC member about what he had been told by another member about the DDMC murder in Cadillac, Michigan?

D.    Was it plain error to admit photographic evidence of the Cadillac murder and the Box Canyon, Arizona attempted murders, where there was no objection based on relevance or on unfair prejudice under Rule 403?

E.    Was it plain error, or error at all, to identify a report of a polygraph examination of a suspected "snitch" that was found in the DDMC's possession, where the results of the examination were not introduced and the subject of the examination was not a witness at trial?

F.    Did the district court abuse its discretion by admitting a photograph of Drozdowski brandishing handguns?

IV.    Did the district court properly deny the motion to suppress the results of wiretapping Darrah's phone?

    A.    Did the district court err in finding that the Title III affidavits established probable cause?

    B.    Did the court err in finding that the affidavits satisfied the requirement of necessity?

    C.    Did the omission of immaterial information regarding Darrah's medical condition require a *Franks* hearing?

V.    Defense counsel's closing arguments attacked the integrity of the people who conducted the investigation, and claimed improper motivation for the prosecution. Were the prosecutor's forceful responses in rebuttal argument improper at all, or so flagrantly improper that they would require a new trial?

VI.    Was it error, much less plain error, for the prosecutor to review with cooperating witnesses, on direct examination, the terms of their plea agreements?

VII.    In a case of this sensitivity and magnitude, where witnesses had already been threatened and pressured into lying, did the district court abuse its discretion in its management of discovery and in denying

11

defendants' motions for mistrial based on the timing of discovery that complied with the rules and statutes governing disclosure?

VIII. Did the district court abuse its discretion by giving short shrift to a motion for new trial that merely listed motions or objections previously made during trial?

IX. The district court allowed newly retained counsel to join Witort's defense team shortly before trial. Did the court abuse its discretion by requiring previously appointed counsel to continue representing Witort alongside Witort's new counsel, where there were concerns that the new counsel could not adequately prepare for trial in the remaining time and Witort did not object to the arrangement after his retained counsel was allowed to join fully in conducting his defense?

X. Did the district court impose procedurally and substantively reasonable sentences?

A. Did the court clearly err in finding that each defendant's relevant conduct included all methamphetamine-related conduct during the time of his fully patched membership in the DDMC, and presumptively included all other racketeering activity during that time?

12

B.    As to each individual defendant the district court imposed a within-guideline sentence. Given this Court's presumption of reasonableness for within-guideline sentences, were these sentences substantively reasonable?

XI.    To what extent are the trial-specific or fact-specific arguments of codefendants readily transferrable for purposes of adoption under Fed. R. App. P. 28(i)? In particular, should defendants in this trial be allowed to adopt evidentiary arguments from a separate trial of codefendants, or sentencing arguments of other codefendants?

## Statement of the Case

In February 2011, a grand jury in Detroit indicted 11 defendants, members of the Devils Diciples Motorcycle Club (DDMC), for conspiracy to obstruct justice, perjury, and related charges. (R. 3, Case No. 11-cr-20066: Indictment, 7–20). Slightly over a year later, the grand jury charged 41 defendants—including 10 of the defendants in the earlier indictment—with RICO conspiracy, conspiracy to manufacture and distribute illegal narcotics, conspiracy to conduct an illegal gambling business, and related charges, in a separate indictment. (R. 72, Case No. 11-cr-20129: Third Superseding Indictment, 590–672). The district court consolidated these two indictments for pretrial and trial proceedings, designated the case as a complex case, and broke the defendants into trial groups for more manageable trials. (R. 461, R. 544: Orders, 1671–72, 1994–95).

Extensive pretrial proceedings ensued. All but nine of the defendants pleaded guilty. The nine remaining defendants were tried in two groups. Trial Group One, the group involved in this consolidated appeal, comprised Scott William Sutherland, Patrick Michael McKeoun, Jeff Garvin Smith, Paul Anthony Darrah, Cary Dale Vandiver, Vincent

14

John Witort, and David Randy Drozdowski. After a three-month trial,

from October 2014 through January 2015, a jury convicted and

acquitted these defendants as follows:

| Defendant | Count | Charge | Statute | Verdict |
|---|---|---|---|---|
| Scott William Sutherland *("Scotty Z")* | 11-20129: 1 | RICO Conspiracy | 18 U.S.C. § 1962(d) | Not guilty |
| | 11-20129: 3 | Meth and Vicodin conspiracy | 21 U.S.C. § 846 | Not guilty |
| Patrick Michael McKeoun *("Magoo")* | 11-20129: 1 | RICO Conspiracy | 18 U.S.C. § 1962(d) | Guilty |
| | 11-20129: 3 | Meth and Vicodin conspiracy | 21 U.S.C. § 846 | Guilty |
| Jeff Garvin Smith *("Fat Dog")* | 11-20129: 1 | RICO Conspiracy | 18 U.S.C. § 1962(d) | Guilty |
| | 11-20129: 2 | Illegal Gambling Conspiracy | 18 U.S.C. § 371, 1955 | Guilty |
| | 11-20129: 3 | Meth and Vicodin conspiracy | 21 U.S.C. § 846 | Guilty |
| | 11-20129: 26 | Witness tampering conspiracy | 18 U.S.C. § 1512(b)(3) | Guilty |
| | 11-20129: 29 | VICAR against Michelle Richards | 18 U.S.C. § 1959(a)(6) | Guilty |
| | 11-20129: 30 | VICAR against Scott Perkins | 18 U.S.C. § 1959(a)(3) | Guilty |
| | 11-20066: 1 | Conspiracy to obstruct justice | 18 U.S.C. § 371, 1503 | Guilty |
| | 11-20066: 2 | Subornation of perjury | 18 U.S.C. § 1622 | Not guilty |
| | 11:20066: 3 | Obstruction of justice | 18 U.S.C. § 1503 | Not guilty |
| Paul Anthony | 11:20129: 1 | RICO Conspiracy | 18 U.S.C. § 1962(d) | Guilty |

| Defendant | Count | Charge | Statute | Verdict |
|---|---|---|---|---|
| Darrah ("Pauli") | 11-20129: 2 | Illegal Gambling Conspiracy | 18 U.S.C. § 371, 1955 | Guilty |
| | 11-20129: 3 | Meth and Vicodin conspiracy | 21 U.S.C. § 846 | Guilty |
| | 11:20129: 5 | Distribution of methamphetamine | 21 U.S.C. § 841 | Guilty |
| | 11-20129: 26 | Witness tampering conspiracy | 18 U.S.C. § 1512(b)(3) | Guilty |
| | 11-20129: 30 | VICAR against Scott Perkins | 18 U.S.C. § 1951(a)(6) | Guilty |
| | 11-20066: 1 | Conspiracy to obstruct justice | 18 U.S.C. § 371, 1503 | Guilty |
| | 11-20066: 2 | Subornation of perjury | 18 U.S.C. § 1622 | Not guilty |
| | 11:20066: 3 | Obstruction of justice | 18 U.S.C. § 1503 | Not guilty |
| Cary Dale Vandiver ("Gun Control") | 11:20129: 1 | RICO Conspiracy | 18 U.S.C. § 1962(d) | Guilty |
| | 11-20129: 2 | Illegal Gambling Conspiracy | 18 U.S.C. § 371, 1955 | Not guilty |
| | 11-20129: 3 | Meth and Vicodin conspiracy | 21 U.S.C. § 846 | Guilty |
| | 11:20129: 4 | Distribution of methamphetamine | 21 U.S.C. § 841 | Guilty |
| | 11-20129: 26 | Witness tampering conspiracy | 18 U.S.C. § 1512(b)(3) | Guilty |
| | 11-20129: 27 | PWID methamphetamine | 21 U.S.C. § 841 | Guilty |
| | 11-20129: 28 | Possession of meth precursors | 21 U.S.C. § 841 | Guilty |
| | 11-20129: 30 | VICAR against Scott Perkins | 18 U.S.C. § 1951(a)(6) | Guilty |
| | 11-20066: 1 | Conspiracy to obstruct justice | 18 U.S.C. § 371, 1503 | Guilty |

16

| Defendant | Count | Charge | Statute | Verdict |
|---|---|---|---|---|
| | 11-20066: 2 | Subornation of perjury | 18 U.S.C. § 1622 | Guilty |
| | 11:20066: 3 | Obstruction of justice | 18 U.S.C. § 1503 | Guilty |
| Vincent John Witort ("Holiday") | 11-20129: 1 | RICO Conspiracy | 18 U.S.C. § 1962(d) | Guilty |
| | 11-20129: 3 | Meth and Vicodin conspiracy | 21 U.S.C. § 846 | Guilty |
| David Randy Drozdowski ("D") | 11-20129: 1 | RICO Conspiracy | 18 U.S.C. § 1962(d) | No verdict: mistrial |
| | 11-20129: 3 | Meth and Vicodin conspiracy | 21 U.S.C. § 846 | No verdict: mistrial |
| | 11-20129: 36 | VICAR against Robert McClure | 18 U.S.C. § 1959(a)(3) | Guilty |
| | 11-20129: 37 | Felon in possession of ammunition | 18 U.S.C. § 922(g)(1) | Guilty |

(R. 1253: Sutherland Verdict, 15397–98; R.1255: Drozdowski Verdict, 15402–04; R.1256: Smith Verdict, 15405–08; R. 1257: Vandiver Verdict, 15409–13; R. 1258: Darrah Verdict, 15414–17; R. 1259: McKeoun Verdict, 15418–19; R. 1260: Witort Verdict, 15420–21). The district court sentenced McKeoun to 372 months; Smith to life; Darrah to life; Vandiver to life; Witort to life; and Drozdowski to 456 months, based on his convictions in both this trial and his later retrial. (R. 2346: McKeoun

17

Judgment, 33414; R. 2352: Smith Judgment, 33454; R. 2358: Darrah Judgment, 33510; R. 2337: Vandiver Judgment, 33223; R. 2376: Witort Judgment, 33724; R. 2357: Drozdowski Judgment, 33502).

## I.    The Devils Diciples Motorcycle Club: bad to the bone

The Devils Diciples Motorcycle Club (DDMC) was formed in the late 1960s in Fontana, California by 12 members, or "brothers," who are represented to posterity by the 12 spokes of the wheel at the center of the "colors" worn by "full-patched" members of the club—insignia on the back of their leather vests. (R. 1097: Tr., 8686–89, 8739–43). DDMC was an outlaw motorcycle club subscribing to the "1%'er" philosophy: after the American Motorcycle Association opined in the 1960s that 99% of motorcyclists are good, law abiding citizens, outlaw motorcycle clubs have taken pride in being the other 1%—"the one in a hundred who has given up on society and politicians one way laws." (R. 1097: Tr., 8743–44; R. 2444: Tr., 38045–47; Government exhibit 62-5).

Sometime after the club was formed, one of the original brothers got "run down the road"—kicked out of the club—and took off to the east, keeping his colors and starting new chapters along the way. (R.

18

1097: Tr., 8741). This eventually led to multiple chapters in Michigan,

Ohio, Alabama, Indiana, Arizona, and elsewhere.



DDMC was well organized, with national officers, state officers,

and principal officers within each chapter: President ("boss"), Vice

President, and Warlord. During the time period covered by the

indictment—1993 through 2012—the national officers were Jeff Garvin

Smith (Fat Dog), President; Kenneth Roll (Spike), followed by Paul

Anthony Darrah (Pauli), Vice Presidents; and Cary Dale Vandiver (Gun

19

Control), Warlord. (R. 1093: Tr., 7570–71; R. 1112: Tr., 9625–28).

Vincent Witort (Holiday) was not a national officer, but he was a long

time California member who was highly respected and had great

authority: the rules did not apply to him. (*Id.*, 9629–31).

DDMC had well established rules and practices. There were

written bylaws and directives. Brothers paid regular dues. Brothers

were required to own a Harley Davidson motorcycle. Membership was

not automatic: normally if one was invited, he had to "prospect" for a

time before being "patched," that is, before getting full colors, including

top and bottom "rockers" on the vest's insignia. Chapters had regular

meetings, usually weekly, called "church." (R. 1077: Tr., 7000–09; R.

1093: Tr., 7571–73; R. 1097: Tr., 8686–89). Diciples got nicknames, in

part to conceal their true identities from outsiders. (R. 1077: Tr., 7029–

30). Because members are often referred to by their nicknames in the

trial transcript, it is helpful to know those nicknames. Upon first

reference to a nicknamed person in this brief, the nickname follows in

parentheses. Also, for the Court's convenience, here's a list of names

and corresponding nicknames used in this brief:

20

## Trial 1 defendants

Patrick Michael McKeoun.....................................*Magoo*
Jeff Garvin Smith ................................................*Fat Dog*
Paul Anthony Darrah ...........................................*Pauli*
Cary Dale Vandiver.............................................*Gun Control*
Vincent John Witort .............................................*Holiday*
David Randy Drozdowski.....................................*D*

## Trial 2 defendants

Victor Carlos Castano...........................................*Vic*
Michael Kenneth Rich ..........................................*Tatu*
David Randy Drozdowski.....................................*D*

## DDMC members / former members

Kenneth Roll......................................................*Spike*
William Thomas Smith .........................................*Billy Wadd*
Michael Mastromatteo ..........................................*Iron Mike*
David Roberts .....................................................*Detroit Dave*
Jeff Armstrong....................................................*Detroit Red*
Vernon Rich .......................................................*Vern*
John Pizzuti........................................................*JP*
William Lonsby ...................................................*Buck*
Howard Quant .....................................................*44*
Ronald Roberts ...................................................*Rockin' Ronnie*
John Riede .........................................................*Bear*
Danny Burby ......................................................*Thumbs*
Charles Casey .....................................................*Bugs*
Michael Croix .....................................................*Scammer*
Michael Sykes.....................................................*Illinois Mikey*
Mark Berman ......................................................*Monkey*
William Bausch ...................................................*Wild Bill*
Larry Morgan .....................................................*Clyde*
Thomas Thacker ..................................................*TT*
Jeffrey Young......................................................*Jethro*

21

Charles Higgins.....................................................*Riggs*
Lowell Shimek .....................................................*Cuz*
Keith McFadden ..................................................*Gadget*
Stella Herron ......................................................*Starr*
Scott Perkin........................................................*Scooter*
Chad Allard .......................................................*Chisel*
Tim Downs..........................................................*Space*

Discipline was enforced, often at church, for sundry violations,
ranging from failing to pay dues, to failing to attend church meetings, to
failing to attend motorcycle "runs," to embarrassing the club through
misbehavior. Discipline included fines or suspension from patched
status, but more frequently "black eyes." That is, on direction of club
leadership, the violator would have to allow a selected member to punch
him in the eye. (*E.g.*, R. 1092: Tr., 7458–60; R. 1093: Tr., 7573–76; R.
1094: Tr., 7931–33).

A club tenet was to resist law enforcement. "Snitching" in any
form was forbidden. (R. 1077: Tr., 7062–64). Members who snitched or
otherwise seriously broke the rules were "run down the road"—that is,
kicked out and shunned, or worse. An unwritten but widely understood
consequence of being run down the road was to forfeit your motorcycle.
That is, the Devils Diciples would take the bike from you, and give or

sell it to another member. (*E.g.*, R. 1077: Tr., 7068–69; R. 1094: Tr., 7941–47; R. 1115: 10300–03).

Women were not allowed to join the DDMC. Wives or girlfriends of Devils Diciples were known as "old ladies" and were not allowed to attend church meetings or know the business of the club. Some wore vests identifying them as "property of" the brother with whom they were associated. Old ladies worked to support their "old men"—many of whom were unemployed. (R. 1113: Tr., 9781–82).

An outlaw motorcycle club must maintain relations with other such clubs. DDMC made friends with Hells Angels early on, forming a good relationship, in return for respecting Hells Angels' turf in California and Arizona, and for agreeing not to sport a 1% patch. DDMC had a similar alliance with the Highwaymen, a major Detroit-based motorcycle club. On the other hand, DDMC had adversaries, such as the Outlaws and their spinoff, Jokers, in Southwest Detroit. This led to conflicts—like a fight, with gunshots, at Vicki's Bar in Detroit, after Jokers had disrespected Devils Diciples and Highwaymen at their club. (R. 1203: Tr., 14098–14104; R. 1112: Tr., 9683–88). After this confrontation, at a DDMC church meeting, "Dog [Smith] sat there and

23

said that Devils Diciples and Highwaymen handled their business, they are bad to the bone, and that was it." (R. 1112: Tr., 9693).

## II.    Devils Diciples: Meth R Us

A defining characteristic of the Devils Diciples was their dedication to methamphetamine, also known as speed, or crank. Diciples and their associates used meth, shared it, trafficked in it, and manufactured (cooked) it. When William Thomas Smith (Billy Wadd) was recruited into the club, his DDMC boss, Ken Roll, told him "hey, if you're going to roll with me, if you're going to be a Devils Diciple, this is what Devils Diciples do"—that is, do meth. (R. 1112: Tr., 9643). So Smith concluded that "if I was going to stay a Devils Diciple and stay safe, I was going to put that up my nose." (*Id*.).

The trial record is filled with accounts of Devils Diciples recruits, DDMC old ladies, and other DDMC associates who were introduced to meth, or were led to its steady use and addiction, by their association with the club. *See, e.g.*, Karen Casey (R. 2444: Tr., 38059–60, 66), Danny Burby (R. 1077: Tr., 6991–93, 7013–14), Charles Myatt (R. 1094: Tr., 7901–02), Jeffrey Armstrong (R. 1096: Tr., 8495–96), Donna Cook (R. 1111: Tr., 9292–95), Lauri Ledford (*id.*, 9349–51), Ronald Preletz

24

(R. 1115: Tr., 10304–05), Jeffrey Young (*id.*, 10370–71), April Sykes (*id.*, 10490–93), Kenneth Dean Johnson (R. 1146: Tr., 11298–99), John Altman (R. 1147: Tr., 11423–24), Lori Maday (R. 1148: Tr., 11694–99), and Jennifer Cicola (R. 1151: Tr., 12382–87). Devils Diciples and their friends routinely used and shared meth together when it was available, at DDMC clubhouses, at DDMC parties and steak fries, at bars they frequented, in their homes, and elsewhere.

Devils Diciples were also substantial traffickers in meth and other controlled substances, including marijuana and Vicodin, both for their own profit and supply and to support the club financially.

Michael Mastromatteo (Iron Mike) dealt in substantial quantities of meth in Detroit. He first obtained it from "Sleepy," a Diciple in Arizona, in ½ to 1 pound quantities. Mastromatteo had help from his "road dogs," Darrah and David Roberts (Detroit Dave), who would drive west to get the drugs for him. (R. 1150: Tr., 12078–86). After Sleepy stopped supplying it, Mastromatteo got meth wherever he could, including deliveries from Witort in 1 to 3 pound quantities. (*Id.*, 12136–44). Mastromatteo sold meth in quantity to Jeff Armstrong (Detroit Red) and to Darrah, who in turn sold it to Vernon Rich (Vern), boss of

25

the Port Huron chapter. (*Id.*, 12128–32). Vern Rich sold meth at retail, and fronted it to other Diciples for resale: John Pizzuti (JP), William Lonsby (Buck), and Howard Quant (44). Also Lauri Ledford, Vern's old lady. (R. 1093: Tr., 7643–50). And Vern Rich "kicked" substantial proceeds from his drug dealing to DDMC leadership: Jeff Smith and Ken Roll. (R. 1097: Tr., 8713–15; R. 1150: Tr., 12131–34). Everyone in this chain was a Devils Diciple or an associate of the club.

At one point during Mastromatteo's meth dealing he got a visit from "Little Dog" (the state "boss" for Alabama) and Vandiver, who told him, on behalf of Jeff Smith, "we're shutting you down"—"you're not selling no more dope." (R. 1150: Tr., 12091). This shocked Mastromatteo, who thought he was being a "good brother:" making money, sharing dope with other members, and sharing the money he was making. (*Id.*, 12092–93). Later, Mastromatteo got a visit from Patrick McKeoun (Magoo), whom he knew to have influence in the club. McKeoun told Mastromatteo that he had talked to Smith, and Smith now understood that Mastromatteo was doing right by his club brothers. But, McKeoun said, "things would be better for you if you were working with Fat Dog's guys"—like McKeoun. (*Id.*, 12095–98).

26

Another major Detroit-based meth dealer was William Thomas Smith. Before joining the DDMC, Smith was a significant cocaine dealer; once he joined the Diciples he transitioned to meth. For about a year between 2000 and 2001 he dealt in meth that was brought to him from Alabama semimonthly, in 3 to 4 ounce amounts, by "Little Dog" and Vandiver. (R. 1112: Tr., 9702–06). After Little Dog died, Smith continued getting meth in quantity from Alabama via Ronald Roberts (Rockin' Ronnie) and from Witort in California, via Mastromatteo and mail shipments. (*Id.*, 9714–15, 9724–29). Smith sold the meth to Anthony Clark (Mad Anthony), a Highwayman, to other Diciples, and to "citizens" through his bar, the Copa Lounge. (*Id.*, 9706–09). Ken Roll, the National Vice President at the time, told Smith he had to "kick" proceeds to Roll, and to the national officers, to avoid being more heavily "taxed." Smith estimated he kicked in excess of $50,000 in a year. (*Id.*, 9710–14).

Vern Rich was another significant meth dealer, in Port Huron. Rich got meth in quantity from Mastromatteo, and distributed it through several middlemen (and women), including his old lady, Lauri Ledford. Rich also got meth from John Reide (Bear) in Bay City,

27

Michigan, and from the DDMC west coast connection: on one occasion he traveled to Arizona and California to get 3 to 5 pounds of meth, which he brought back to Michigan in a false muffler on his motorcycle. (R. 1077: Tr., 7035–38).

Danny Burby (Thumbs) also got meth from Vern Rich, and used it at various DDMC clubhouses with other Diciples, including Darrah, McKeoun, and Vandiver. "Pretty much everybody had it"—both for using it and selling it. (R. 1077: Tr., 7017–22). Later Burby began getting larger quantities from Rich, once or twice a week, using some and selling the rest. (*Id.*, 7024–28).

Another substantial meth dealer in Port Huron was Jeffrey Armstrong, who got his supply, over a period of eight years, in large quantities, from Jeff Smith, Mastromatteo, and others. (R. 1096: Tr., 8497–501). Armstrong stepped on the meth and sold it, he shared it with other Diciples, and he fronted some of it to Vern Rich and "Reverend," another member of the Port Huron chapter. (*Id.*, 8404–05).

These are just some of the significant DDMC meth traffickers. But the trafficking permeated the membership and trickled down, to the point that, for example, Paul Darrah forced his old lady, Jennifer

28

Cicola, to sell meth for him at her bartending job at the Hitching Post, a popular Devils Diciples hangout, until she was arrested for it. (R. 1151: Tr., 12421–28). The proceeds of her dealing went to Darrah and Jeff Smith (Fat Dog). (R. 1113: Tr., 9772–75).

Devils Diciples were prolific meth manufacturers as well. Manufacturing or "cooking" methamphetamine involves assembling the ingredients, finding a place to cook, and having someone competent to do the cooking. Necessary ingredients include solvents, lithium batteries, and most importantly, pseudoephedrine—a pharmaceutical decongestant—which has become increasingly subject to regulation over the years. (R. 2444: Tr., 38012–17; R. 2445: Tr., 38266–71). So Diciples found ways to get the ingredients, set up the labs, and get the cooks.

An early example is Karen Casey. Casey grew up in Lancaster, Ohio, next door to a Devils Diciples clubhouse. At age 13 she became enamored with Charles Casey (Bugs), and at 17 she left home to be his old lady. Bugs introduced her to meth, and she soon became involved in drug trafficking—first cocaine from Detroit, then meth, to which she had become addicted. (R. 2444: Tr., 38059–66). She and Bugs got their

meth from Trooper, an Alabama Diciple, and then started going to California for it.

In California, they dealt with Vincent Witort at his Spa Ranch, where "we had a thing going on with the, the mini thins." (*Id.*, 38067–68). Mini thins were a form of ephedrine that they could get wholesale at the time, so Karen and Bugs would order cases of them, and take or ship them to Witort in California. In turn, Witort had a cook, "Mr. Bill," who would use the ephedrine to manufacture pounds of pure meth. (*Id.*, 38068–73). Bugs and Karen would then cut their share of the meth and sell it to Devils Diciples in Ohio and Michigan. (*Id.*, 38073–75, 38087–92). This continued over a three-year period, with Karen and another woman, Sherri, acting as drug mules, shipping thin mints to California and flying there to bring the resulting meth back to Ohio for resale. (*Id.*, 38076–81, 38092–96).  Also during this time, McKeoun came to their place in Ohio and cooked meth, in a burned-out house in front of their trailer. (*Id.*, 38098–101).

Mr. Bill, the California meth cook, cooked with Allen Mancini for several outlaw motorcycle clubs, including Hells Angels and Devils Diciples. Their DDMC contacts were Witort and McKeoun (R. 1075: Tr.,

30

6571–82). After Mancini was convicted for manufacturing meth in California, he fled to Alabama, where McKeoun found him a place to stay at a trailer park that was largely occupied by Devils Diciples. Pretty soon, Mancini began cooking meth for the Diciples, along with Jeffrey Arnold, in an underground lab, where McKeoun and Arnold had already been cooking, using the more difficult "red phosphorus" method. Production continued for several months, until shortly before the trailer park and lab were raided by law enforcement. (*Id.*, 6512–14; 6520–21; 6591–97). After that, Vandiver, "Little Dog," and "Trouble" came back to the trailer park and forcibly took Arnold's motorcycle—with McKeoun present, but dissenting—as was their wont. (R. 1075: Tr., 6526–28). In a later FBI interview McKeoun said "I'm a cook, not a shaker"—meaning he was a more sophisticated meth cook, using a more complex method than the so-called shake-and-bake method using lithium from batteries. (R. 1074: Tr., 6400).

Jaime Franks met Michael Croix (Scammer), an Indiana Diciple, at a wake for her prior Diciple boyfriend, AJ. They got together, and Croix taught her to cook meth using the red phosphorus method. They cooked it, used it, shared it, and sold it. (R. 1094: Tr., 8012–15).  Later,

Franks was given a place to live in a trailer at the Mount Clemens chapter clubhouse. There she worked with Cary Vandiver to obtain meth precursors, and they went to the Blue Water clubhouse at night to cook meth together. Darrah provided the keys to the clubhouse. Other Diciples and their girlfriends provided the necessary pseudoephedrine for the process, and received meth in return. (*Id.*, 8018–33).

April Sykes was married to Michael Sykes (Illinois Mikey), who introduced her to meth. It became a daily habit. (R. 1115: Tr., 10484–93). Mikey began to cook meth, with April's help, to use and sell. (*Id.*, 10494–97). After Mikey beat her up and put her in the hospital, April moved to the Indiana Diciples clubhouse, and then to Michigan, where she got together with Ronald Roberts (Rockin' Ronnie). (*Id.*, 10502–07). After Ronnie got the club's permission to be with her (for a fee of $44 per month, since she was still married to Mikey, who was in prison) Ronnie asked her to cook meth, for money. She taught him to cook, using the shake-and-bake method. (*Id.*, 10510–13). They cooked meth together for a year, in ¼ to 1 ounce quantities using ingredients obtained by Ronnie's associates, and he sold it to Diciples and others. (*Id.*, 10514–19). Then April split up with Ronnie, and moved to Pontiac,

32

where she met David Drozdowski (D) and began cooking meth with him. (*Id.*, 10519–22). Later, she took up with Smiley Villa (SA) and moved to Anchor Bay, ending up in a trailer park where she shared a trailer with Drozdowski and Lori Maday. D and SA became friends, cooked meth together, and used it constantly. (*Id.*, 10528–38; R. 1148: Tr., 11699–711).

William Ely Smith (no relation to defendant Smith or William Thomas Smith) came to live in his grandmother's house on Kathy Street in Roseville in 2009, and cared for her until she died. David Roberts came there soon afterward, with his girlfriend, when he was paroled from prison. (R. 1111: Tr., 9419–27). Roberts soon began manufacturing meth at the house, and selling it to Diciples and others. And he got William to go buy Sudafed to feed the process. (*Id.*, 9427–36). Diciples and others came to the Kathy Street house with pseudoephedrine they had bought, to exchange for meth. And there was a bonfire in back, to burn the residue and evidence from the cooking process. (*Id.*, 9454–58). This went on for about two years, until a search warrant was executed and residue of the meth cooking was found there. (R. 2444: Tr., 38011–15).

The Devils Diciples Motorcycle Club was methamphetamine world, all the way down.

## III.    Devils Diciples: Violence with a purpose

Violence was an essential element of the DDMC enterprise, to maintain discipline in the organization, to punish those who were perceived to be "snitching," to establish turf and street credibility, and to maintain relations with other outlaw motorcycle clubs. The violence ranged from black eyes, to serious assaults, to murder.

Black eyes were common discipline for Devils Diciples, and sometimes did serious harm. Mark Berman (Monkey) got a black eye that "split his face open" and sent him to the emergency room with a maxillary sinus fracture. (R. 1094: Tr., 7928–31; R. 1112: Tr., 9536–42).

But club discipline could rise to the level of murder. William Bausch (Wild Bill) was a member of the Indiana chapter who was "run down the road" when his club brothers found he had taken up cross-dressing. As was their practice when a member left in "bad standing," the club stole Bausch's motorcycle from him and gave it to a new recruit, Joseph Letherman, who was expected to pay for it. (R. 1096:

34

Tr., 8531–33). Bausch, however, had the temerity to take his bike back. (*Id.*, 8534–36).

This led to a visit from Larry Morgan (Clyde), the warlord of the Grand Rapids chapter. (*Id.*, 8536–37). Morgan went with Thomas Thacker (TT), the Indiana warlord, to Bausch's house, where Morgan killed Bausch execution style. (*Id.*, 8540–41). Later that night, Morgan ordered Letherman to drive him and Thacker to a party in southern Indiana. (*Id.*, 8539–40). Along the way, Morgan shot Thacker in the head, and told Letherman "[t]hat son-of-a-bitch saw me kill Bill." (*Id.*, 8542–44). Terrified, Letherman helped clean up the van and drove back to the clubhouse. After receiving death threats and getting protection from local law enforcement, Letherman ended his connection with the DDMC and moved away from Indiana. (*Id.*, 8547–49). Local prosecutions led to Morgan's conviction for the two murders. (*Id.*, 8378–82).

Danny Burby was a member of the Blue Water chapter in Michigan, where he became warlord and then Vice President. He and his girlfriend, Michele Richards, often partied with Diciples, at clubhouses, on runs to other chapters, and at steak fries sponsored by

35

the club. At one steak fry, at the headquarters clubhouse in Mount Clemens, Richards got drunk and wanted to leave. (R. 1077: Tr., 7044–46). She went to Burby's motorcycle to get her purse, and in searching the saddlebags threw his club colors on the ground. (*Id.*, 7046–48). Jeff Smith saw this, and was enraged. He violently assaulted her, knocking her on the ground and striking her several times while other Diciples stood by. (*Id.*, 7048–54). Burby pulled Smith off, and he and Richards left the party. (*Id.*, 7054–58). Burby immediately quit the club, which meant he left in bad standing and the Devils Diciples would now want to take his new motorcycle. (*Id.*, 7059–61, 7067–70).

After Burby left the club rumors circulated that he was "snitching." (*Id.*, 7061). A few months before this incident, federal search warrants had been executed at multiple locations associated with the Devils Diciples. The federal interest in the DDMC was a concern, which club leaders discussed at church meetings and elsewhere. (*Id.*, 7064–67). Then, shortly after Burby left the club, another round of warrants were executed, reinforcing the Diciples' suspicion that Burby was a snitch, and leading him to fear that he

36

would be "messed with" and his motorcycle would be taken. (*Id.*, 7068–72).

A little later Devils Diciples began posting fliers at local bars with Burby's picture, labeling him a "snitch." (*Id.*, 7072–73). This was followed by a verbal confrontation at the Lighthouse Bar, where Burby was surrounded by Ronald Roberts, Wayne Werth, "Randy," and "Damien." The confrontation moved into the parking lot, where it became physical. Burby fought with Roberts, and then Werth attacked him with a knife. Roberts smashed a beer bottle over Burby's head and they fought again. Werth had moved off, and fired shots into the air. A crowd of 20 to 30 watched. After the shots, the crowd fled, and the attackers drove off. (*Id.*, 7088–7112). Until this assault, Burby had refused to cooperate with law enforcement. But now, when approached by the FBI, he decided that his only recourse was to cooperate. (*Id.*, 7113–17).

Jeffrey Young (Jethro) joined the DDMC in the mid-1990s, where he was introduced to meth. (R. 1115: Tr., 10370–75). Unlike many of his club brothers, Young was employed. The club's demands on his time interfered with his job, so he had to skip some activities, such as

interstate motorcycle runs and church meetings. For this he was "hassled, bird-dogged, fined"—and the fines stacked up, to more than $1,300. (*Id.*, 10376–77, 10385–87). Young also received a black eye, which he resisted. (*Id.*, 10390–92). So he stopped paying the fines and quit the club.

Since Young left "in bad standing," the club leadership demanded that he surrender his motorcycle, and members persisted in harassing him, with visits to his house and ominous notes, to enforce that demand. (*Id.*, 10393–405). Ultimately, Jeff Smith and Ken Roll pulled up in Young's driveway in a Chevy van. Young came out, and saw Smith with a revolver pointed at him. When he turned to run back in, Smith shot him in the leg. (*Id.*, 10410–20). In the house, Young grabbed a shotgun. He came back out and fired it at the van, which backed out and drove away. (*Id.*, 10421–25). After this, Young was prosecuted for unlawful possession of firearms, and served three years. Smith and Roll were prosecuted for assault, and sentenced to probation. (Id., 10433–36). But Young did not surrender his motorcycle. (*Id.*, 10473).

Devils Disciples used violence to reinforce their image as "bad to the bone," to the point that they even inflicted serious injuries on an

38

innocent bystander. Drozdowski and Villa violently assaulted Robert McClure at a concert at New York New York, a bar in the Detroit area. After Drozdowski sucker-punched McClure, knocking him unconscious, they said to him "take that off or I'll cut it off." (R. 1147: Tr., 11548–53). McClure had been wearing a vest with a patch for the Black Label Society, a heavy metal rock band. (*Id.*, 11590–97). But Drozdowski and Villa thought it was a patch for the Outlaws, a rival of the Devils Diciples. They were wearing their DDMC colors, and took offense. So after Drozdowski punched McClure he and Villa took his vest and brought it back to the Blue Water clubhouse. (R. 1115: Tr., 10545–50). McClure suffered severe blunt head trauma, a broken jaw, broken nose, and broken sinus bones. (R. 1148: Tr., 11665–72).

DDMC violence wasn't limited to punishing rivals. Devils Diciples punished their own members to preserve relations with their allies. So when members of the Tucson, Arizona chapter jeopardized the Diciples' friendly relationship with the Hells Angels, club leadership took strong measures. Some of the Arizona Diciples were thought to have beaten and tortured a woman who owed them money for a drug debt. She was affiliated with the Hells Angels, who would be offended by this abuse of

one of their old ladies. (R. 1146: Tr., 11134–35, 11157–58). This was not good: if the Diciples did not take some action, it was likely the Hells Angels, a much stronger MC, would take revenge.

Charles Higgins (Riggs), the President of the Tucson, Arizona DDMC chapter, talked with Joe Joe and Fang, the President and Warlord of the local Hells Angels chapter, in an attempt to defuse the situation. (R. 1146: Tr., 11150–62). But Joe Joe also contacted Lowell Shimek (Cuz), another Arizona Diciple, about the situation, and Shimek in turn contacted Smith, the National President. (R. 1113: Tr., 9797–801). A little later, when the Tucson Diciples were preparing for a church meeting, 20 or so Devils Diciples from California and Arizona showed up at their clubhouse, led by Witort and Little John, the "boss" of the California Devils Diciples. (R. 1146: Tr., 11166–69). Higgins said "Holiday, man, how bad is this?" And Holiday said "it's pretty bad." (R. 1113: Tr., 9801). Higgins volunteered for a black eye as punishment from Witort, who accommodated the request. (R. 1146: Tr., 11169–71).

But that was not sufficient. The visiting brothers handcuffed the five perpetrators, beat them with bats, and loaded them in the back of a pickup truck. Two of them drove the truck to a remote area called Box

40

Canyon and dumped the victims for dead, one by one, by the side of the road. (As it turned out, all survived). (R. 1113: Tr., 9801–808; R. 1146: Tr., 1171–89; R. 1147: Tr., 11450–58, 11465–74).

Immediately after this incident, an email captioned "ass holes" was circulated widely among leaders of the Devils Diciples. (R. 1113: Tr., 9785–92). The email warned everyone that the five Arizona members were "out for good" and that other members should "think again" before betraying their allies in the Hells Angels:

> SO EVERYONE WILL KNOW SOME ASSHOLE'S IN SO.AZ. THOUGHT THEY COULD BE ASSHOLE'S TO OUR BROTHER'S AND DO ANY THING TO THEM AND ANY ONE ELSE YOU DO NOT SHIT ON YOUR BROTHER'S IF YOU DO THIS WILL HAPPEN TO YOU BIG RIGS-TWO DOGS-PANHEAD MIKE-GOLF CLUB-JOHNNY OLD SCHOOL ARE OUT FOR GOOD SO IF YOU THINK YOU CAN FUCK OVER MY BROTHER THINK AGAIN THANKS TO ALL MY BROTHER'S THAT LOVE DEVILS DICIPLES AND DEVILS DICIPLES WAY'S

(*Id.*, 9792–93; R. 2500: Gov't exhibit 13-10, 42047). Thereafter Jeff Smith, holding a ball bat, told brothers that "those guys won't be around anymore" (R. 1097: 8833–34). And Smith reported at church that Joe Joe had told him that "Devils Diciples handled their own business; that they are bad to the bone." (R. 1113: Tr., 9794–95).

41

## IV.    Devils Diciples: Gambling and motorcycle theft

The DDMC supplemented its income by maintaining illegal gambling machines at several of its clubhouses, for use by members and guests. There were gambling machines at clubhouses in Ohio, Indiana, Alabama, and Michigan. (R. 1077: Tr., 7015–17). Mastromatteo bought and maintained slot machines at several Michigan clubhouses, and used gambling proceeds for club business and expenses. (R. 1151: Tr., 12209–14). William Smith installed gambling machines at the Mount Clemens, Port Huron, and West Side clubhouses, and shared the proceeds with those chapters and with Ken Roll. (R. 1113: Tr., 9815–20). FBI search warrants recovered 15 gambling machines, as well as pertinent coins, keys, and records. (*E.g.*, R. 1116: Tr., 10749–64, 10777–81). The machines were illegal. (R. 2387: Tr., 33901–04).

Diciples also stole motorcycles, and motorcycle parts, when they could—and not just the bikes they stole or extorted from brothers they had "run down the road." In Alabama, they pulled off two substantial thefts. In one, Keith McFadden (Gadget), with Ronald Roberts, Cary Vandiver, and club brother "Jesus" stole seven Harley Davidson motorcycles from a towing facility and shared them and their parts with

42

Diciples in Alabama and Michigan. (R. 1097: Tr., 8766–73). In another theft, Victor Castano (Vic) and his girlfriend, Little Bit, distracted the owner of a local motorcycle shop for an evening of partying, while McFadden, Vandiver, and Jesus looted his shop of $20,000–25,000 in motorcycles and parts. The shop was not insured, and closed after the theft. (*Id.*, 8773–76; R. 1095: Tr., 8133–44).

## V.    Devils Diciples: Evading and obstructing justice

The Devils Diciples were always concerned about attention from law enforcement, particularly "the feds," for their illegal activities. Hence the absolute prohibition on any cooperation, or "snitching." So when Jeff Smith and Paul Darrah recruited William Smith, they required him to take a lie detector test to prove he wasn't a snitch. (R. 1112: Tr., 9620–24). When Mastromatteo failed to tell club leadership about being searched and interrogated by a law enforcement task force in Albuquerque while transporting meth, Smith took him violently to task, saying "by not saying anything to anybody, that you got shook down, could have got somebody else in trouble" and then physically attacking him. (R. 1150: Tr., 12113–16).

43

DDMC leadership assembled and maintained large quantities of information about law enforcement activities for counterintelligence purposes. (R. 1076: Tr., 6763). Search warrants executed at many locations found massive collections of law enforcement related documents, including manuals, police reports, grand jury transcripts, search warrants, criminal histories, informant records, court records, judicial opinions, news accounts, and threatening letters to members suspected of "snitching." (*E.g.*, R. 1075: Tr., 6697–99, 6704–44; R. 1076: Tr., 6765–834; R. 1149: Tr., 11994–98; R. 1150: Tr., 12029–36).

But when necessary, the Diciples went beyond counterintelligence to active obstruction of justice and perjury. Devils Diciple Victor Castano was a substantial dealer in marijuana. He was caught driving a truck with a large amount of marijuana and a handgun and prosecuted federally for the drugs and the gun. (R. 1093: Tr., 7678–79, 7682–87). Because the gun charge carried a substantial additional penalty, Castano's club brothers tried to help him beat that charge. They brought their influence to bear on William Lonsby, Keith McFadden, and Stella Herron (McFadden's old lady, Starr) to lie to the FBI and to testify at Castano's trial that the gun in the truck was not

44

his. (R. 1092: Tr., 7397–406; R. 1097: Tr., 8781–808; R. 1098: Tr., 9068–91). Jeff Smith, Darrah, Vandiver, Mastromatteo, Michael Rich (Tatu), and "Jesus" all participated in coercing, persuading, and coaching McFadden and Herron to lie. (*Id.*; R. 1111: Tr., 9167–74). It didn't work, and Castano was convicted. After his gun conviction was set aside on appeal for an instructional error he approached McFadden once more to lie for him. Having no more of this, McFadden came to the FBI and told the truth. (R. 1097: Tr., 8842–47).

## Summary of the Argument

There was sufficient evidence for a reasonable jury to find these defendants guilty of RICO conspiracy. The evidence at the three-month trial included testimony of dozens of former members and associates of the club, recorded conversations of its leaders, controlled purchases of methamphetamine, and voluminous documents, drugs, guns, gambling machines, and other evidence seized through dozens of search warrants. The evidence showed the long term existence of the club, its organization and management, its common objectives, criminal and otherwise, and the roles through which these defendants were associated with the enterprise and agreed to its objectives—both

45

through their leadership roles and through their participation in and oversight of the club's racketeering activities. The evidence showed that the defendants, through their participation in the enterprise, were also involved in a single multifaceted conspiracy to manufacture and distribute methamphetamine, which was one of the principal racketeering acts alleged. The evidence also showed their various roles in a conspiracy to conduct an illegal gambling business, two conspiracies to obstruct justice, three assaults in aid of racketeering activity, distribution of methamphetamine, and illegal possession of ammunition.

The district court instructed the jury that it could find the element of a RICO enterprise if the evidence showed that under defendants' agreement the enterprise did, or would, exist. Because the charge was conspiracy, not a substantive RICO charge, this was correct. The court also correctly charged the jury that only a minimal effect on interstate commerce was required, and that to convict a defendant they need only be unanimous on the type of racketeering activity he agreed would be committed. The court gave correct instructions on the elements of murder under Michigan law, and did not abuse its discretion in

46

declining to give certain cautionary instructions requested by defendants. The court also did not abuse its discretion by giving a modified instruction on reasonable doubt that has been expressly approved by this Court, or by giving detailed supplemental instructions on multiple conspiracies when the jury indicated its confusion. And the court did not abuse its discretion by providing the jury a list of overt acts alleged in the indictment.

The district court did not abuse its discretion by admitting limited lay opinion testimony by the FBI case agent, because it was helpful to the jury while it was based on facts and events witnessed by the agent and shared with them, and not on matters outside the knowledge of the jury. The court did not abuse its discretion in finding a proper basis for the admission of co-conspirators' statements under Rule 801(d)(2)(E), because there was strong evidence of a conspiracy and the conspirators' roles in it. Evidence of a murder and several attempted murders was admitted as proof of racketeering acts: given that murder was charged as an agreed-upon racketeering activity, the probative value of this evidence was not substantially outweighed by any danger of unfair prejudice. A photograph of one defendant brandishing firearms wasn't

47

unfairly prejudicial: it was evidence of his complicity in the violent character of the enterprise. And there was no error in allowing reference to finding a polygraph report on a suspected "snitch" in the possession of a DDMC officer, where there was no reference made to the content or results of the polygraph.

The affidavits in support of the application for a wiretap on defendant Darrah's phone, and its extensions, contained ample support for the issuing judge's findings of probable cause and necessity: they chronicled an underlying investigation that showed that Darrah and the DDMC were trafficking drugs and committing other offenses listed in the applications, and that information about those crimes would be obtained by intercepting calls on Darrah's phone. The omission of information regarding Darrah's medical condition was immaterial, and did not warrant a *Franks* hearing.

In closing argument defense counsel assailed the integrity of the investigation, imputed improper and unethical motives to the prosecution, and suggested jury nullification, arguing that the case was too difficult to decide. The prosecutor responded forcefully but fairly to

48

these arguments, showing how vacuous they were. There was no misconduct, much less flagrant misconduct, in the rebuttal argument.

The court did not abuse its discretion by denying motions for mistrial based on discovery issues. This case involved a lengthy investigation and generated voluminous discovery materials, including witness interviews and transcripts, recorded conversations, massive evidence seized through execution of search warrants, government records, and other materials. The district court and the government implemented special procedures for making these materials available for review over many months prior to trial, while preserving the security of witnesses, in full compliance with the government's discovery obligations. If during trial counsel identified particular difficulties with the production of discovery materials, the court accommodated them—for example, by delaying the testimony of an important witness by almost a month.

After the verdicts the defendants made a motion for new trial which merely listed motions and objections made and denied during trial, without any legal argument. The district court properly denied the motion without further ado. The court was not required to search

49

through a three-month trial record and make the defendants' arguments for them.

Two months before the scheduled trial date, defendant Witort requested substitution of retained counsel for his court appointed counsel. Appointed counsel had spent years becoming familiar with the evidence in the case, Witort expressed no dissatisfaction with her work, and the district court had genuine concerns that new counsel could not properly prepare in the time left. The court did not abuse its discretion by allowing new counsel to enter the case and participate fully in his defense, while requiring appointed counsel to remain as lead counsel.

The district court did not clearly err in finding generally that each defendant's relevant conduct for sentencing would include all methamphetamine-related activity during the time of his patched membership in the club, and would presumptively include other racketeering activity during that time, because there was abundant evidence that the racketeering activity of the enterprise was reasonably foreseeable to any patched member. Further, as to each defendant, the court considered individual characteristics and the sentencing factors under 18 U.S.C. § 3553(a), and imposed a presumptively reasonable

50

within-guideline sentence. The sentences were procedurally and substantively reasonable.

Defendants here have indiscriminately adopted arguments from other defendants' briefs on appeal under Fed. R. App. P. 28(i). When the argument is "readily transferrable" such adoption is permissible. But when the argument is fact-specific, it's not. Here, some defendants have sought to adopt evidentiary arguments from a brief in a separate trial of other defendants in this case. And one has sought to adopt sentencing arguments specific to other defendants. Those adopted arguments should be disregarded.

51

## Argument

### I.   The evidence supported the defendants' convictions.

In reviewing the sufficiency of evidence, the Court asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A defendant challenging the sufficiency of the evidence supporting his conviction "bears a very heavy burden." *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)). The Court "do[es] not weigh the evidence, assess the credibility of the witnesses, or substitute [its] judgment for that of the jury," *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994), and "[c]ircumstantial evidence alone is sufficient to sustain a conviction," even if it does not "remove every reasonable hypothesis except that of guilt." *Spearman*, 186 F.3d at 746 (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986)).

After trial, the district court issued a comprehensive opinion denying the defendants' various motions for acquittal under Federal Rule of Criminal Procedure 29. (R. 2327: Opinion and Order, 32809–

32842). As the district court's opinion demonstrates, ample evidence supported the jury's verdicts.

## A.    Count 1: RICO Conspiracy (Smith, Darrah, Witort, McKeoun)[1]

Count 1 of the Third Superseding Indictment charged defendants with conspiracy to commit RICO in violation of 18 U.S.C. § 1962(d). (R. 72: Indictment, 592–639). The substantive RICO statute provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1962(d) makes it unlawful to conspire to violate § 1962(c).

A defendant's conviction for a RICO conspiracy requires proof of the defendant's agreement to associate with an enterprise whose affairs were or would be conducted through a pattern of racketeering activity.

---

[1] We will try to identify in each argument heading whose brief or briefs we are responding to. When a defendant has requested to adopt an argument, without fully briefing it, his name will be identified with a "**+**." Thus, for example, "**+Darrah.**"

53

*See Salinas v. United States*, 522 U.S. 52, 61–66 (1997). Defendants Smith, Darrah, and Witort here variously contest the proof of an enterprise, of their association with it, and of the pattern of racketeering activity. McKeoun challenges the sufficiency of evidence tying him to certain racketeering acts of murder. (R. 72: Third Superseding Indictment, Overt acts 1, 6, 7: 604–05). The evidence readily established each of these elements.

### 1.    A RICO enterprise

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, or any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise includes "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). An association-in-fact enterprise has three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, (3) and longevity sufficient for the associates to pursue the enterprise's purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009).

An association-in-fact enterprise "is simply a continuing unit that functions with a common purpose" for a period long enough to pursue a course of conduct. *Id.* at 948. Moreover, "[w]hile the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." RICO enterprises are not "limited to groups whose crimes are sophisticated, diverse, complex, or unique." *Id.* Proof that a group operated together in a coordinated manner in furtherance of a common purpose may include inferences from the members' commission of similar racketeering acts in furtherance of a shared objective, financial ties, coordination of activities, community of interests and objectives, interlocking nature of the schemes, and overlapping nature of the wrongful conduct. *United States v. Qaoud*, 777 F.2d 1105, 1116–17 (6th Cir. 1985).

There was ample evidence that the DDMC was an association-in-fact enterprise whose members and associates operated together in a coordinated manner in furtherance of a common purpose. The jury heard the testimony of 60 witnesses, including 19 former "patched"

55

members of the DDMC from Michigan, Alabama, and Arizona, 9 DDMC associates from Michigan, Indiana, California, and Alabama, and 11 old ladies from Michigan, Ohio, Indiana, Alabama, and Arizona, all of whom gave their understanding of the structure and hierarchy of the organization. DDMC had existed for over 40 years, was nationally and locally organized, had an established leadership structure, had national and local bylaws, and had a system of discipline for its members. (R. 1338: Gov't Response, 15975–76).

The claim that the drug trafficking activities of individual DDMC members were independent activities devoid of a common purpose is wrong. Drugs, particularly methamphetamine, were at the heart of the DDMC enterprise. The manufacture and trafficking of meth were widespread among DDMC's members and associates—and among the organization's main purposes. Several DDMC members were large scale drug dealers, including Michael Mastromatteo, William T. Smith, Vern Rich, and Jeffrey Armstrong. Meth dealers were "taxed" or required to "kick in" money from their drug proceeds to club leadership, and club leaders exerted control over members' drug dealing activities. And several DDMC members and associates manufactured meth, or

obtained the precursors to cook it, including: Charles Casey, working with Karen Casey and Vincent Witort; Witort working with "Mr. Bill;" Allen Mancini working with Patrick McKeoun and Jeff Arnold; McKeoun working with Casey; Jaime Franks working with Cary Vandiver, with help from Paul Darrah; April Sykes working with Ronald Roberts and David Drozdowski; and David Roberts cooking at the Kathy Street house in Roseville.

Manufacture, distribution, and use of drugs was but one of the purposes of the enterprise. The DDMC also supported itself through theft, transportation, and sale of motorcycles and parts, and through illegal gambling at its clubhouses.

The DDMC cultivated its reputation for violence and sought to enforce its authority and power through discipline, physical punishment, and fines. It promoted and enhanced its authority, reputation, and standing through violence, intimidation, and weapons possession. DDMC members, under direction of their leadership, used violence—including murder and attempted murder—to maintain discipline and to protect the DDMC from external threats, such as conflict with the Hells Angels. DDMC members and associates also

57

worked together to protect the enterprise by thwarting law enforcement and the criminal justice system through violence, threats, perjury, and obstruction of justice.

This Court has found that outlaw motorcycle clubs and similar gangs constitute RICO enterprises, on less compelling evidence of organization than seen here. *See, e.g., United States v. Odum*, 878 F.3d 508, 516–17 (6th Cir. 2017), *vacated on other grounds*, 139 S. Ct. 319 (2018) (Phantom Motorcycle Club); *United States v. Nicholson*, 716 F. App'x 400, 405 (6th Cir. 2017) (Phantoms); *United States v. Gills*, 702 F. App'x 367, 374–75 (6th Cir. 2017) (Murda Ville/Howard Boys); *United States v. Nagi*, 541 F. App'x 556, 570 (6th Cir. 2014), *vacated on other grounds*, 134 S.Ct. 2288 (2014) (Highwaymen Motorcycle Club).

On the evidence here a reasonable juror could readily conclude that the members and associates of the DDMC operated together in a coordinated manner in furtherance of these common purposes, and so constituted a RICO enterprise.

### 2.   Agreement to associate with the RICO enterprise

Each of the defendants also agreed to associate with the enterprise. "The concept of 'associat[ion]' requires both interpersonal

relationships and a common interest." *Boyle v. United States*, 556 U.S. at 946. (Quotations omitted). "Moreover, each conspirator does not have to 'participate in every phase of the criminal venture, provided there is assent to contribute to a common enterprise.'" *United States v. Gardiner*, 463 F.3d 445, 457 (6th Cir. 2006) (quoting *United States v. Hughes,* 895 F.2d 1135, 1140 (6th Cir.1990)). "[A] defendant need not know about every member and component of the enterprise; he need only know 'the general nature of the enterprise and that the enterprise extends beyond his role.'" *United States v. Tocco*, 200 F.3d 401, 425 (6th Cir. 2000) (quotation omitted).

There was extensive evidence at trial detailing Smith, Darrah, McKeoun, and Witort's roles and participation in the DDMC. Smith was the National President of the DDMC during the entire period of the indictment. (R. 1072: Tr., 5795; R. 1150: Tr., 12048–50). Darrah became the National Vice President of the DDMC after Ken Roll, in the early 2000s. (R. 1072: Tr., 5795–97; R. 1077: Tr., 7029). Witort was a member of the DDMC for more than 30 years, had been president of the California chapter, and was highly respected by DDMC's national leadership. (R. 1112: Tr., 9627–29; R. 1146: Tr., 1102–04; R. 1150: Tr.,

12148–49). McKeoun was a long time DDMC member and sometime leader of the Sand Mountain Alabama chapter. (R. 1074: Tr., 6394–95; R. 1075: Tr., 6499–500, 6503–07, 6583–86, 6589–92).

As those leadership roles showed, these defendants went beyond merely associating with the enterprise; they helped exercise control over it. For instance, Vandiver did so when he and "Little Dog" visited Mastromatteo and advised, "We're shutting you down," meaning that DDMC leadership was exerting control over Mastromatteo's drug trafficking activity. (R. 1150: Tr., 12091–95). McKeoun participated in this control when he told Mastromatteo that he had discussed the matter with Smith, and advised that "things would be better for you if you were working for Fat Dog's guys," referring to drug trafficking. (*Id.*, 12095–98). Smith exerted his control of the enterprise when he assaulted Mastromatteo for failing to disclose a drug related police encounter in Albuquerque, New Mexico, and told Mastromatteo "[y]ou should have told someone here, because, you know, you could have jeopardized something else that was going on in the country. And by not saying anything to anybody, that you got shook down, could have got somebody else in trouble." (*Id.*, 12105–16).

60

Smith and Darrah also exerted control over the enterprise by ordering beatings and assaults and assessing fines as a form of punishment and discipline. (E.g., R. 1077: Tr., 7030–32). Witort exerted control over the enterprise when he and "Little John"—the Hollywood California chapter president—orchestrated and participated in the brutal beating, robbery, and attempted murder of five Tucson Chapter members to avoid conflict with the Hells Angels. (R. 1146: Tr., 11166–89; R. 1147: Tr., 11450–57).

Based on this evidence, together with abundant other evidence of their activities in and control over the organization, a rational jury could only conclude that Smith, Darrah, Witort, and McKeoun were associated with the DDMC enterprise.

### 3.   Agreement to a pattern of racketeering activity

To convict a defendant of a RICO conspiracy, the government must prove that the defendant agreed that a conspirator would commit a "pattern of racketeering activity." 18 U.S.C. § 1962(c), (d). A pattern of racketeering activity requires at least two predicate acts of racketeering activity, as defined in 18 U.S.C. § 1961(1), occurring within ten years of each other. 18 U.S.C. § 1961(5). Racketeering activity includes drug

61

manufacturing and trafficking, murder, kidnapping, trafficking in stolen vehicles, extortion, and obstruction of justice.

The government must prove that the predicate acts "were related to the enterprise's illegal purpose and that the acts constitute a threat of ongoing criminal activity." *United States v. Corrado*, 227 F. 3d 543, 554 (6th Cir. 2000) (citing *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989)). The predicate acts must be connected to the affairs and operations of the enterprise, "but do not necessarily need to be directly interrelated." *Corrado*, 227 F. 3d at 554. "The relatedness requirement can be satisfied by proof that: (1) the defendant was enabled to commit the offense solely by virtue of his position in the enterprise; or (2) the offense was related to the activities of the enterprise." *Id.* (internal quotations omitted). "It is not determinative that the defendant committed the crime to further his own agenda, if indeed he was only able to commit the crime by virtue of his position within the enterprise." *Id.* (quoting *Salinas v. United States*, 522 U.S. 52, 63 (1997)). The government can satisfy the continuity prong by presenting evidence that shows the predicate acts "were attributed to a

62

defendant operating as part of a long-term association that exists for criminal purposes." *Id.* (quoting *H.J., Inc.*, 492 U.S. at 242–43)).

To convict for RICO conspiracy "the government does not need to prove that [a] defendant committed or agreed to commit two predicate acts himself, or even that any overt acts have been committed." *United States v. Saadey*, 393 F.3d 669, 676 (6th Cir. 2005). "A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense," and "a person may be liable for conspiracy even though he was incapable of committing the substantive offense." *Salinas*, 552 U.S. at 64. "The supporters of a conspiracy are as guilty as the perpetrators . . . so long as they share a common purpose." *Corrado*, 227 F. 3d at 553 (citing *Salinas*, 552 U.S. at 64).

The government thus need only prove that a defendant intended "to further 'an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense [and] it suffices that [the defendant] adopt the goal of furthering or facilitating the criminal endeavor.'" *Id.* (citing *Salinas*, 522 U.S. at 65). "A defendant's agreement to participate in the RICO conspiracy may be inferred from

63

his acts," and a conspirator need not agree "to commit every crime within the scope of the conspiracy so long as it is reasonable to infer that each crime was intended to further the enterprise's affairs." *United States v. Gardiner*, 463 F. 3d 445, 457 (6th Cir. 2006) (citing *United States. v. Hughes*, 895 F. 3d 1135, 1140–41 (6th Cir. 1990)). Each conspirator need not participate in every phase of the criminal enterprise, if there is assent to be part of the enterprise. *Id.*

McKeoun argues that he knew nothing of certain racketeering acts: the murders of Charles Isler in Cadillac, Michigan and of William Bausch and Thomas Thacker in Indiana, as well as others. (R. 72: Third Superseding Indictment, Overt acts 1, 6, 7: 604–05; McKeoun brief, 31–38). Be that as it may, it was not necessary to prove his direct involvement in those specific acts, or even knowledge of them. It was sufficient to prove that McKeoun agreed to join the DDMC enterprise and agreed that a conspirator would commit two or more acts of the types of racketeering activity alleged. *United States v. Rios*, 830 F.3d 403, 434–35 (6th Cir. 2016). His active role in the DDMC and his meth distribution and manufacturing activity alone were sufficient evidence of his complicity.

64

Indeed, each defendant's drug-related activities sufficed, by themselves, to show the defendant's agreement to a conspiracy that involved a pattern of racketeering activity. Witort agreed with other members of the DDMC to manufacture and distribute methamphetamine. (R.1070: Tr., 5339–41). Witort agreed to supply DDMC members with large quantities of methamphetamine and other drugs over a period of decades. (R. 1150: Tr., 12118, 12136–40). McKeoun had ongoing agreements with DDMC member Charles Casey to manufacture methamphetamine on his property. (R. 1070: Tr., 5370–73; R. 1074: Tr., 6389–93). McKeoun also agreed to traffic methamphetamine with DDMC member Mastromatteo. (R. 1150: Tr., 12100–02). Darrah sold methamphetamine and Vicodin to other DDMC members, ordered an assault on Danny Burby to prevent (or punish) suspected snitching, and gave Vandiver access to the DDMC Blue Water Chapter clubhouse to manufacture methamphetamine. (R. 1072: Tr., 5838–43; R. 1095: Tr., 8306–08; R. 1093: Tr., 7693–94; R. 1072: Tr., 5826–35). On multiple occasions, Smith provided Jeff Armstrong with large quantities of methamphetamine for him to distribute. (R. 1096: Tr., 8497–99).

To avoid conflict with the Hells Angels, DDMC leadership punished five members thought to be responsible for an assault on a Hells Angels "old lady" at the Tucson, Arizona chapter. The punishment: attempted murder and kidnapping. (R. 1147: Tr., 11444–45; R. 1113: Tr., 9800–02). A group of 15–20 DDMC members, led by Witort, descended upon the Tucson clubhouse, beat the five "brothers" with fists and bats, and then loaded the victims onto a pick-up truck, drove them into the desert, and dumped them into a ravine. (R. 1146: Tr., 11169, 11171, 11176–89; R. 1147: Tr., 11454–58, 11462–72). An email found at Smith's house, addressed to several DDMC leaders, including Darrah, praised these assaults, saying that the offending members "are out for good." (R. 1149: Tr., 11957–62; R. 2500: Gov't exhibit 13-10, 42047). Smith announced at a DDMC meeting that the five "brothers" had been dealt with, and the Hells Angels were happy with how DDMC handled the situation. (R. 1113: Tr., 9792–95).

These examples merely scratch the surface of the evidence of a wide pattern of racketeering acts related to the enterprise that DDMC conspirators committed over the years in question. There was much more, including trafficking in stolen motorcycles and parts, illegal

66

gambling activity, obstruction of justice, and witness tampering. (R. 1338: Gov't Response, 15975–79, 15983–16014). These racketeering activities were part and parcel of the identity of the DDMC: an enterprise focused on motorcycles and illegal drug trafficking, funded by those and other illegal activities, that protected itself through violence, counterintelligence, and obstruction of justice.

The evidence was sufficient to prove Smith's, Darrah's, Witort's, and McKeoun's guilt of RICO conspiracy.

### B.    Count 2: Illegal gambling business (Smith, + Darrah)

Count 2 of the Third Superseding Indictment charged defendants with conspiracy to conduct an illegal gambling business, in violation of 18 U.S.C. §§ 371 and 1955. (R. 72: Indictment, 639–45). An illegal gambling business is a business which "is a violation of the law of a State or political subdivision in which it is conducted, involves five or more persons who conduct, finance, manage, direct, or own all or part of such business; and has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day."

67

In their Rule 29 motions, Smith and Darrah claimed insufficient evidence that the DDMC's gambling business was conducted by five or more persons. (R. 1182: Tr., 13787; R. 1188: Tr., 13834–35). They did not dispute the existence of an illegal gambling business or that the business was in substantially continuous operation for more than 30 days. Where the defendant makes a Rule 29 motion on specific grounds, grounds not specified in the motion are waived. *United States v. Hamm*, 952 F.3d 728, 739–40 (6th Cir. 2020).

Conducting a gambling business is performing "any function or duty that is necessary or *helpful* in the operation of the business." *United States. v. Merrell*, 701 F. 2d 53, 55 (6th Cir. 1983) (emphasis in original). "Any degree of participation in an illegal gambling business, aside from being a bettor, constitutes a violation." *United States v. Frazier*, 595 F. 3d 304, 307 (6th Cir. 2010) (citing *Sanabria v. United States*, 437 U.S. 54, 70 n. 26 (1978)).

Numerous DDMC members maintained gambling machines in DDMC clubhouses in Michigan and other states. (R. 1077: Tr., 7016). Gary Nelson, and Timmy Downs maintained gambling machines at the Blue Water Clubhouse. (*Id.* at 7008). Vernon Rich had the keys to the

68

slot machines maintained at the Port Huron Clubhouse. (R. 1092: Tr., 7346–47). William T. Smith placed gambling machines in DDMC clubhouses, including Port Huron, Mount Clemens and Westside Detroit, and split the proceeds with the chapters. (R. 1113: Tr., 9815–16; R. 1114: Tr., 10098–10100). Michael Mastromatteo installed and maintained gambling machines at the Port Huron, Marine City, and Mount Clemens Clubhouses. (R. 1093: Tr., 7583–85). William Smith provided a gambling machine to Jeff Smith to put an Alabama clubhouse. (R. 1113: Tr., 9820). Charles Higgins maintained gambling machines at the Tucson clubhouse, which shared proceedings with the owner of the machines. (R. 1146: Tr., 11108–09). Ronald Preletz, the National Treasurer, maintained machines at the Mount Clemens clubhouse and took a split to pay bills of the club. (R. 1114: Tr., 10266–70).

Certainly a reasonable jury could find five or more individuals conducted DDMC's gambling business during its operation, including DDMC members Gary Nelson, Timothy Downs, Vernon Rich, Michael Mastromatteo, Ronald Preletz, William T. Smith, Charles Higgins, Paul Darrah, and Jeff Smith. And this evidence showed that the gambling

69

business continued for over thirty days, contrary to defendants' unpreserved claim on appeal.

### C.    Count 3: Narcotics conspiracy (Smith, Darrah, Witort)

Count 3 of the Third Superseding Indictment charged defendants with conspiracy to manufacture, distribute, and possess with intent to distribute 500 grams or more of methamphetamine (as well as hydrocodone), in violation of 21 U.S.C. §§ 846 and 841(a)(1). (R. 72: Indictment, 646–47). As the evidence previously discussed shows, manufacturing and trafficking meth was a central focus of the DDMC. DDMC members and associates used it, bought and sold it in large quantities, distributed it to each other and others, and manufactured it in quantity, for use, sharing, and sale. While these activities took various forms, in various locations, and involved various participants, they were all directed toward DDMC's central focus of trafficking methamphetamine.

So these defendants' claim that there were multiple disparate conspiracies fails. A single conspiracy does not become "multiple conspiracies" merely because "each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *United*

70

*States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982). Instead, a defendant's knowledge that he "is participating in a joint enterprise" is sufficient. *Id.*

The drug activities were continuous, and were linked together in a loose network through the DDMC. Smith, Darrah, and Witort were all in leadership roles from which their complicity can be inferred. But each also took an active role in the conspiracy. Early on, Smith provided ½ to 1 pound quantities of meth to Jeffrey Armstrong for distribution in the Port Huron area, where Armstrong also fronted meth to Vern Rich. (R. 1096: Tr., 8497–505). Rich was a prolific dealer in that area, who "kicked" substantial funds to club leadership—that is, Smith and Darrah. (R. 1097: Tr., 8713–15; R. 1092: Tr., 7484–85). William Smith, another big DDMC meth dealer, also kicked drug money to national leadership, including Jeff Smith. (R. 1112: Tr., 9710–14). Darrah used his "ole lady," Jennifer Ciccola, to drive a substantial load meth up to Michigan from Ohio (R. 1151: Tr., 12415–20), and made her sell meth for him at the bar where she worked. (*Id.*, 12421–27). Witort was a major source of West Coast meth, in pound and kilogram quantities, through Charles and Karen Casey (R. 2444: Tr., 38068–75, 38087–92),

71

Mastromatteo (R. 1150: Tr., 12136–41), and William Smith (R. 1112: Tr., 9723–29, 9732–34). Before getting meth from Witort, Mastromatteo had obtained it from Sleepy, in Arizona, using his "road dogs"—Darrah and David Roberts—to make the trips. (R. 1150: Tr., 12077–86). And Mastromatteo sold this meth to Darrah, who sold to Vern Rich, who sold to others (and who kicked drug money up to "Spike" and Jeff Smith). (R. 1150: Tr., 12128–34).

It's all of a piece. Taken together, along with all the other evidence, in the light most favorable to the government, this is more than sufficient to sustain these defendants' drug conspiracy convictions.

### D.    Count 5: Distribution of methamphetamine (Darrah)

Count 5 of the Third Superseding Indictment charged Darrah and Vernon Rich with distribution of methamphetamine. (R. 72: Indictment, 647–48).

John Pizzuti was a DDMC member who had used meth with the club and had dealt in pound quantities of marijuana he was getting from Vern Rich. (R. 1072: Tr., 5808–11). Pizzuti got into trouble and agreed to cooperate with the government. So he made controlled buys of meth from Rich, Vandiver, and Darrah. (R. 1072: Tr., 5834–50). In one

of the buys, Darrah met with Pizzuti and delivered a Marlboro box with meth in it from Rich for $1,000. (*Id.*, 5839–43). Darrah now challenges Pizzuti's credibility, but this Court does not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Fisher*, 648 F. 3d 442, 450 (6th Cir. 2011) (citation omitted).

And the recording of the encounter between Pizzuti and Darrah made clear Darrah's intent to distribute a controlled substance, which is the mens rea required under 21 U.S.C. § 841(b). *United States v. Dado*, 759 F.3d 550, 569–70 (6th Cir. 2014). The two men are heard discussing the deal and Darrah is heard counting the payment made by Pizzuti for the drugs. Pizzuti counts out the 1,000 dollars. Pizzuti asks, "It's fucking good shit?" and Darrah replies, "It looks pretty good." (R. 1072: Tr., 5842–43; Gov't exhibit R-4A). At the very least, that recording confirmed that Darrah intended to distribute a controlled substance, and his use of the word "looks" even permitted the jury to find that he knew the controlled substance was meth. That was more than sufficient to prove Darrah's distribution of meth and his required mens rea. *Dado*, 759 F.3d at 569–70.

73

### E.    Count 26: Conspiracy to obstruct justice by witness tampering (Smith, + Darrah)

Count 26 of the Third Superseding Indictment charged Smith, Darrah, and others with conspiracy to obstruct justice by witness tampering—that is, by attempting to intimidate Danny Burby to prevent and deter him from cooperating in any investigation of the DDMC. (R. 72: Indictment, 654–60).

Jeff Smith assaulted Michele Richards, Burby's girlfriend, at a DDMC steak fry because she had disrespected Burby's DDMC colors. Following that, there were recorded telephone conversations between Smith, Darrah, and other DDMC members regarding their fears that Burby or Richards would speak with law enforcement. (*E.g.*, R. 2553: Gov't exhibit T-281A, 43000–001). Defendants Smith and Darrah were aware that the FBI was investigating the DDMC because federal law enforcement had recently searched several DDMC locations, and they discussed the FBI investigation. (R. 1077: Tr., 7065–67). Smith and Darrah tried to determine whether Richards or Burby had spoken with law enforcement. (R. 2553: Gov't Exhibit T-285A, 43002–003). After Burby refused to attend club meetings or answer questions, Smith

74

kicked him out of the club. (R. 2553: Gov't Exhibit T-300A, 43004–006). Darrah told Gary Nelson to contact Burby and threaten him to "keep his mouth shut." (R. 2553: Gov't Exhibit T-309A, 43007–008). Darrah also ordered Nelson to go to Burby's house and collect DDMC property. (R. 2553: Gov't Exhibit T-312A, 43009–011).

Burby was then labeled a snitch by the DDMC. (R. 1093: Tr., 7586, 7693–95). Smith, Darrah, Vandiver, and others visited various bars and motorcycle club hangouts to post threatening flyers labeling Burby a snitch. (*Id.*, 7588–90.) Burby became concerned for his safety after learning about the threatening posters. (R. 1077: Tr., 7073–75). Agent Fleming contacted Burby and warned him that DDMC members might be planning to assault him. (*Id.*, 7076.) Fleming also met with Darrah and told him that the FBI received information that Devils Diciples were planning to assault Burby. (R. 1076: Tr., 6884–85). A short time later, DDMC members and associates assaulted Burby at the Lighthouse Bar. (R. 1070: Tr., 4274; R. 1077: Tr., 7101–10). Burby believed that the confrontation occurred because he had left the DDMC and because the DDMC believed he was cooperating with law enforcement. (R. 1077: Tr., 7080–81).

75

This was sufficient to show that Smith, Darrah, and others conspired to obstruct justice by intimidating Burby to prevent him from providing information to the federal government. It is no defense to argue, as Smith and Darrah do, that Burby fought back after he knew he was being threatened, or when he was ultimately confronted and assaulted at the bar. The crime here, conspiracy, required only an agreement to engage in witness tampering. The calls, threatening flyers, and assaults established that agreement.

### F.     Count 29: Assault in aid of racketeering activity—Michele Richards (Smith)

Count 29 of the Third Superseding Indictment charged Smith with assault in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(6). Conviction of this offense requires proof that the defendant committed a violent crime—here, assault with intent to do great bodily harm—for the purpose of maintaining or increasing his position in the racketeering enterprise, that is, the DDMC.

At a DDMC steak fry, Jeffrey Smith, the National President of the DDMC, saw Michele Richards, Danny Burby's girlfriend, throw Burby's DDMC patched vest on the ground while searching his motorcycle

76

saddlebags for her purse. (R. 1075: Tr., 6629–31). Smith approached Richards, along with Darrah, Vandiver, and other DD brothers, and accosted her for this disrespect, calling her a "cunt" and smacking her. (*Id.*, 6632). Richards told Smith he "hit like a bitch" and told him to "fuck off." In response, Smith threw her to the ground, got on top of her, and hit her at least 20 times in the head and face. This violent assault continued until Burby came and pulled Smith off. (*Id.*, 6633–34).

Smith says that his motive in attacking Richards was simply anger, so his purpose was not related to the DDMC enterprise. But this Court has held that "VICAR's 'purpose' element is met if the jury could find that an 'animating purpose' of the defendant's action was to maintain or increase his position in the racketeering enterprise." *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014) (citation omitted). VICAR's motive requirement of "maintaining or increasing [one's] position in an enterprise" is satisfied if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *United States v.*

*Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001) (quotation marks and citations omitted).

Although the government must show an enterprise-related purpose, the government is not "required to prove the defendant acted 'solely' or 'primarily' for a gang-related purpose." *Hackett*, 762 F.3d at 500 (citing *United States v. Banks*, 514 F.3d 959, 965-966 (9th Cir. 2008)). There is no indication that "Congress intended for courts to busy themselves with ranking the reasons that a defendant had for committing the offense." *Banks*, 514 F.3d at 967 (alterations, quotation marks, and citation omitted). Therefore, a VICAR motive may still be established even if the defendant was motivated to commit the act, in part, out of a personal interest or motive. *See, e.g., United States v. Kamahele*, 748 F.3d 984, 1008-1009 (10th Cir. 2014).

Smith attacked Richards for her disrespect for the sacred "patch" of the DDMC, and then for her initial response to him. He was the national "boss" of the club, and this took place in front of his Vice President, his Warlord, and other members of the enterprise. What would have happened if he did not respond violently to this provocation, given the violent culture of the club? A reasonable juror could certainly

78

find that an "animating purpose" of the assault was to maintain Smith's prestige and position.

Smith also claims that the assault did not involve intent to do great bodily harm. The relevant elements for the underlying offense under Michigan Penal Code Section 750.84 are "(1) an attempt with force or violence to do bodily harm to another . . . and (2) an intent to do great bodily harm less than murder." *People v. Stevens*, 858 N.W. 2d 98, 103 (Mich. 2014). Smith was quite a large man, while Ms. Richards was quite small—approximately 5'3" and 118 pounds. (R. 1075: Tr., 6615; R. 1077: Tr., 7052). Smith repeatedly struck Richards with his fists, and would have continued to strike her had Burby not pulled him off. (R. 1077: Tr., 7051–55). After the assault Richards was bleeding from her nose, had a black eye, and had other injuries to her face. (R. 1077: Tr., 7058). Viewing this evidence in the light most favorable to the government, a reasonable juror could find that Smith intended to do great bodily harm to Michele Richards.

79

### G.    Count 30: Assault in aid of racketeering activity—Scott Perkins (Smith, Darrah)

Count 30 of the Third Superseding Indictment charged Smith, Darrah, and Vandiver with assault in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(3).

Scott Perkins, a DDMC member, let his friend Smiley Villa live with him for a time. Villa wasn't a Diciple; he had been a member of the Next of Kin Riding Club, a club associated with the Vigilantes motorcycle club. (R. 1094: Tr., 7854–56). Perkins and Villa had embarrassed the DDMC by going to bars, getting drunk, and acting belligerent. (*Id.*, 7877–79). This included a time when Villa went to the Green Street Tavern, a DDMC hangout, and "tore it up and disrespected people." (*Id.*, 7860–61). In addition Villa had stored a motorcycle, which he had reported stolen, in Perkins's garage. This led Darrah to demand, in phone calls to Perkins, that he kick Villa and his bike out of his house. (*Id.*, 7863–64).

To show they were serious, Smith, Darrah, and Vandiver—the president, vice president, and warlord of the DDMC—drove up to Perkins's house. "And when they pulled up, they told me get him out

80

of—get that Vigilante out of my house…. They, they threatened me to the point where even [sic] SA leaves or me and SA both get hit with a pipe or club or whatever." (*Id.*, 7857). The club metal bar, was a "car lockout thing" that Smith carried. Perkins testified: "he threatened SA, but he said that if I didn't get SA out of there, I'd get it, too." As a result, Perkins made Villa leave his house. (*Id.*, 7858).

These threats with a metal bar constituted assault with a deadly weapon. They were made by the triumvirate at the head of the DDMC. And they were made, at least in part, to sustain the honor of the club and to "get that Vigilante out." Acquiescence in the presence of a member of a rival gang could be seen as weakness, undermining the authority and reputations of the club's leaders. A reasonable juror could conclude that an "animating purpose" of the assault was to maintain these leaders' positions in the enterprise.

## H.    Count 36: Assault in aid of racketeering activity—Robert McClure (Drozdowski)

Count 36 of the Third Superseding Indictment charged David Drozdowski with assault in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(3).

81

Drozdowski became a "patched" member of the DDMC in 2011, and was an active member of the Blue Water chapter. He and his girlfriend, Lori Maday, frequented several DDMC clubhouses, including Blue Water, Detroit (Gratiot), and Port Huron, and went on a club "run" to Alabama. (R. 1148: Tr., 11738–39). Drozdowski went to California for a week or two on club business, for the "Hollywood yearly annual party," and came back with club shirts and a blue bolt-like container, with meth in it. (*Id.*, 11739–42). Drozdowski introduced Maday to meth, which they used often together, and with other Diciples. (Id., 11694–99). Drozdowski cooked meth at the various places they lived—a house in Anchor Bay, trailers in the Anchor Bay trailer park, and a shed behind their trailer. He had help from others, including Maday, Smiley Villa, and Chad (Chisel). (*Id.*, 11699–717). Maday saw Drozdowski cutting meth with MSM and packaging it for sale. (*Id.*, 11719–20).

Drozdowski was a loyal and ambitious member of the DDMC. He worked to ingratiate himself with the leader of the Blue Water chapter, Tim Downs (Space). (*Id.*, 11729–30). He thought he was stronger than Space, and wanted to "climb the ladder" and "lead the team"—the team being the Blue Water chapter. (*Id.*, 11731–32). When the FBI later

82

searched Drozdowski's trailer, they found a four-page handwritten document that included detailed guidelines for managing the Blue Water chapter, revised bylaws, and an elaborate organization chart with "D" as warlord. (*Id.*, 11800–03; R. 2504-5: Gov't exhibit 56-17, 42146–49). They also found law enforcement manuals, a phone list, and a "down brothers list" of imprisoned club members, similar to items found in searches of other leaders of the DDMC. (R. 1148: Tr., 11799–800).

On the night of January 8, 2012, a heavy metal band, Bender, played a concert at New York New York, a Detroit area club favored by the Devils Diciples. Brian Fields played bass in the band; his good friend Robert McClure came to see him play. McClure was wearing a vest with a patch for Black Label Society, a well-known heavy metal band. Both Fields and McClure were pretty big fans. The Black Label Society patch is modeled after motorcycle club colors. (R. 1147: Tr., 11581–84, 11588–90).

At the end of the band's set, Fields saw a Hispanic male wearing DDMC colors, later identified as Smiley Villa, shouting at Robert McClure about his vest. (R. 1147: 11591–94). Villa "was in his face,

basically nose-to-nose with him, screaming, like the top of his lungs, screaming at him to take it off." (*Id.*, 11592). McClure was "not a little guy," weighing about 240 pounds, but he had health issues, including liver problems and a disability that required him to use a cane. (*Id.*, 11588–11596). Fields tried to intervene and explain that the vest referred to a band, not a motorcycle club. McClure "had no idea what was going on." (*Id.*, 11592, 11594). He started removing the vest, but slowly, because "Bob moved really slowly." (*Id.*, 11594). As he was removing the vest, he was unexpectedly "suckerpunched" by another DDMC member, later identified as Drozdowski. (*Id.*, 11595–96).

Drozowski's blow knocked McClure back several feet until he hit the wall and dropped to the floor unconscious. The two Diciples ripped the vest and other items off McClure and left, riding away on their motorcycles. (*Id.*). McClure suffered severe blunt head trauma, a broken jaw, broken nose, and broken sinus bones. (R. 1148: Tr., 11665–72).

McClure's vest represented Black Label Society. But from a distance it looked like the patch of the Outlaws Motorcycle Club, a chief rival of the DDMC, or the Black Pistons, a support club for the Outlaws. (R. 1115: Tr., 10549–50; R. 1093: Tr., 7752–54, 7786–87; R. 1147: Tr.,

11641). Villa confronted McClure, and Drozdowski violently assaulted him, because they thought he wore a rival gang's colors.

Drozdowski was a loyal Devils Diciple, with strong ambition to advance his position and status in the club, right down to making detailed handwritten plans. He sported finger tattoos that said "talk shit"—the first part of the club motto, "talk shit, get hit." (R. 1148: Tr., 11723–24). A successful public assault on a member of a rival gang, or someone wearing its colors, would strengthen Drozdowski's standing in the club and support his ambitions. A reasonable juror could readily find that an 'animating purpose' of the assault on Robert McClure was to maintain or increase Drozdowski's position in the racketeering enterprise. *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014).

Drozdowski's Rule 29 motion regarding this charge claimed specifically that the evidence was insufficient to show that the assault had the purpose of maintaining or increasing his position in the DDMC. (R. 1165: Motion, 13311–13). He did not claim insufficient evidence of his intent to cause great bodily harm, so that argument is waived. *Hamm*, 952 F.3d at 739–40. And in any event, the unprovoked violence of the attack and the extent of McClure's injuries were an ample basis

85

for a reasonable juror to find Drozdowski's intent "to cause the requisite quantum of harm." *People v. Dillard*, 303 Mich. App. 372, 378 (Mich. Ct. App. 2013) (citations omitted).

## I.    Count 37: Felon in possession of ammunition (Drozdowski)

Count 37 of the Third Superseding Indictment charged David Drozdowski with being a felon in possession of ammunition.

Shortly after the assault on Robert McClure at the New York New York bar, the FBI executed search warrants at the homes of Villa and Drozdowski. (R. 1148: Tr., 11768). At Villa's place, they found a 12-gauge sawed-off shotgun and the patches that had been removed from McClure's Black Label Society vest. (*Id.*, 11769–70, 11773–74; R. 1212: Tr., 14238–41). At Drozdowski's trailer, they found five rounds of rifle ammunition and two boxes of 20-gauge shotgun shells. (R. 1148: Tr., 11784–85). The shotgun shells were found in a closet near the bedroom, and the rifle rounds were in plain view on a display case in the living room. (R. 1212: Tr., 14241).

The government can prove actual and constructive possession through circumstantial evidence. *United States v. Bailey*, 553 F. 3d 940, 944 (6th Cir. 2009). The evidence here was sufficient to establish that

Drozdowski constructively possessed this ammunition. Constructive possession "exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Hadley*, 431 F.3d 484, 507 (6th Cir. 2005) (quoting *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998)). "Proof that the person has dominion over the premises where the firearm is located is sufficient to establish constructive possession." *Kincaide*, 145 F.3d at 782 (internal quotation marks and citation omitted). Further, "a jury generally 'is entitled to infer that a person exercises constructive possession over items found in his home.'" *United States v. Tyus*, 379 F. App'x 450, 452 (6th Cir. 2010) (quoting *United States v. Hill*, 142 F.3d 305, 312 (6th Cir. 1998)).

Drozdowski's dominion over the trailer he occupied with the girlfriend, and the items in it, is uncontested. Though Lori Maday thought the shotgun shells may have belonged to "Lurch," who had previously lived with them in another location (R. 2387: Tr., 33867), that would not preclude Drozdowski's constructive possession of them—

87

or hers, for that matter. And there are still the rifle rounds, which were in the open on a display case in the living room. (R. 1212: Tr., 14241).

Viewed in the light most favorable to the government, this evidence was sufficient for a reasonable juror to find that Drozdowski possessed the ammunition found in his trailer.

### J. Part II, Count 1: Conspiracy to suborn perjury and obstruct justice (Smith, +Darrah)

Count 1 of Part II of the consolidated indictment charged Smith, Darrah, Vandiver, and other DDMC members with conspiracy to suborn perjury and obstruct justice, in violation of 18 U.S.C. §§ 371, 1503, and 1622. (R. 2535-1: Redacted Consolidated Indictment, 42713–18).

Victor Castano was prosecuted federally for gun and drug charges. (R. 1093: Tr., 7678–79, 7682–87). His DDMC brothers tried to help him out, by getting William Lonsby, Keith McFadden, and Stella Herron to lie to the FBI and to testify at trial that the gun in question was not Castano's. (R. 1092: Tr., 7397–406; R. 1097: Tr., 8781–808; R. 1098: Tr., 9068–91). As part of this effort, Smith and Darrah told McFadden that "it would be a good thing if I was to take care of a brother"; McFadden took that to mean he didn't have a choice. (R. 1097: Tr., 8787–89). They

had similar interactions with Stella Herron. (R. 1098: Tr., 9087–88, 9092–94). McFadden and Herron did what they were told.

In their Rule 29 motions Smith and Darrah argued solely that McFadden and Herron, as previous perjurers, lacked sufficient credibility to support their convictions. (R. 1182: 13793–94; R. 1188: 13840–41). But on review of the sufficiency of evidence under the *Jackson v. Virginia* standard, a court may not "reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Fisher*, 648 F. 3d at 442, 450 (6th Cir. 2011) (quotations omitted).

Smith and Darrah now argue more generally that the evidence of their roles was insufficient. By making only the specific claim that the witnesses lacked credibility, they waived this argument. *Hamm*, 952 F.3d at 739–40. But in any event, the proof of their roles was direct and clear. After Vandiver initially approached Keith McFadden about lying to protect Castano, Smith and Darrah had a direct conversation with him, in which they told McFadden "it would be a good thing if I was to take care of a brother" and made it clear that this was more than just a request. (R. 1097: Tr., 8786–88). This was followed by more

89

conversations, in which McFadden confirmed that he would do it and they made further plans. (*Id.*, 8788–90). After this, McFadden and his girlfriend, Stella Herron, met with Castano and others to "make sure that the stories are all straight." (R. 1097: Tr., 8795–99). Smith himself sought confirmation that McFadden's girlfriend, Stella Herron, would support the lie. (R. 1098: Tr., 9086–89). At Castano's house, McFadden and Castano coached Herron on her testimony, and Darrah visited to discuss Castano's concern that she would not be believable. (*Id.*, 9090–94). As it turned out, Castano's concern was correct: the jury did not believe the lies.

## II.    The district court did not err in its jury instructions. (Smith, +McKeoun, +Darrah, +Vandiver, +Witort)

This Court reviews a district court's choice of jury instructions for abuse of discretion. *United States v. Taylor*, 800 F.3d 701, 709 (6th Cir. 2015). A trial court has broad discretion in crafting jury instructions; it does not abuse its discretion unless the jury charge fails to state the law accurately. *United States v. Maslenjak*, 821 F.3d 675, 681 (6th Cir. 2016). Reversing a conviction for error in jury instructions occurs "only if the instructions, viewed as a whole, were confusing, misleading, or

90

prejudicial." *United States v. Svoboda*, 633 F.3d 479, 483 (6th Cir. 2011). No single provision of the instructions is reviewed in isolation; the Court considers the charge as a whole. *United States v. Prince*, 214 F.3d 740, 761 (6th Cir. 2000). Even an improper instruction will not justify reversing a conviction unless the instructions as a whole were "confusing, misleading, or prejudicial." *United States v. Kelsor*, 665 F.3d 684, 695 (6th Cir. 2011).

### A.    The RICO conspiracy instructions were correct.

The defendants were charged with RICO conspiracy, 18 U.S.C. § 1962(d), not a substantive RICO offense, based on the DDMC enterprise and its activities. Consistent with basic conspiracy law, the district court instructed the jury that to convict the defendants the government had to prove "the existence of an enterprise or that an enterprise would exist." (R. 2450: Tr., 38437). Also, that the enterprise "was or would be" engaged in interstate commerce, that a conspirator "was or would be" associated with the enterprise, that a conspirator "did or would" conduct or participate in the affairs of the enterprise, and that a conspirator "did or would" participate in the affairs of the enterprise through a pattern of racketeering activity. (*Id.*, 38437–38).

Defendants claim that the district court erred by instructing the jury that they could be found guilty of RICO conspiracy if they agreed that "the enterprise would exist." They argue that the government was required to prove an existing enterprise. They are wrong as a matter of law. Section 1962(d)'s plain language, together with *Salinas v. United States,* 522 U.S. 52 (1997) and the cases following it, establish that the government need only prove that the conspirators agreed to form an enterprise. (Given this, appellants' interstate-commerce, association, and participation claims are likewise foreclosed.) And anyway, where, as here, the government's entire case was centered on an existing enterprise—DDMC—any error was not prejudicial.

Although this Court has stated in dicta that a RICO conspiracy offense requires proof of "'the existence of an enterprise,'" *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000), it has not decided whether it suffices for the conspirators to agree to form an enterprise. Indeed, in *Tocco* the Court was not confronted with the issue because that prosecution, like this one, relied on evidence of an existing racketeering enterprise. The Court did not address whether a RICO conspiracy

92

offense could be established if the conspirators agreed that a not-yet-existing enterprise would exist in the future.

This Court is bound by its prior holdings in published opinions, but "not dispensable dicta that sweep more broadly than the issue at hand." *Wright v. Spaulding*, 939 F.3d 695, 697, 700 (6th Cir. 2019). In *United States v. Harris*, 695 F.3d 1125, 1131–32 (10th Cir. 2012) the Tenth Circuit rejected as "dicta" a statement in an earlier case that existence of enterprise was essential element of Section 1962(d) offense, where earlier case "focused on what constituted an 'enterprise' under RICO, and did not address the alternate possibility that the 'existence of an enterprise' might not in fact be a necessary element at all." And in *United States v. Applins*, 637 F.3d 59, 75 n.4 (2d Cir. 2011) the Second Circuit rejected as "dicta" statements in previous cases that RICO conspiracy requires proof of enterprise because, "in those cases, the government relied on evidence of the actual existence of an enterprise and pattern of racketeering acts to prove the conspiracy").

The Supreme Court's decision in *Salinas* makes clear that a RICO conspiracy only requires an *agreement*, not that the agreement ever comes to fruition. Salinas was charged with both a substantive RICO

93

offense and RICO conspiracy; the jury acquitted him of the substantive RICO count but convicted him of RICO conspiracy. 522 U.S. at 54–55. On appeal, he challenged the court's failure to instruct the jury that he must have committed or agreed to commit two predicate acts himself. The Court held that § 1962(d) contains no such requirement. *Id.* at 63. The Court explained that § 1962(d) must be interpreted according to "conventional" principles of conspiracy law. Among those principles are that "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense," and that a person "may be liable for conspiracy even though he was incapable of committing the substantive offense." *Id.* at 63–64.

Since *Salinas*, two circuits have expressly held that its reasoning extends to the enterprise element. In *United States v. Harris*, the court said that, under *Salinas*, "to prove a violation of § 1962(d), 'it suffices that [a defendant] adopt the goal of furthering or facilitating the criminal endeavor,' so long as that endeavor would, 'if completed, . . . satisfy all the elements of a substantive criminal offense"; thus, "just as the Government need not prove that a defendant personally committed or agreed to commit the requisite predicate acts to be guilty of § 1962(d)

94

conspiracy, neither must the Government prove that the alleged enterprise actually existed." 695 F.3d at 1133. And in *United States v. Applins* the court observed that in *Salinas*, "[t]he Supreme Court . . . rejected the proposition that a conviction for RICO conspiracy requires proof that a substantive offense was committed"; thus, "*Salinas* counsels that the establishment of an enterprise is not an element of the RICO conspiracy offense." 637 F.3d at 74–75. *See also United States v. Fernandez*, 388 F.3d 1199, 1223 n.13 (9th Cir. 2004) ("[T]he contemplated or actual existence of a RICO enterprise is . . . a necessary element of a § 1962(d) conspiracy"); Third Circuit Model Crim. Jury Instruction 6.18.1962D Comment (2010) (stating that it "is not always necessary" to establish that an enterprise "did in fact exist" to prove a RICO conspiracy); Pattern Crim. Fed. Jury Instruction for the Seventh Circuit for 18 U.S.C. § 1962(d) (2012) (requiring proof that the relevant association "was" or "*would be*" an enterprise to establish a RICO conspiracy) (emphasis added).

In short, under *Salinas*, § 1962(d) is a distinct offense that requires only that the defendant have agreed "to further an endeavor which, if completed, would satisfy all of the elements of a substantive

95

[RICO] offense." *Salinas*, 522 U.S. at 65. The government thus may establish a RICO conspiracy with proof that the defendant agreed to facilitate the conduct of an enterprise that would exist; it need not show that the enterprise actually existed.

In any event, this instructional dispute would at worst result in harmless error here. The charged association-in-fact enterprise here was the Devils Diciples, and the defendants never disputed that the Devils Diciples existed. They only disputed whether it satisfied the requirements for an enterprise. This language in the jury instructions therefore could not have affected the verdict.

### B.　The interstate commerce instruction was correct.

The second element of the RICO conspiracy charge was "that the enterprise was or would be engaged in, or its activities affected or would affect interstate commerce." (R. 2450: Tr., 38437). The district court instructed that "[t]he Government is not required to prove that these economic activities had a significant or substantial effect on interstate commerce; rather, even a minimal effect is sufficient." (*Id.*, 38441).

This was correct. *United States v. Riddle*, 249 F.3d 529, 537 (6th Cir 2001). But defendants say that *Waucaush v. United States*, 380 F.3d

251 (6th Cir. 2004) required the court to instruct that the government must prove a substantial effect on interstate commerce. However, in *Waucaush*, the Court acknowledged *Riddle*'s minimal effect principle, but carved out a narrow exception for a case where the RICO enterprise was not involved in any sort of economic activity. *Id*. at 255–56. Here, as in *Riddle* and the cases it cites, the heart of the DDMC's crimes— drug trafficking, illegal gambling, and stolen merchandise—"are quintessential illegal economic activities." *Id*.; *United States v. Shryock*, 342 F.3d 948, 984 n.6 (9th Cir. 2003). The court's instruction was focused on these economic activities. (R.2450: Tr., 38440–41). Under the law of this circuit, a minimal effect was sufficient.

## C.    The Michigan murder instructions were correct.

One of the charged racketeering acts in Michigan involved second-degree murder. Other racketeering acts involved assault with intent to commit murder. The district court instructed the jury on the elements of these offenses using Michigan's Model Criminal Jury Instructions. As to murder, the court instructed the jury as to these elements:

> First, that the person caused the death of an individual, that is, an individual died as a result of the act of another.

Second, that the person had one of these three states of mind when he acted:

That he intended to kill, or that he intended to do great bodily harm to an individual, or that he knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions.

(R. 2450: Tr., 38489–90). As to assault with intent to commit murder:

First, that the person tried to physically injure another person.

Second, that when the person committed the assault, he had the ability to cause an injury or at least believed that he had such an ability.

And third, that the person intended to kill the person he assaulted.

(*Id.*, 38490). These instructions tracked Michigan's model jury instructions, with the omission of optional mitigation factors.

The model second-degree murder instruction, Mich. Crim. Jury Instruction 16.5, includes—in brackets—a third "element:" "that the killing was not justified, excused, or done under circumstances that reduce it to a lesser crime." Defendants claim the omission of this "element" was error. But the use note to the model instruction makes it clear that this paragraph may be omitted if there's no evidence to support it. And Michigan law does not require the prosecution to refute

98

a defense of justification, excuse, or mitigation in the absence of evidence to support it. *See Burton v. Renico*, 391 F.3d 764, 779–80 (6th Cir. 2004). In denying defendants' request for this instruction, the district court accurately observed that no such evidence had been offered at trial. (R. 1202: Order, 13902).

It is the same with assault with intent to commit murder. The district court's instruction tracked Mich. Crim. Jury Instruction 17.3, including the requirement of a specific intent to kill, but omitted the bracketed phrase at the end of the third element: "and the circumstances did not legally excuse or reduce the crime." As with 16.5, this phrase is optional, as is clearly indicated in the use note to this model instruction.

Defendants offered no support for any claim of justification, excuse, or mitigation at trial. Nor do they here. These murder instructions were correct as given.

### D. The RICO unanimity instruction was correct, and the district court did not abuse its discretion in declining to submit special interrogatories on racketeering acts or overt acts. (Smith, McKeoun, +Darrah, +Vandiver, +Witort)

This Court has concluded that to convict for RICO conspiracy the jury need not be unanimous as to the specific racketeering act or acts a defendant agreed would be committed. *United States v. Rios*, 830 F.3d 403, 434–35 (6th Cir. 2016); *see also, e.g., United States v. Cornell*, 780 F.3d 616, 625 (4th Cir. 2015); *United States v. Randall*, 661 F.3d 1291, 1299 (10th Cir. 2011); *United States v. Applins*, 637 F.3d 59, 81–82 (2d Cir. 2011). However, many courts have held that the jury must agree unanimously "'as to the *types* of predicate racketeering acts' that someone would commit." *United States v. Wilson*, 579 F. App'x 338, 347 (6th Cir 2014) (quoting *Randall*, 661 F.3d at 1299). In *Rios*, this Court declined to resolve this issue, because by finding the racketeering conspiracy responsible for at least five kilograms of cocaine the jury was necessarily unanimous as to at least one type of racketeering act. 830 F.3d at 434–35.

The same analysis would apply here, as the jury made the same finding. (*E.g.*, R. 1256: Jeff Smith Verdict, 15405). But that approach is not necessary anyway, for the district court here gave the very unanimity instruction indicated by *Rios* and endorsed in *Wilson*, requiring that the "verdict must be unanimous as to which type or types of racketeering activity you, the jury finds, that the defendant agreed was committed or would be committed or caused." (R. 2450: Tr., 38444). So unanimity was required by the district court's instructions.

Nothing required the court to submit special interrogatories to the jury. As the Second Circuit has explained, the "ultimate decision whether to use special interrogatories in criminal RICO cases is left to the discretion of the trial judge and [ ] neither the prosecutor nor the defendant has the right to insist on their use." *United States v. Applins*, 637 F.3d 59, 83 (2d Cir. 2011) (quoting Robert M. Grass, Note, *Bifurcated Jury Deliberations in Criminal RICO Trials,* 57 Fordham L.Rev. 745, 754 (1989)); *accord, United States v. Henley*, 766 F.3d 893, 913–14 (8th Cir. 2014); *United States v. Shenberg*, 89 F.3d 1461, 1472 (11th Cir. 1996). The district court did not abuse that discretion here.

101

Likewise, certain defendants were charged with 18 U.S.C. § 371 conspiracies: conspiracy to conduct an illegal gambling business (R. 2535-1: Consolidated Redacted Indictment: 42692–98), and conspiracy to obstruct justice (*id.*, 42713–18). Each of these conspiracies required proof of an overt act. But under *United States v. Sanderson*, 966 F.2d 184, 187 (6th Cir. 1992), there was no requirement of unanimity as to any particular overt act, and the district court instructed the jury accordingly. (R. 2450: Tr., 38429). Defendants made no objection to this instruction. They only requested, without making citing authority, a special interrogatory for which overt act or acts the jury had agreed upon. (R. 1174: Defendants' Joint Request for Special Verdict Forms, 13676–77). This makes no sense, since there was no requirement of unanimity on any particular overt act. But even if there were such a requirement, that would not have necessitated special interrogatories, for the reasons explained above.

### E.    The district court did not abuse its discretion by departing from the Sixth Circuit pattern instruction on reasonable doubt. (Smith, Vandiver, +McKeoun, +Darrah, +Witort)

The district judge repeatedly instructed the jury, in its initial instructions and at the close of trial, that the government bore the

burden of proving guilt beyond a reasonable doubt. The judge correctly defined a reasonable doubt as a "fair doubt, an honest doubt growing out of the evidence or the lack of evidence, or the nature of the evidence and based upon reason and common sense." (R.2450: Tr., 38420).

As is his practice, the district judge declined to give one sentence of Sixth Circuit Criminal Pattern Jury Instruction 1.03, which describes proof beyond reasonable doubt as "proof which is so convincing that you would not hesitate to rely and act on it in making the most important decisions in your own lives." The court instructed the jury in full as follows:

> The Government must prove every element, that is every important part or ingredient of the crime charged beyond a reasonable doubt. What is that? Well, a reasonable doubt is a fair doubt, an honest doubt growing out of the evidence or the lack of evidence, or the nature of the evidence and based upon reason and common sense.
>
> Ultimately, a reasonable doubt would be a doubt that remains standing, even after you have carefully and thoughtfully examined and discussed in the jury room all of the facts and circumstances present in this case.
>
> Proof beyond a reasonable doubt, however, does not mean proof that amounts to an absolute certainty or beyond all possible doubt or that the proof of a fact or of a crime must fit with mathematical precision. We are talking about the affairs of human beings here, not machines. Doubts that are

103

merely imaginary or that arise from nothing more than speculative possibilities, or that are based only on sympathy or prejudice or guessing are not what the law recognizes as reasonable doubts.

(Id., 38419–20).

In a published opinion, this Court recently conducted a thorough analysis of a virtually identical reasonable doubt instruction, given by the same district judge in another case, and examined carefully the significance of the "would not hesitate" concept in the pattern instruction. *United States v. Ashrafkhan*, 964 F.3d 574, 577–580 (6th Cir. 2020). The Court concluded that the "would not hesitate" language is questionable and not mandatory, and there is no fault in this form of reasonable doubt instruction. *Id.*, at 580.

In this vein, appellants also challenge the district court's inclusion of the following language in its general instruction on evidence, because it's a revision of Sixth Circuit Criminal Pattern Jury Instruction 1.04:

> Don't speculate about what some potential witness who did not testify might have said or what some potential document or exhibit that was not introduced into evidence might have shown. Such things that are not received in evidence are not evidence and you are bound by your oath to not let them influence your decision in any way. In other words, make your decision based on the evidence as I have defined it here, and not on anything else.

104

(R. 2450: Tr., 38421–22). But what's wrong with that? Is the jury *supposed* to speculate on evidence that was not presented? And no, this language does not mean the jury could not consider the absence of evidence; that's different. The court's instructions on the presumption of innocence clearly expressed this concept. (*Id.*, 38419). And the court expressly told the jury to consider the lack of evidence in evaluating reasonable doubt. (*Id.*, 38420, 38536). No more was necessary.

### F.    The district court correctly declined to give a cautionary instruction regarding the Cadillac murder.

The government introduced evidence that at a party at the DDMC clubhouse in Cadillac, Michigan in 1993, Devils Diciple William Bartell (Stumpy) murdered Charles Isler, and that other club brothers attempted to conceal the crime by moving and burying the body. (R. 1150: Tr., 12167–71; R. 1212: Tr., 14288–91; R. 2504-5: Gov't Ex. C-1, 42152). This was substantive evidence of racketeering activity, as specified in overt acts 1–3 of the Indictment. (R. 72: Third Superseding Indictment, 604–05). Contrary to Smith's claim, Brief at 33, this evidence was not offered for "background" or "context"; nor did the court

105

give any limiting instruction when it was admitted. It was substantive evidence of the charged RICO conspiracy.

Yet defendants requested a limiting instruction at the close of trial, focused on the Cadillac murder evidence, that "this testimony was offered for the limited purpose of providing background or context and is not substantive evidence against any individual defendant nor is it substantive evidence which you can consider in determining the existence of an enterprise." (R. 1173: Defendants' Joint Proposed Cautionary Instruction, 13666). While the district court did from time to time give such cautionary instructions during trial when such background evidence was heard, it did not do so regarding this evidence.

So the court correctly refused the instruction, saying: "[i]n each circumstance where testimony was elicited regarding background information, the court gave a limiting instruction at the time. It explained that "the evidence was submitted not simply for context but as substantive evidence of the conspiracy." (R. 1202: Order Resolving Certain Objections, 13903).

106

This was correct. Evidence of the DDMC's operation during the early years of the charged conspiracy was relevant to show how the enterprise operated. It was also relevant to show how the DDMC engaged in and covered up the charged racketeering activity, including murders. This was not mere background evidence, and the jury was properly permitted to consider it as evidence of guilt on the charged RICO conspiracy.

### G.    The district court did not abuse its discretion by declining to give an addict-informant instruction.

The Devils Diciples Motorcycle Club was awash in drugs, particularly methamphetamine. Many former members, associates, and old ladies of the club testified. Almost all had used meth while with the Devils Diciples; many had used a lot of it; some had been addicted to it. This was all brought out in their testimony, and fully explored on cross examination.

The district court gave the pattern instruction on evaluating witness credibility (R. 2450: Tr., 38423–25), as well as a combined instruction—agreed upon by the parties—on the testimony of paid informants and witnesses who have been promised reduced criminal

107

liability. (R. 1169-1: Working Draft of Proposed Joint Instructions, 13611; R. 2450: Tr., 38533–34). Defendants requested more: Sixth Circuit Criminal Pattern Jury Instruction 7.06B, an instruction on the testimony of an addict-informant testifying under a grant of immunity or reduced criminal liability. (R. 1195: Brief, 13862). It would have instructed the jury to consider addicts' "testimony with more caution than testimony of other witnesses." The district court declined this request. (R. 1205: Order Overruling "Addict-Informant" Jury Instruction Objection: 14203–04).

Under the circumstances of this case, this instruction wasn't necessary. There is "no per se rule requiring that an addict-informant instruction be given in all cases involving the testimony of an addict-informant." *United States v. Brown*, 946 F.2d 1191, 1195 (6th Cir. 1991). Where the jury knows about drug use by witnesses, their testimony is corroborated, the court gives a general instruction on credibility and an instruction to consider the testimony with caution for some other reason, and the witnesses are subject to effective cross-examination on their drug use, a separate addict-informant instruction is unnecessary. *See United States v. Combs*, 369 F.3d 925, 940 (6th Cir.

108

2004); *see also United States v. McGhee*, 882 F.2d 1095, 1100 (6th Cir. 1989).

This case is not like *United States v. Griffin*, 382 F.2d. 823 (6th Cir. 1967), where the prosecution hinged on the testimony of a single addict-informant whose testimony was "essential to Griffin's conviction" and was corroborated only in minor details. *Id.* at 828–29. Here there were dozens of witnesses whose testimonies interlocked and in large part corroborated one another, and were further corroborated by evidence seized in multiple searches, by recorded calls, by undercover buys of narcotics, and otherwise. This corroboration, combined with the district court's other instructions on credibility and the exploration of the witnesses' drug use on cross examination, made an "addict-informant" instruction unnecessary. It also meant that any additional instruction on this point could not have affected the jury's verdict.

**H.    The district court gave proper supplemental instructions to address the jury's questions on conspiracy to manufacture, distribute, and possess with intent to distribute controlled substances.**

Count 3 charged these defendants and numerous others with a single drug conspiracy. (R. 72: Third Superseding Indictment, 646–47).

109

Arguing that the government had failed to prove a single conspiracy, defendants McKeoun and Witort requested multiple conspiracy jury instructions, framed in terms of their theories of defense, and the defendants generally requested such an instruction. (R. 1168-3: Defendants' Proposed Jury Instructions, 13437–39; R. 1161: Joint Defense Requested Jury Instructions, 11234). The government agreed that a general multiple conspiracy instruction should be given. (R.1169-1: Working Draft of Proposed Joint Jury Instructions, 13477–79). The district court agreed, and gave without objection an instruction on "Single Conspiracy vs. Multiple Conspiracies," modeled directly on Sixth Circuit Criminal Pattern Jury Instructions 3.08 and 3.09. (R. 1265: Jury Instructions, 15454–56; R. 2450: Tr., 38433–35). That instruction concluded:

> But a single conspiracy may exist even if all of the members did not know each other, or never sat down together, or did not know what roles all of the other members played. And a single conspiracy may exist, even if different members joined at different times, or if the membership of the group changed over time. These are all things you may consider in deciding whether there was one or more than one conspiracy, but they are not necessarily controlling.

Similarly, just because there were different sub-groups operating in different places, or many different criminal acts committed over a long period of time, does not necessarily mean that there was more than one conspiracy. Again, you may consider these things, but they are not necessarily controlling. What is controlling is whether the Government has proved that there was an overall agreement on a common goal. This is key.

(R.2450: Tr., 38343–35).

During deliberations, the jury had questions about the drug conspiracy count. First, they asked if "a defendant who worked with only one other person [can] be found guilty of the conspiracy" and asked what the phrase "agree with each other" meant. (R. 1238: Remark, 15336). With the agreement of the parties, the court referred the jury to portions of its written instructions. (*Id.*).

The next day, the jury sent the court a "continuation of our question yesterday." (R. 1262: Remark, 15425). The gist of the jury's question appeared to be whether the conspiracy charged in Count Three was limited to "those listed in the body of the charge." (*Id.*; R. 1284: Tr., 15683–85).

Given the complexity of the case and the legal issue, the district court saw that it was necessary to clarify its instructions, and not

111

simply refer the jury to those instructions already given. *United States v. Nunez*, 889 F.2d 1564, 1567–68 (6th Cir.1989). Over objection, the court sent the jury a note, telling them expressly that not all members of a conspiracy need be named, that a defendant can be charged with a conspiracy with parties who are not known, and that "the question before you is whether a defendant has been proven, beyond a reasonable doubt, to have knowingly and intentionally engaged with another person—named or unnamed, known or unknown—in the single conspiracy charged in the indictment." (R. 1262: Remark, 15424).

This was not a constructive amendment of the indictment, and it did not deprive defendants of due process. (McKeoun brief, 9–14). It was simply a clarification to the jury, based on fundamental principles of conspiracy law and focused on those principles set forth in the court's earlier instructions. (R. 1265: Jury Instructions, 15454).

The following day the jury further refined its question, focusing on language in the multiple conspiracy instruction, and asking "[d]oes 'one single conspiracy' … mean that each defendant charged in Count 3 must be part of an interconnected conspiracy or are they charged with

112

an individual conspiracy that is not interconnected to the other

defendants charged?" (R. 1263: Remark, 15430).

After consulting with the parties, and over objection by the

defense, the district court gave another detailed response, referring to

elements of its earlier multiple conspiracy instruction and clarifying the

points of concern to the jury. (*Id.*, 15427–28). The court restated basic

principles, and concluded:

> Your question refers to a conspirator or a conspiracy being "<u>interconnected</u>" to or with the other defendants. A conspiracy is, by its very nature, an <u>agreement</u>. In my instructions, I do not use the term "interconnected." It is your task, in this regard, to determine whether there is an <u>agreement</u> between at least two people, or more, to commit the crime or crimes charged. That is the essence of a conspiracy. Now, in order for the Government to prove that a particular defendant was a member of a particular conspiracy, it is necessary to prove only that the defendant knew of the conspiracy, intentionally associated himself with it, and knowingly contributed his efforts in its furtherance. So, the essential question before you in this regard is whether the government has proved the existence of at least the conspiracy alleged in Count 3: a single conspiracy to manufacture, distribute, or possess with intent to distribute one or more kinds of controlled substances as specified in that Count.

> Finally, remember, of course, that proof that a defendant was a member of another conspiracy is not enough by itself to convict that defendant of being a member of the conspiracy in Count 3; on the other hand, bear in mind that

113

even if a defendant has been proved to be a member of another conspiracy, that fact is not necessarily inconsistent with also being a member of the conspiracy charged in Count 3, as long as the government has proved, by the requisite burden, that the defendant was, in fact, a member of the conspiracy charged in Count 3.

(*Id.*; R. 1285: Tr., 15724–25).

This was a correct statement of the law. To establish a single conspiracy, "[i]t is not necessary for each conspirator to participate in every phase of the criminal venture, provided there is assent to contribute to a common enterprise." *United States v. Ghazaleh*, 58 F.3d 240, 245 (6th Cir. 1995) (quoting *United States v. Hughes*, 895 F.2d 1135, 1140 (6th Cir. 1990)). The conspirators need not have direct association to establish a single conspiracy. *United States v. Rugerio*, 20 F.3d 1387, 1391 (6th Cir. 1994). A single conspiracy may be proved although the defendants did not know every other member of the conspiracy, and although each member did not know of or become involved in all of the activities in furtherance of the conspiracy. *United States v. Maliszewski*, 161 F.3d 992, 1014 (6th Cir. 1998). A single conspiracy does not become a multiple conspiracy by lapse of time, changing members, or shifting locales. *United States v. Sanchez*, 928

114

F.2d 1450, 1456 (6th Cir. 1991). "In short, case law makes plain that evidence of multiple players and multiple locales does not equate with evidence of multiple conspiracies." *United States v. Maliszewski*, 161 F.3d 992, 1015 (6th Cir. 1998). The existence of distinct sub-groups within a conspiracy does not necessarily mean there are multiple conspiracies. *See, e.g., United States v. Wilson*, 168 F.3d 916, 924 (6th Cir. 1999) (citing *United States v. Warner*, 690 F.2d 545, 550 n.8 (6th Cir. 1982) and *Rugerio*, 20 F.3d at 1392).

Given these principles, there was no fault in the court's instructions or its supplemental instructions. The defendants were given full latitude to argue that there were multiple conspiracies, and not a single conspiracy, as a basis for acquittal. They had a multiple conspiracy instruction on which to base their arguments. The jury heard their arguments and decided, based on proper instructions, that there was a single conspiracy.

I. **The district court was permitted to send the redacted indictment to the jury, including overt acts alleging how the enterprise operated and committed its racketeering activities.**

The indictment recited 201 overt acts in connection with the RICO conspiracy (R.72: Third Superseding Indictment, 604–39). These were

factual allegations that filled in some of the substance behind the more general allegations about the enterprise's operation and its racketeering activities. (*Id.*, 594–604). Before trial, defendants moved to strike these overt acts from the indictment. (R. 1013: Joint Motion to Strike, 4763). In negotiating the contents of a consolidated redacted indictment to be provided to the jury, the government offered to omit the overt acts at the outset, with the understanding that the court would determine at the end of trial which overt act allegations to provide to the jury. (R. 1038: Response, 5052–53). The court proceeded on this basis, and used a consolidated redacted indictment that omitted the overt acts. (R. 1050: Bench Order; R. 2535-1: Consolidated Redacted Indictment, 42679–721).

At the conclusion of trial the government provided a redacted list of the overt acts which had been proven at trial, to be re-inserted in the indictment when the jury was instructed. Defendants objected, on the basis that overt acts are not an element of a RICO conspiracy. (R. 1158: Joint Memorandum of Law in Opposition to Including Overt Acts, 13184). The district court decided to provide the overt acts to the jury, redacted to omit those not referenced at trial, and did so in its

116

instructions, to be inserted in the redacted consolidated indictment they had been earlier provided. The court cautioned the jury that, like the indictment, the overt acts were mere allegations and not evidence. (R. 1218: Tr., 14438; R. 2450: Tr., 38415, 38419; R. 2535-2: Overt Acts, 42722–52).

The district court did not err in providing the jury with the entire redacted indictment pertaining to the evidence at trial. A district court can give a jury a copy of the indictment so long as the court instructs the jury that the indictment isn't evidence of guilt. *United States v. Chavez*, 951 F.3d 349, 362–63 (6th Cir. 2020) (citing *United States v. Smith*, 419 F.3d 521, 531 (6th Cir. 2005)). A motion to strike surplusage should be granted only where it is clear that the language is irrelevant and prejudicial. *United States v. Moss,* 9 F.3d 543, 550 (6th Cir. 1993). "[I]f the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant)." *Moss,* 9 F.3d at 550 (quoting *United States v. Thomas,* 875 F.2d 559, 562 n. 2 (6th Cir. 1989)).

117

The overt acts described in the RICO conspiracy count were relevant and material, not surplusage. They included allegations showing how the enterprise operated and preserved itself. They described many of the alleged racketeering activities that the conspirators agreed upon and committed. Those allegations were part of the charged offense, describing the scope of the charged conspiracy and several of its elements. *See United States v. Rios*, 830 F.3d 403, 427 (6th Cir. 2016). The trial was lengthy—over three months—and it made sense to provide the jury with some detail of those allegations. The overt acts were redacted at the end of the trial to omit those not addressed, and defendants did not dispute the redactions. The district court also made clear to the jury that the indictment was only an allegation, subject to proof at trial, and was not evidence of guilt. There was no error in submitting these allegations to the jury.

## III.    The district court did not abuse its discretion in its evidentiary rulings, and any errors that may have occurred were harmless.

This Court reviews a district court's evidentiary ruling for abuse of discretion. That discretion is abused if the court "relies on clearly erroneous findings of fact, improperly applies the law, or employs an

118

erroneous legal standard," or if this Court is "firmly convinced" that the trial court "committed a clear error of judgment." *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015) (quoting *United States v. Miner,* 774 F.3d 336, 348 (6th Cir.2014)) (internal citations omitted). When a defendant fails to object at trial, review of an evidentiary ruling is for plain error. *United States v. Olano,* 507 U.S. 725, 731–32 (1993). Further, even where the district court abused its discretion, evidentiary rulings are subject to harmless error review under Fed. R. Crim. P. 52(a). If it is more likely than not that a non-constitutional evidentiary error did not materially affect the verdict, then reversal is not required. *Kilpatrick*, 798 F.3d at 378.

### A. The case agent's lay opinion testimony was properly admitted, and any mistakes were harmless. (McKeoun, Vandiver, Witort, + Smith, + Darrah)

FBI Agent William Fleming first became aware of the Devils Diciples' activities in 2004 through communications with confidential informants. (R. 2443: Tr., 37900–01). In March 2005, Fleming took part in the execution of state search warrants at the Mount Clemens DDMC clubhouse and the residence of Vern Rich; based on what the investigators found he opened an FBI investigation. (*Id.*, 37926–31).

119

From then through the trials in 2014 and 2015, Fleming was the case agent responsible for the FBI's DDMC investigation. He conducted dozens of interviews with Devils Diciples, former Devils Diciples and associates, and members of other outlaw motorcycle clubs. (*E.g.*, R. 2444: Tr., 38021). He recruited and debriefed cooperating informants and oversaw controlled buys of methamphetamine. (*E.g.*, *id.*, 37988–91, 38006–07). He was the affiant for Title III wiretap applications for telephones of DDMC members Vernon Rich and Paul Darrah, and was actively involved in monitoring those wires in real time. (*Id.*, 37991–92, 37997–38000, 38008–11, 38015–20). He oversaw and participated in the execution of multiple search warrants of properties associated with the Devils Diciples. (*E.g., Id.* at 37992–93, 37996–97). He conducted surveillance activities. (*E.g.*, R. 1076: Tr., 6877–82). It is fair to say that he accumulated vast personal knowledge of the Devils Diciples and their activities, based on personal experience and observation, in the course of the investigation.

On the fifth day of trial, in testimony from Agent Fleming, the government introduced and played for the jury undercover recordings and wiretapped phone calls relating to controlled buys of

120

methamphetamine that confidential informant John Pizzuti had made from Devils Diciples Vernon Rich, Carl Vandiver, and Paul Darrah. Pizzuti had testified about these buys the day before (R. 1072: Tr., 5826–48). During his testimony Fleming, who had overseen these buys, explained some of the terminology in the recordings, gave background information about DDMC chapters, members, and practices, and gave his opinion as to the context and meaning of parts of the recorded conversations. (This testimony is recapitulated in the district court's opinion. R. 1141: Memorandum Opinion further addressing the *Freeman* Objections to Special Agent William Fleming's Opinion Testimony fn. 6, 11016–17).

Defendants made no contemporaneous objection to this testimony. Only after Fleming's direct and cross examination concluded—and after a lunch break—did counsel raise an objection under *United States v. Freeman*, 730 F.3d 590 (6th Cir. 2013), saying "we are respectfully objecting to the continued testimony of Officer Fleming as it relates to his giving his opinion after interpreting the phone calls." (R. 1203: Corrected Tr., 14049). The court took this objection under advisement, and later, after briefing and a short hearing, it declined to strike the

testimony under Fed. R. Evid. 103(a), while cautioning the government to take care in any further lay opinion testimony to establish a proper foundation and to avoid the concerns of *Freeman*. (R. 1075: Tr., 6670, 6674–77).

The trial continued, and Fleming was recalled periodically to testify regarding matters relevant at each stage, including testimony about additional recordings. Near the conclusion of the trial, the district court issued the comprehensive opinion referenced above, which analyzed all of Fleming's testimony for possible *Freeman* error, along with the bases for the testimony and the court's cautionary instructions regarding opinion evidence, and found the evidence had been properly admitted. (R. 1141: Memorandum Opinion, 10995–11019).

*Freeman* was a murder-for-hire case, where the "primary evidence" implicating the defendant was 77 recorded phone calls. *Freeman*, 730 F.3d at 594. At trial, the government's case agent offered his opinion about cryptic conversations in those calls, expanding on otherwise plain language "to broadly illustrate the prosecution's theory of the case for the jury." *Id.* at 594–95. He even interpreted one phrase—"the situation"—to narrate the entire murder plot: "The

122

situation discussed was regarding Leonard Day and his having stolen jewelry from Roy West, Roy West having put a hit on Leonard Day, and Leonard Day ultimately being killed." *Id.* at 595. This Court held that the agent's testimony went too far under Federal Rule of Evidence 701. *Id.* at 595–99. The agent's vague references "to the investigation as a whole" did not establish a sufficient foundation for his interpretations, and perhaps even incorporated hearsay. *Id.* at 596–97. The testimony also did not help the jury; it simply told the jury what result to reach. *Id.* at 597–98.

In *Freeman,* this Court focused on the risk presented when an agent interprets recordings "based on his knowledge of the entire investigation," which could lead the jury to believe he has important information that has not been presented to them. *United States v. Kilpatrick*, 798 F.3d at 379–80 (quoting *Freeman*, 730 F.3d at 596). The agent there "repeatedly substantiated his responses and inferences with generic information and references to the investigation as a whole," and never specified personal experiences or observations as the basis for his opinions. *Id.* The agent did not testify to being present for the surveillance or to observing relevant activity, so that because the agent

123

"failed to explain the basis of his interpretations—what experience he had that the jurors themselves did not have—[he] therefore failed to lay a foundation under Rule 701." *Id.*

Agent Fleming's lay opinion testimony did not suffer from the defects present in *Freeman*. He had ample personal knowledge and observation on which to base his opinions, and explained that to the jury. His interpretation of conversations was largely focused on describing things the jurors might not understand, by drawing on his own observation of the conversations, and he was able to explain the basis for his interpretations without saying they were based on "the totality of the investigation." *See United States v. Albertelli*, 687 F.3d 439, 450 (1st Cir. 2012). To the extent that his interpretation could be questioned, Fleming was subject to cross-examination on the grounds for his opinions. *Id.* at 448. And the district court repeatedly cautioned the jury that the recordings were the evidence, that the jurors did not have to accept Fleming's opinions, and that the interpretation of the conversations was ultimately for them alone. (*See* R. 1141: Memorandum Opinion, fn. 1, 11013–15).

As noted above, the defendants failed to preserve a *Freeman* objection to Fleming's initial interpretation of the recordings relating to the controlled buys by Pizzuti. Fed. R. Evid. 103(a); *see United States v. Kelly*, 204 F.3d 652, 655 (6th Cir. 2000). Accordingly, the admission of that evidence is reviewed only for plain error. *United States v. Atchley*, 474 F.3d 840, 853–54 (6th Cir. 2007). To succeed on plain-error review, a defendant must demonstrate that there was an "(1) error (2) that was obvious or clear, (3) that affected [his] substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (citation and internal quotation marks omitted). Moreover, for an error to have substantially affected a defendant's rights, he must demonstrate that there is "'a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 76, 82 (2004)).

In these appeals, the defendants have made only one specific claim of error in Fleming's opinion testimony:

125

Q.    Based upon the context of the call, as well as the investigation that was going on at that time, what did you understand Mr. Rich to be referring to when he said, "it's here now"?

A.    In my opinion, Mr. Rich is telling Mr. Pizzuti that he got a new shipment of methamphetamine that he has, and is willing to sell it.

*     *     *

Q.    And is that your opinion, based upon your investigation in this case, and your review of all of the calls in this case?

A.    Based upon that and my experience working drug investigations, yes.

(R. 1203: Tr., 14011, 14017; Witort brief, 49–51).

These observations were based both on the content of the conversations and on the agent's personal supervision of Pizzuti's undercover activity at the time. The reference to "the investigation that was going on at the time" clearly means that activity, which was fully developed for the jury in Fleming's and Pizzuti's testimony. The passing reference in the prosecutor's question to "all the calls in this case" seems to refer to the calls relating to these undercover buys, and certainly does not equate to the reliance on the "investigation as a whole" that was the problem in *Freeman*. There was no plain error here.

126

So what of the lay opinion testimony Fleming gave *after* the defense interposed its first *Freeman* objection? The district court declined to allow a standing objection, because "with respect to presentation of similar evidence in the future, those questions have yet to be formulated. That testimony is yet to be elicited." (R. 1075: Tr., 6677). Again, in these appeals, the defendants have made only one specific claim of *Freeman* error in the agent's testimony:

> Q.    I want to direct your attention to some wire interceptions that are related to—withdrawn—wire interceptions that may be related to Ms. Franks.
>
> Are you familiar with one of the calls on the Paul Darrah wire, Government's Exhibit T-311?
>
> A.    That's correct.
>
> Q.    And can you tell the jury if you have an opinion about whether it's related to the particular events of October the 17th of 2008?
>
> A.     I believe it's related to the manufacturing of methamphetamine involving Mr. Vandiver and Mr. McGowan [sic].

(R. 1095: Tr., 8160; McKeoun brief, 39–41). Counsel for defendant Witort belatedly objected to this tidbit of testimony on foundation grounds.

127

The district court correctly denied the objection, as the foundation was the statements of Jamie Franks, who had testified the day before as to her meth cooking and subsequent arrest with defendant Vandiver. (R. 1094: Tr., 8023–41). Moreover, as the district court observed, the purpose of the testimony was not to interpret the content of the conversation; it was to orient the jury and place it in context based on the previous day's testimony. (R. 1095: Tr., 8161–63). And then the recording was played for the jury, with no interpretation by the agent other than identifying the callers as identified in the transcript: "'PD' is Mr. Darrah, 'PM' is Mr. McGowan [sic], and 'CV' is Mr. Vandiver." (*Id.*, 8163). The agent did not base his opinion on "the entire investigation;" he based it on the contents of the conversation and its relation to the testimony of Jaime Franks, which was before the jury. The district court told the jury that "the significance of these things is completely up to the jury, not up to any particular witness to assert." (*Id.*). The government played the recording without further comment, and defense counsel cross-examined the witness on its content. (*Id.*, 8283–84). The court did not abuse its discretion in letting this pass.

128

Finally, if there was any error in allowing lay opinion testimony by the agent, it was surely harmless. The recorded conversations were only a minor part of the government's case, and Agent Fleming's testimony about them was even more minor. The meat of the case was in the testimony of dozens of witnesses—former members and associates of the DDMC, members of other outlaw motorcycle clubs, victims of their crimes, law enforcement officers, and others. It was in the evidence produced in the execution of almost 40 search warrants at various locations between 2004 and 2012, and the observation of activities at those locations. It was in expert testimony about the manufacture of methamphetamine and in official records regarding the purchase by Devils Diciples and their associates of meth precursors and controlled substances. It is more likely than not that *Freeman* error, if any, did not materially affect the verdict, so reversal is not required. *Kilpatrick*, 798 F.3d at 378.

### B. The district court did not abuse its discretion by admitting co-conspirators' statements under Fed. R. Evid. 801(d)(2)(E). (Smith, +McKeoun, +Darrah, +Witort)

The district court elected to admit co-conspirators' statements conditionally during trial, subject to its determination at the conclusion

129

whether the government had met its burden of establishing the admissibility of those statements. (R. 983: Order, 4393–94). At the outset of trial, when defense counsel requested "standing objections on the co-conspirators hearsay stuff," the court allowed as counsel would not have to "jump up every time," while "not prohibiting you from standing and raising objection" if necessary under the circumstances. (R. 2439: Voir Dire, 36749–51). Trial proceeded on this basis, with counsel frequently objecting on hearsay grounds and the court conditionally admitting statements under Fed. R. Evid. 801(d)(2)(E).

After the government rested the defense filed a "Joint Memorandum of Law Regarding Enright Findings for Co-Conspirator Statements." (R. 1179: Memorandum, 13751–74). This memorandum comprised four pages of general legal principles, followed by a list of 170 "hearsay statements" which were purportedly inadmissible under Rule 801(d)(2)(E). The memorandum did not articulate how it was that the listed statements were offered under that rule, nor how, if so offered, they failed to meet the requirements of the rule. Nor does defendant Smith's brief on appeal, which simply lays out legal principles and cites the list of statement. (Smith brief, 56–62). This amounts to throwing a

pot of spaghetti at the wall, in the hope that a noodle or two might stick.

The government responded below with a detailed brief that explained how many of the statements were not hearsay at all, because they were not offered for their truth, were based on the witness's personal observations or opinions, were offered for background or foundation, or were party admissions (i.e. statements of the defendants on trial, either made to the witness or contained in an audio recording). (R. 1187: Brief on Admissibility of Co-Conspirators' Statements: 13808–09; 13817–20). The government further explained the multifarious objectives of defendants' RICO conspiracy—maintenance of the organization, protection of the organization through violence, intelligence gathering to frustrate law enforcement, controlling territory and relationships with other outlaw motorcycle clubs, drug manufacturing and dealing, illegal gambling, theft of motorcycles, obstruction of justice—and how particular categories of statements in defendants' list were connected to and furthered those objectives. (*Id.*, 13812–17; 13820–22).

131

Before proceeding to jury instructions and closing argument the court reviewed generally the nature and scope of the conspiracies alleged, and found that the evidence of the conspiracy's existence and the defendants' involvement in it far exceeded the preponderance standard under Rule 801(d)(2)(E). (R. 2450: Tr., 38404–07, 38409). The court declined to parse the defendants' list of 170 "statements," because "the bulk of them were noted in the course of the presentation of evidence and objections were, when raised, dealt with on the spot." (*Id.*, 38402). The court observed that many of the statements listed by defendants were not hearsay at all (*id.*, 38402, 38407–08), and determined that those actually offered as co-conspirator statements were properly admitted under Rule 801(d)(2)(E). (*Id.*, 38409).

The district court did not abuse its discretion, much less in any way that could have affected the jury's verdict. Under Rule 801(d)(2)(E), an out-of-court statement offered for the truth of the matter asserted does not constitute hearsay if that statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy. The statements of a co-conspirator are admissible against a defendant upon a district court's finding that (1) a

132

conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the co-conspirator made the statement during the course of and in furtherance of the conspiracy. *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1980) (citing *United States v. Enright,* 579 F.2d 980 (6th Cir. 1978)); *see also United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999) ("This three-part test is often referred to as an *Enright* finding.").

The foundational requirements for a co-conspirator's statements to be admissible must be established by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). Rule 801(d)(2)(E) applies to statements of co-conspirators not named in the indictment. *United States v. Word*, 806 F.2d 658, 664–65 (6th Cir. 1986). A pretrial hearing or determination is not required. *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979). Instead, it is "the trial court's prerogative to conditionally admit co-conspirator statements 'subject to later demonstration of their admissibility by a preponderance of the evidence.'" *United States v. Robinson*, 390 F.3d 853, 867–68 (6th Cir. 2004) (quoting *Vinson*, 606 F.3d at 153).

"A statement is 'in furtherance of' a conspiracy if it is intended to promote the objectives of the conspiracy." *United States v. Clark,* 18

133

F.3d 1337, 1342 (6th Cir. 1994). "'[S]tatements in furtherance of a conspiracy can take many forms,' such as keeping co-conspirators advised, or concealing aspects of the scheme. The statement may also be 'susceptible of alternative interpretations.'" *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000). "A statement may be admissible as in furtherance of a conspiracy even if not exclusively, or even primarily, made to further the conspiracy." *Id.; see also United States v. Hitow*, 889 F.2d 1573, 1581 (6th Cir.1989); *United States v. Hamilton*, 689 F.2d 1262, 1270 (6th Cir.1982). "Statements that 'identify participants and their roles in the conspiracy' also qualify as statements made in furtherance of the conspiracy." *United States v. Monus*, 128 F.3d 376, 393 (6th Cir. 1997) (quoting *Clark*, 18 F.3d at 1342). Similarly, statements that "keep a conspirator abreast of a co-conspirator's activities" are admissible. *United States v. Franklin*, 415 F.3d 537, 552 (6th Cir. 2005) (quoting *United States v. Rios,* 842 F.2d 868, 874 (6th Cir. 1988)). And statements that are designed to facilitate the concealment of a conspiracy's criminal accomplishments are admissible under 801(d)(2)(E). *See Monus,* 128 F.3d at 393; *Tocco,* 200 F.3d at 419.

134

In *United States v. Curro*, 847 F.2d 325 (6th Cir. 1988), the defendant asserted error because the district court stated its 801(d)(2)(E) conclusions but did not specify its reasons for finding the admitted statements were made during and in furtherance of the conspiracy. *Id.* at 328. The Court observed that "[t]he 801(d)(2)(E) ruling is an evidentiary ruling, and there is no general proposition of law that requires a trial judge to explain evidentiary rulings." *Id.* It then noted that there was not a single statement at issue, but the entire testimony of a witness that included statements based on the witness's direct knowledge observation as well as admissions of various defendants. *Id.* As for the statements of co-conspirators, the Court observed that, "since the offense charged was a free-wheeling RICO conspiracy, there were many different criminal acts involved, all of which were 'in furtherance of' the conspiracy." *Id.* at 329. Accordingly, the Court found it clear that the trial court's conclusion was correct, while cautioning that "a mere conclusory statement will not always suffice." *Id.*; *accord United States v. Moss*, 9 F.3d 543, 549 (6th Cir. 1993); *United States v. Martinez,* 430 F.3d 317, 328 (6th Cir. 2005); *United States v. Maliszewski,* 161 F.3d 992, 1007 (6th Cir. 1998).

135

The same was true here. Both in the district court and on appeal, the defendants submitted a laundry list of 170 statements, claiming that the predicates for admission under Rule 801(d)(2)(E) were not met, without any further explication. The burden is not on the government, on the district court, or on this Court, to parse defendants' list and make their arguments for them. Nonetheless, as the government demonstrated below and the district court found, many of the listed items were admitted on grounds unrelated to Rule 801(d)(2)(E). (R. 2450: Tr., 38407–08). As to the items admitted as co-conspirator statements, the district court found expressly that the government had established by a preponderance the conspiracies alleged and the defendants' membership in those conspiracies. (*Id.*, 38409). And the court gave a broad explanation of the objectives of the conspiracy and how statements of co-conspirators furthered those objectives. (*Id.*, 38402–07). The district court's *Enright* findings as to the elements of admissibility under Rule 801(d)(2)(E) were far more detailed and thoughtful that those approved by this Court in cases such as *Curro, Martinez, Moss,* and *Maliszewski.*

The district court did not abuse its discretion.

136

### C.    The district court did not abuse its discretion by admitting testimony about the Cadillac murder under Rule 801(d)(2)(E), and any error in this regard was harmless. (McKeoun)

Some of the RICO conspiracy's first allegations involved the 1993 murder of Charles Isler by Devils Diciple William Bartell, aka "Stumpy," at the DDMC Cadillac chapter clubhouse, followed by the concealment of his body and destruction of evidence by other DDMC members. (R. 72: Third Superseding Indictment, 604–05). Michael Mastromatteo testified about these events. He said that when he was a new member of the club, he and another member had traveled to Cadillac to help them set up their clubhouse. (R. 1150: Tr., 12167). He was then asked if later he had learned from "brothers in the Devils Diciples" about an incident at the clubhouse. Over objection as to foundation, the court allowed the testimony under Rule 801(d)(2)(E). (*Id.*, 12168).

Mastromatteo testified that he had heard "from the brothers" that there had been a party at a bar uptown; that when the bar closed the party had moved to the clubhouse; that at the clubhouse one of the visitors "was bitching" about the quality of some dope he had bought there; and that a DDMC member named "Stumpy" then shot the

137

complaining drug customer in the head. (*Id.*, 12168–19). After that, "[t]hey buried him"; then, when police came to search, they were unable to find the body. (*Id.*). On further objection, the court confirmed its understanding that "they" referred to DDMC members and that these statements were "made during and in furtherance of the relationship." (Id., 12170). Then, on further inquiry, Mastromatteo said that he learned from "club brothers" that the body was moved, that some brothers were arrested, and that one of them was "Batman," and that he had later had conversations about these incidents with Batman "as well." (*Id.*, 12171). Other evidence confirmed that William Bartell had been convicted of murder (R. 1212: Tr., 14288–90; R. 2504: Gov't exhibit C-1, 42152), and that three others had been convicted of obstruction of justice, conspiracy, and accessory after the fact in relation to that homicide. (*Id.*, 14290–91; Gov't exhibit C-2).

Bartell's continuing significance to the DDMC enterprise was shown by his name's presence on "down brothers" lists that the FBI found when they searched numerous locations, including Jeff Smith's home. A "down brothers" list was a list of DDMC members in state or federal prison, with prisoner numbers and addresses, so that designated

138

chapters could send them postal money orders while incarcerated. (R. 1096: Tr., 8405–09; R. 2500: Gov't exhibits 13-4, 13-6). And Bartell's importance to the enterprise was further cemented by numerous items found in Smith's home when it was searched in 2004: a series of articles about the murder, mailed from a Mount Clemens P.O. Box (R. 1075: Tr., 6724–25; Gov't exhibit 13-27); an article about assault charges against two DDMC members, that related to the Cadillac homicide (R. 1075: Tr., 6732–34; Gov't exhibit 13-161); police reports from the investigation of the Cadillac homicide, including witness statements, medical records, and an interview transcript (R. 1076: Tr., 6772–73; Gov't exhibit 13-25); and VHS recordings of new reports about the Cadillac homicide and the recovery of the victim's body (R. 1212: Tr., 14291–92; Gov't exhibit 13-24).

McKeoun conflates Mastromatteo's testimony to suggest that he only heard about the Cadillac events in a later conversation with Batman. (McKeoun brief, 23). But it's clear from the transcript that he said he learned of the events from "brothers in the Devils Diciples." His later conversation with Batman may have covered the same subject, but it wasn't all he heard.

139

Nor is McKeoun correct that what the DDMC brothers told Mastromatteo about what happened in Cadillac was "idle chatter or casual conversation about past events," citing, for example, *Tocco*, 200 F.3d at 419. The sharing of this information was more than that: it was important to the conspiracy for members to know what had happened, to deal with the consequences. In the context of the DDMC's strong interest in the investigation and prosecution of Bartell, in avoiding or minimizing adverse ramifications for the club, in providing support to Bartell in prison so as to keep him loyal, and in fostering loyalty among other members, it was critical to inform club members of these events. These statements "identif[ied] participants and their roles in the conspiracy," *Monus*, 128 F.3d at 393; they were made to "keep a conspirator abreast of a co-conspirator's activities," *Franklin*, 415 F.3d at 552; and, in the context of DDMC's efforts to avoid and defeat law enforcement scrutiny, they were designed to facilitate concealment, *see Monus,* 128 F.3d at 393; *Tocco,* 200 F.3d at 419. It was not an abuse of discretion to admit these statements under Rule 801(d)(2)(E).

But even if the district court erred, the error was harmless. The Cadillac murder was a very small piece of the RICO conspiracy in this

140

case, in comparison to the overwhelming evidence of drug trafficking and manufacturing, other violent murders and assaults, illegal gambling, motorcycle thefts, witness intimidation, and obstruction of justice. And these statements were a small fraction of the many statements of co-conspirators that were properly admitted. This Court "may affirm if we can say with 'fair assurance' that any such error did not "substantially sway[ ]" the judgment." *United States v. Christian*, 925 F.3d 305, 314 (6th Cir. 2019) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)). As in *Christian*, "even had th[is] evidence not been admitted, no jury could have acquitted Christian on these charges. The evidence against him was too damning." *Id.*

### D. It was not plain error to admit evidence of the Cadillac murder and the Box Canyon beatings, which was relevant evidence of the enterprise's operations and racketeering activities. (Vandiver, +McKeoun, +Smith +Darrah, +Witort)

The government's evidence included proof that DDMC member Charles Bartell murdered a drug customer at the Cadillac clubhouse, as discussed above. Although there were hearsay objections, there was no objection based on relevance, or on unfair prejudice under Fed. R. Evid. 403. The government also proved through testimony of several

141

witnesses that, to appease the Hells Angels over an assault on one of their old ladies by five members of the Tucson, Arizona DDMC chapter, a gang of Arizona and California Diciples had savagely beaten those members and dumped them in Box Canyon, a remote area in Southern Arizona. (R. 1113: Tr., 9797–808; R. 1146: Tr., 11150–89). Again, there was no objection based on relevance or unfair prejudice.

Vandiver now argues superficially that this evidence was not relevant, and that its admission was error under Rule 403. (Vandiver brief, 26–33). But this evidence was plainly relevant to specific allegations in the charged RICO conspiracy: racketeering acts involving murder under Michigan and Arizona law and kidnapping under Arizona law (R. 72: Indictment ¶10(B)(1), 601–02), and the means and methods of the conspiracy relating to the enterprise's use of violence for discipline and punishment, use of violence to maintain standing and authority, use of violence to maintain territory, and destruction of evidence to avoid detection (*id.*, ¶¶ 12(A), (B), (C), (H), 602–03; *see also id.*, 604–05, 612–13).

The relevance of this evidence was not substantially outweighed by any danger of unfair prejudice. Rule 401 provides for admitting

142

evidence that has "any tendency to make a fact more or less probable," if the fact "is of consequence in determining the action." Rule 403 only allows the exclusion of relevant evidence if "its probative value is substantially outweighed by a danger of … unfair prejudice." Important words in Rule 403 are: "substantially" and "unfair." In evaluating a Rule 403 challenge to relevant evidence, this Court views the challenged evidence "in the light most favorable to its proponent, giving the evidence the maximum reasonable probative force and its minimum reasonable prejudicial value." *United States v. Whittington*, 455 F.3d 736, 739 (6th Cir 2006) (quoting *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 587 (6th Cir.1994)). And "[u]nfair prejudice," as used in Rule 403, does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." *United States v. Mendez-Ortiz,* 810 F.2d 76, 79 (6th Cir.1986); *see also United States v. Schrock,* 855 F.2d 327, 335 (6th Cir. 1988).

Especially in light of this standard, admitting this evidence could not have been plain error. However violent and graphic the evidence was, it was how the charged RICO conspiracy operated. It was not a

143

collateral matter that would unfairly influence the jury. It was violence committed within the scope of the alleged conspiracy that directly involved two of the defendants on trial—Witort and Smith—as well as numerous other co-conspirators. No matter that other defendants were not direct participants: as leaders of a RICO conspiracy that operated based on threats and violence, they were responsible for those incidents too. Criminal defendants who are on trial for violent crimes are not entitled or permitted to exclude the evidence of those crimes just because it paints them in a bad light.

Under this Court's usual standard of review, admitting this evidence was not an abuse of discretion. It was therefore not plain error. Nor is Vandiver correct in arguing that the failure to object was excusable because it was futile, because the district court found the evidence relevant in denying defendants' Rule 29 motions. (Vandiver brief, 34). Those motions, and that decision, came at the end of trial, far after the time for defendants to make a Rule 403 objection. They did not retroactively excuse the defendants from making a contemporaneous objection.

Under any standard it was not error to admit this evidence.

144

### E.     Reference to a polygraph report found in a search of a DDMC leader's house was not error, much less plain error. (Witort)

On the eighth day of trial, Agent Fleming testified at length about documents and other items seized in searches of multiple locations connected with the Devils Diciples, principally members' residences. These documents showed DDMC's counterintelligence efforts: collecting law enforcement guides, judicial records, investigative reports, trial transcripts, grand jury records, and the like.

One aspect of this was to assemble information on suspected "snitches," including Mark Berman, a Diciple who had been kicked out. (R. 1076: Tr., 6796, 6804–08, 6821; Gov't exhibits 26-1, 26-2, 26-3, 26-4, 26-20). During this testimony, Fleming identified Government exhibit 16-15: it was an FBI polygraph report for Berman that was found in the 2004 search of the residence of Ken Roll, the former national Vice President of the DDMC. (*Id.*, 6796; Gov't exhibit 16-15). The government did not move its admission, the agent did not tell the result (if any) of the polygraph, and nobody objected to this brief part of the testimony. The obvious import and relevance of this testimony was to document that DDMC members physically collected and reviewed

145

sensitive law enforcement documents for counter-surveillance purposes and for the purpose of identifying putative witnesses and government informants. The evidence had nothing to do with whether Berman was or was not truthful in answering whatever questions might have been posed in the polygraph test.

Six days later, defendants moved for a mistrial or to strike Exhibit 16-15 (R. 1079: Motion for Mistrial, 7174–79), to which the government duly responded in detail. (R. 1105: Response, 9138–46). But the district court correctly denied that motion, because there's no basis to question this brief reference to a co-conspirator's possession of a polygraph report that he had no business to possess. True, polygraph examinations and polygraph results are generally inadmissible. *United States v. Weiner*, 988 F.2d 629, 633 (6th Cir. 1993). But that's true only when they're being used to show whether the subject of the test told the truth or lied—not when they're admitted for some other relevant purpose. Thus, in *Weiner*, this Court approved the admission of the defendant's FBI polygraph tests—and results—not to show whether he in fact had lied, but to show why the FBI had discontinued his use as an informant. *Id.* Here, the reference to Berman's polygraph had nothing to do with

146

whether he had told the truth or lied: it was about something entirely different, that the Devils Diciples *had* this kind of information as part of their counterintelligence efforts to thwart law enforcement.

But, says Witort, the mere fact that someone was given a polygraph suggests that he "passed," and that a curative instruction "would have highlighted the fact that government witness Berman must have taken one, and must have 'passed.'" Witort brief, 46–47. This is silly: Mark Berman did not testify in this trial.

As there was no contemporaneous objection here, the standard of review is plain error. There was no error, much less plain error.

### F.   The district court did not abuse its discretion in admitting, over a Rule 403 challenge, a photograph of Drozdowski brandishing handguns. (Drozdowski)

Before trial, defendant Drozdowski moved in limine to exclude photographs of him brandishing large automatic pistols and of tattoos on the fingers of his hands spelling out "TALK SHIT"—the first part of a DDMC motto, "talk shit, get hit." The government argued that these photos were relevant to Drozdowski's membership and role in the DDMC enterprise, particularly with regard to the importance of intimidation by and within the enterprise, through the use of firearms

147

and otherwise. (R. 1001: Response and Brief Opposing Motion in Limine, 4482–83). At a pretrial hearing the district court found the photos relevant and denied the motion to exclude, but without prejudice to the possibility of a cautionary instruction, if requested, to address the claim of unfair prejudice under Rule 403. (R. 2442: Tr., 37691–92).

In due course, the firearms pictures were admitted, without further objection or request for a cautionary instruction. (R. 1111: Tr., 9313–18; R. 1148: 11743–46; R. 2504-5: Gov't exhibit 56-26, 42150). Drozdowski now claims reversible error in the admission of these photos, under Rule 403. (Drozdowski brief, 53–54).

Pursuant to Rule 403, the district court may exercise its discretion to exclude relevant evidence if the probative value of that evidence is substantially outweighed by the danger of unfairly prejudicing the jury against the defendant. *United States v. Gibbs*, 797 F.3d 416, 422 (6th Cir. 2015). But "[b]road discretion is given to district courts in determinations of admissibility based on … relevance and prejudice, and those decisions will not be lightly overturned." *United States v. Bell,* 516 F.3d 432, 440 (6th Cir.2008).

The firearms photos were relevant, both to show Drozdowski's membership and role in the intimidation aspects of the DDMC enterprise and culture, and to show his association with firearms, which were an important tool and aspect of that culture. And this association was at least marginally relevant to the charge of felon in possession of ammunition, by showing Drozdowski's facility with firearms. And they're not particularly graphic, much less unfairly prejudicial. Moreover, the defendant failed to take the court up on its offer to give a cautionary instruction, nor did he object to the government's brief reference to the photo in closing argument. (R. 2450: Tr.,, 38557–59). So, viewing the evidence "in the light most favorable to its proponent, giving the evidence the maximum reasonable probative force and its minimum reasonable prejudicial value," *Whittington*, 455 F.3d at 739, the court did not abuse its discretion in admitting it. Further, any error in admitting this evidence was harmless, as it could not have "substantially swayed" the jury in deciding whether Drozdowski possessed the ammunition for which he was convicted.

149

**IV.    The wiretap affidavits provided a substantial basis for the issuing judge's findings of probable cause and need, and Darrah was not entitled to a Franks hearing. (Darrah, +McKeoun, +Smith, +Vandiver, +Witort)**

In March 2008, after six years of investigating the DDMC, the government applied for authorization under 18 U.S.C. § 2510, *et seq.* (Title III), to intercept Paul Darrah's telephone calls. (R. 825-1: March Affidavit, 40775–827). The original order and six subsequent extensions were signed by District Judge Paul Borman. The court authorized the interception of calls concerning violations of 18 U.S.C. §§ 1962 (RICO) and 1955 (illegal gambling), and 21 U.S.C. §§ 841 and 846 (drug trafficking and conspiracy).

In 2014, after the deadline for filing pretrial motions had passed, Darrah filed motions to suppress the intercepted calls, alleging that the affidavits in support of the applications failed to establish probable cause or need and that the affidavit in support of the second extension contained a material omission. (R. 822: 3464–68; R. 823: 3469–73; R. 824: 39877–40194; R. 825: 40647–827). Twelve other defendants filed notices of joinder in those motions without making any additional argument, even to establish their standing to object to the wiretap. (R.

150

2438: Motion hrg., 36650–51). The district court found that the joinder motions were untimely because only Darrah had obtained an extension of the deadline for filing pretrial motions. (*Id.*; R. 1045: Order, 5128 n. 1). McKeoun, Smith, Vandiver, and Witort have therefore forfeited this argument. *See United States v. Ramamoorthy*, 949 F.3d 955, 962 (6th Cir. 2020).

On appeal of the denial of Darrah's motions to suppress, including his *Franks* claim, this Court reviews the district court's findings of fact for clear error and its determinations of law de novo. *United States v. Poulsen*, 655 F.3d 492, 503 (6th Cir. 2011). The reviewing court must consider all evidence in the light most favorable to the government. *United States v. Young*, 847 F.3d 328, 342 (6th Cir. 2017). In determining whether a wiretap order met the statutory standard, this court gives "great deference" to the judge who signed the order, just as it does to a magistrate who issues a search warrant. *United States v. Giacalone*, 853 F.2d 470, 479 (6th Cir. 1988).

Although Title III has many procedural requirements, Darrah's challenge is limited to whether the orders were based on probable cause, whether the issuing judge's finding of "necessity" was supported,

and whether the affidavit for the second extension contained a material omission—information about Darrah's health. Each of those issues is discussed below.

### A.    The affidavits established probable cause that the wiretap would reveal evidence of a listed crime.

The first requirement for a wiretap authorization is a judicial finding that "there is probable cause for belief that an individual is committing, has committed, or is about to commit" an offense enumerated in the statute and that "particular communications concerning that offense" will be intercepted. 18 U.S.C. § 2518(3)(a) and (b). "Probable cause is not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation omitted). And the basic standards for probable cause to wiretap are the same as for a search warrant. *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988). The evidence in the affidavit "must be judged on the totality of the circumstances and in a reasonable and common sense manner." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). If Judge Borman could reasonably have found that the affidavit established probable cause that a wiretap of Darrah's phone would lead to evidence relating

152

to criminal activity by DDMC, the order must be upheld. *United States v. Young*, 847 F.3d at 343.

William Fleming, a 20-year veteran of the FBI, signed the affidavits for the original application and each of the extension requests. Agent Fleming described the DDMC as an enterprise with national, state, and local leadership; the Detroit chapter was both the national headquarters and the state headquarters. (R. 825-1: March Affidavit, 40782). Fleming explained that a lengthy investigation of DDMC had already yielded grand jury testimony from two former members, information from five informants or cooperators, video from a pole camera at the DDMC clubhouse in August 2007, and a search of Darrah's home in 2004. (*Id.*, 40782–801, 40812–815). The investigation had established that "Darrah was the 'National Vice-President' of the DDMC, Jeff Smith was the 'National President' of the DDMC, and together they were 'responsible for running the entire DDM[C].'" (*Id.*, 40783–785).

On September 5, 2007, an informant placed a consensually-recorded call to Vernon Rich to arrange a methamphetamine purchase. (*Id.,* 40796). The next day, Darrah called the informant to say that Rich

had left something for him early that morning. Later, Darrah and other DDMC members went to the informant's house. While wearing a recording device, the informant gave Darrah $1,000 in marked bills in exchange for methamphetamine. (*Id.,* 40797–798). After that, the district court had authorized a wiretap on Rich's phone. (*Id.,* 40798). That wiretap captured at least 20 calls to Darrah, including an October 2007 call in which Rich notified Darrah that another DDMC member would be picking up a large shipment of methamphetamine from a contact in Missouri. (*Id.,* 40803–804).

In January 2008, another DDMC member gave information confirming that Smith and Darrah were the club's leaders and describing the DDMC as "one big drug ring." (*Id.,* 40812–813). The following month, the first confidential informant provided more information, stating that Darrah monitored the activities of the DDMC chapters nationwide by telephone, email, and personal visits, and that Darrah met or spoke by phone with Smith almost daily. (*Id.,* 40788). Information from a pen register showed that there were 520 calls between Darrah's phone and two phones used by Smith from November 16, 2007 (the day Darrah's current cell phone was activated)

154

to March 10, 2008, a period of less than four months immediately preceding the affidavit. (*Id.*, 40816–817).

Each affidavit supporting an extension incorporated all previous affidavits by reference, reported the criminal histories and personal identifying information of the target subjects, contained pen register data or subscriber information for relevant telephones, reported the results of any surveillance, informed the court of the results of the previous month's interceptions, and described what else needed investigating. For example, the first extension request mentioned four new targets—Danny Burby, Michael Darrah, Scott Perkins, and Christopher Marrocco—and noted that Darrah had replaced his phone with a new instrument with the same number. (R. 824-1: April 17th Affidavit, 39904 & n.1, 39906–907). Agent Fleming stated that it appeared that there were still more people involved in the criminal activity, but they had not yet been identified. (*Id.*, 39915). The agent gave examples of drug-related calls that had been intercepted in the first 30 days, and stated that Darrah appeared to be involved in the sale of Vicodin. (*Id.*, 39916–922). In other calls, Darrah discussed collecting "taxes" from DDMC members, travel to a DDMC chapter in Alabama,

155

and the DDMC's traditional alliance with the Hells Angels Motorcycle Gang. (*Id.*, 39922–931). Darrah also discussed DDMC member Scott Perkin's assault on a member of the Red Wings Motorcycle Gang, and the potential for a physical confrontation with the Outlaws Motorcycle Gang in Ohio. (*Id.*, 39923–924, 39927–930).

In the request for a second extension, Agent Fleming repeated the reasons to investigate the same violations further. (R. 824-1: May 16th Affidavit, 39947). Fleming also described recently-intercepted calls in which Darrah and Smith said they had discussed Danny Burby's arrest with a local judge (*id.*, 39966–67), and another call in which Darrah warned a member that the judge had tipped them off to a raid at a bar (*id.*, 39972–73). In addition, Fleming reported new information from a state agency that Darrah had filled 105 prescriptions for Vicodin or Vicodin-like painkillers, totaling 10,200 pills, between September 2003 and March 2008. (*Id.*, 39961).

The remaining extension requests likewise each reported the results of the previous month's wiretap and other investigative efforts and explained why further investigation was required. For example, in the affidavit for the third extension, Fleming described the sources of

156

Darrah's prescription painkillers, the contents of drug-related calls, and pending requests for information on prescriptions issued to other targets to try to determine whether they were getting prescriptions from the same doctors or pharmacies as Darrah. (R. 824-1: June 13th Affidavit, 39996, 40010–14). He also advised the court that some of the intercepted calls revealed DDMC's efforts to avoid police infiltration and DDMC's willingness to use violence against members or former members who cooperated. (*Id.*, 40016–22). In the fourth extension request, Fleming explained that the wire had identified a new target, Gary Nelson, to whom Darrah was supplying Vicodin for resale, and that Darrah had other sources for Vicodin when he couldn't get prescriptions. (R. 824-1: July 11, 2008, Affidavit: 40045, 40060–65). Also, Darrah discussed concerns about a potential cooperator, and spoke with Smith about getting help for Danny Burby from within the law enforcement or judicial system. (*Id.*, 40068–69).

In support of the fifth extension, Fleming detailed additional drug-related calls intercepted in July, particularly two that had allowed agents to interpret a meeting recorded by a recently-installed pole camera. (R. 824-1: August 9, 2008, Affidavit, 40099, 40107–113). Also

157

during July, DDMC had held a "national party" where law enforcement conducted surveillance and arrested several members on outstanding warrants. (*Id.*, 40114). Around that time, Darrah got many calls reporting how many members attended the party, details about arrests, and information about where police were located. (*Id.*, 40114–116). Darrah also discussed the absence of Vernon Rich, telling another member that Rich feared he was considered a snitch, and saying that if Rich did not want to be around them, he should hand over his motorcycle and "get out." (*Id.*, 40117).

In the final extension application, Fleming sought permission to collect evidence about an additional offense, violent crimes in aid of racketeering, 18 U.S.C. § 1959. (R. 824-1: September 6, 2008, Affidavit, 40148, 40151). He described calls from the prior interception period concerning Darrah's Vicodin distribution and more information about the structure of DDMC and the roles of particular members. (*Id.*, 40156–177). Fleming also described several calls discussing Smith's assault on Burby's girlfriend for "disrespecting" DDMC. A confidential informant had told the FBI that Smith, in the presence of Darrah and other members, had punched the woman in the face until she collapsed.

158

(*Id.*, 40162–163). During one call, Darrah said, "[S]he deserved what she got…." (*Id.*, 40172). In other calls, the subjects discussed their concern that the girlfriend would call the police, prompting Darrah to call a mandatory meeting where Fleming expected members would be told not to talk to the police about the assault. (*Id.*, 40164–165, 40173).

The painstaking detail in the original application and each extension application was more than sufficient to establish probable cause that Darrah and the DDMC were trafficking drugs and committing RICO offenses, as well as other offenses listed in the applications, and that information about those crimes would be obtained by intercepting calls on Darrah's phone. There is no formula for determining whether an application contains probable cause; "the exact quantum of support required has frequently been described as 'a fair probability,' but more than a 'mere suspicion,' that such evidence will be discovered." *United States v. Alfano*, 838 F.2d at 162 (cleaned up). And as long as the record contains a "substantial basis for his probable cause findings," the issuing judge's determination must be upheld. *United States v. Giacalone*, 853 F.2d at 479 (quoting *Alfano*, at 162).

159

Darrah's lengthy critique of the facts supporting probable cause (Darrah brief, 14–18), violates the rule that a reviewing court must "look holistically at what the affidavit does show, instead of focusing on what the affidavit does not contain, or the flaws of each individual component of the affidavit." *United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019) (en banc). For example, Darrah concedes that when an informant reported that Darrah called another member to say an "item" had been left at his home for that person, a pole camera confirmed that the person arrived to pick it up. (Darrah brief, 16). That conversation had evidentiary value even though Darrah never said "narcotics" or "methamphetamine" on the phone. Likewise, even if Darrah never overtly discussed criminal activity with Vernon Rich on the phone (see Darrah brief, 17), that doesn't prove that he never talked to anyone else on the phone about the DDMC. On the contrary, it shows why the Rich wiretap was insufficient. Other information showed that Darrah had almost daily contact with Smith. It was reasonable to believe that conversations between the president and vice-president of the DDMC would convey useful information, and the first period of interception proved that to be true.

160

Darrah also argues that individual assertions in the affidavits might have innocent explanations. But that divide-and-conquer approach is impermissible. *District of Columbia v. Wesby*, 138 S. Ct. at 589. Darrah points to a call from the Rich wiretap described in the original application for the interception of Darrah's phone. Danny Burby reported that Darrah, who was then hospitalized, warned him, "I don't know if you got anything going on, but you better get your shit cleaned up." (Darrah brief, 17, citing Aff. ¶ 119). According to Darrah, Burby was acknowledging that Darrah had no knowledge of "individual club members or their illegal activities," and Darrah was merely warning Burby not to do anything that would reflect poorly on the club. (*Id.*). But that's a fanciful interpretation of the conversation: more likely, Darrah was warning Burby to be careful about anything he had "going on." The issuing judge was not required to interpret this call in the light most favorable to Darrah. And a reviewing court is not allowed to dismiss factors simply because some, viewed in isolation, could have an "innocent explanation." *United States v. Christian*, 925 F.3d at 311.

161

### B.    The affidavits met the statutory "needs" requirement.

An application for a wiretap order must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Courts refer to this requirement as the "needs statement," *United States v. Alfano*, 838 F.2d 163, or sometimes, the "necessity requirement," *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007).

The needs statement and the requirement that the Attorney General or a designated Assistant Attorney General approve any application ensure that a wiretap will not be used as the first step in an investigation. *United States v. Giordano*, 416 U.S. 505, 515 (1974). But the statute does not say that a wiretap is only a tool "of last resort." *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977). It just requires that investigators seriously consider the usefulness of other techniques first and explain to the judge why they believe those methods will likely be inadequate. *United States v. Patel*, 579 F. App'x 449, 454 (6th Cir. 2014). This component of a wiretap application, like probable cause, is tested "in a practical and common sense fashion."

162

*Landmesser*, 553 F.2d at 20 (rejecting *United States v. Kalustian*, 529 F.2d 585 (9th Cir. 1975), on which Darrah relies at p. 13 of his brief). As this Court observed recently in a case where a 52-page affidavit similarly explained the results of a six-month investigation of a drug trafficking organization, detailed the methods already used, and explained why other methods were unlikely to succeed or too dangerous to attempt, "one could argue that if *this* affidavit were found insufficient, it is unlikely that any affidavit would be sufficient to prove necessity for a wiretap." *United States v. Cooper*, 893 F.3d 840, 844 (6th Cir. 2018).

It is true that the government was able to obtain a great deal of evidence without the wiretap. But that does not prove that there was no need for a wiretap. *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000). The affidavit explained why it would be nearly impossible to insert an undercover officer into the gang—the members were hyper-vigilant about law enforcement efforts directed against them. (R. 825-1: March Affidavit, 40786–87, 40794–95, 40810–11, 40815). And the affidavit explained why it could not rely too heavily on cooperators who were members or former members of the gang—they would not have

163

access to information maintained within the "inner circle" of Smith, Darrah, and club leadership, and efforts to penetrate that "inner circle" would pose an unacceptable risk to the cooperator and the investigation. (*Id.*, 40818–819).

And cooperators are readily impeached. By contrast, wiretap evidence, capturing the defendant's own words, "is the gold standard when it comes to trustworthy evidence." *United States v. Canales Gomez*, 358 F.3d 1221, 1227 (9th Cir. 2004). The wiretap gave the investigators access to conversations between the two top officers of the organization, evidence that was critical to prove a conspiracy among members of a tight-knit and secretive organization.

### C.   There was no basis for a Franks hearing.

Whether to grant a hearing on a defendant's claim that important information was omitted from a wiretap affidavit is "committed to the sound discretion of the district court." *United States v. Young*, 847 F.3d 328, 348 (6th Cir. 2017). To warrant a hearing under *Franks v. Delaware,* 438 U.S. 154 (1978), the defendant must (1) make a "substantial preliminary showing" that the affiant knowingly and intentionally, or with reckless disregard for the truth, omitted material

164

information from the affidavit, and (2) prove that the material omission was "necessary to the probable cause finding" in the affidavit. *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). Here, the district court properly denied Darrah's request for a *Franks* hearing because he did not make either showing. (R. 1045: Order, 5131).

Information about Darrah's medical condition, even if the affiant had known that Darrah might risk uncontrolled bleeding from a minor brawl or that he had a legitimate medical reason to take Vicodin, was not material to the issue of probable cause. And the record contains no evidence that Agent Fleming had access to Darrah's medical history. Darrah's speculation that he was under surveillance that "must" have revealed he had a tracheotomy is not nearly enough. (Darrah brief, 41).

Even if Fleming had known that Darrah appeared to be disabled, that information would not have detracted from the evidence that Darrah was the vice president of DDMC who controlled the actions of subordinates and participated in planning and coordinating DDMC's criminal activity. Moreover, if Fleming had said in the affidavit that Darrah had a tracheotomy, it would not have affected the court's conclusion that a wiretap of his phone would lead to evidence of drug

165

dealing, RICO conspiracy, and other crimes. Not even Fleming's description of Darrah as an "enforcer" would have been affected. Having a tracheotomy, taking a blood thinner, or using oxygen would not prevent Darrah from ordering punishments or wielding firearms. The district court did not abuse its discretion by denying a hearing because it concluded that none of the omissions Darrah identified would have affected the finding of probable cause. (R. 1045: Order, 5132).

## V.   The prosecutor's remarks in her rebuttal argument were not improper, were not flagrantly improper, and were not plain error. (McKeoun, Vandiver, + Smith, + Drozdowski)

This Court reviews preserved claims of prosecutorial misconduct de novo. *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011). This involves a two-step analysis. First, were the challenged statements by the prosecutor improper, and second, were the remarks so flagrant as to require reversal? *Id.*; *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008). To address flagrancy, the Court examines four factors: (1) how much did the remarks tend to mislead the jury or prejudice the defendant; (2) were they isolated or extensive; (3) were they deliberate or accidental; and (4) how strong was the overall evidence of defendant's guilt. *Id.* In conducting this review, the Court gives "wide latitude to a

166

prosecutor during closing argument, analyzing the disputed comments in the context of the trial as a whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings were otherwise fair." *Id.* (quoting *Henry*, 545 F.3d at 377). And in evaluating the context, the Court examines defense counsel's conduct as well, because if the prosecutor responds reasonably to attacks by the defense it is unlikely the jury was misled. *Id.* (citing *United States v. Young*, 470 U.S. 1, 12 (1985)). Where defense counsel fails to object, the Court reviews misconduct claims for plain error. *Henry*, 545 F.3d at 376 (citing *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001)).

Defense counsel presented some ten hours of closing arguments over a two-day period. (R. 1232: Tr., 14772–14961; R.1233: Tr., 14968–15084). As the district court explained in denying defendant's motion for mistrial, defense counsel's arguments repeatedly crossed the line and lobbed improper accusations toward the prosecution:

> [I]n general, the defense presented closing arguments which were coordinated, often inflammatory, sometimes incorrect on the law, too often misleading on the facts, generally encouraging of jury confusion, and arguably

167

suggesting nullification with respect to the Box Canyon events.

Throughout, the defense arguments imputed unethical and improper conduct undertaken by or on behalf of the Government. In other words, the defense set the table and established the tone for the rebuttal that their arguments invited.

(R. 2332: Opinion and Order Denying Trial Group One's Motion for Mistrial and Motion for New Trial, 33125).

Defense counsel attributed improper motives to the prosecution and attacked the prosecutors' integrity. Vandiver's counsel asserted that this was "an investigation where the government was not going to take no, an investigation where the Government ignored what it wanted to and focused on the other." (R. 1232: Tr., 14786). Later, this lawyer said that "what the Government is hiding is a motivation to arrest, charge, and convict at all costs. We're going to ignore any evidence that gets in the way of that." (*Id.*, 14795). Smith's counsel argued that the prosecutors' motivation was "so it can be written up in, I guess, the Government Weekly, as convicting people for racketeering and perjury, find them guilty." (*Id.*, 14876). Darrah's counsel spoke of the "constant theme" of "the Government's overreach in this case,"

168

arguing that the government refused to consider evidence that might undermine its theory. (R. 1233: Tr., 15014–15). Drozdowski's counsel, referring to the interview of a government witness, put these words in the agent's mouth: "… she said what I wanted to hear. I don't need to corroborate it. Done. As long as you say what I want to hear, it's good enough for me." (*Id.*, 14973). Counsel also scoffed at the government's use of a photograph of Drozdowski brandishing large handguns in both hands, saying "[d]on't be fooled by that trick." (R. 1232: Tr., 14949).

These comments continued in the same vein when defense counsel unfairly attacked the credibility of the government's witnesses, stepping well beyond the bounds of permissible argument. Vandiver's counsel began by arguing that, because witnesses had made plea bargains, they must not be believed: "If you buy trust, trust is not what you get. And if you buy the truth, it is not the truth." (*Id.*, 14773). This continued, to the point where counsel claimed the prosecutors had committed a crime: "[t]he only regret all of you should have is that the individuals who bought and paid for the testimony of every one of the snitches in this trial cannot be charged in the same fashion [with facilitating perjury and obstruction of justice], because that is exactly what happened here

169

over the last three or four months, testimony bought and paid for." (*Id.*, 14819–20). Other defense counsel followed suit. Drozdowski's lawyer argued that the witnesses' testimony was "corrupted by influence … [t]ell us what we want to hear … [y]ou can have probation … [c]orrupted testimony comes through the Government's case." (R. 1233: Tr., 14978). Witort's lawyer argued that because the prosecutors did not produce documents or other evidence to corroborate witnesses' testimony, the prosecutors must have personally known or suspected the witnesses were lying. (*Id.*, 15041–44, 15046–47, 15051, 15054–55).

Defense counsel also suggested jury nullification, based on a picture they painted of the Box Canyon events. Witort's lawyer, over sustained objections, explored the details of the alleged assault and torture of Heather Ford—evidence that had not been admitted for its truth, but to show the basis upon which the five DDMC members had been beaten and left for dead in the canyon. (*Id.*, 15072–77). This lawyer then capped his argument by claiming that the attempt to murder those DDMC members was justified because Witort "just doesn't like torturing women. And that's why he's sitting here." (*Id.*, 15079). Earlier, also referring to Ms. Ford, Vandiver's counsel had said

170

"the Government doesn't want you asking yourselves do the people that did that to her get what they deserved." (R. 1232: Tr., 14801). Smith's lawyer likewise spoke in graphic detail of what had purportedly been done to Ms. Ford, and how the government had "downplayed" it. (*Id.*, 14905).

Sutherland's lawyer argued flatly that the case was too difficult for the jury to resolve, suggesting that they could not do it. He said: "The racketeering acts are very specific. And it takes a lot of hard work to figure this out. It is so hard for you to figure this out, that I can promise you that the lawyers in this case can't agree on anything. They can't agree on what the words mean, what the Government says, what the defense lawyers say. We can't agree on it. And yet, we're asking you to figure it out. Good luck. Good luck." (*Id.*, 14834). And then he went on to misstate the elements of the offense. (*Id.*, 14835–36).

Perhaps the flavor of the defense arguments is captured in the reference, by Sutherland's lawyer, to a letter his client had sent to Mark Berman, a witness against him in an earlier case. The lawyer read the words loudly, including an expletive: "fuck you." And then he turned to the government's table and repeated the expletive: "Those are the exact

171

words that every one of us would think if somebody accused us of a serious state crime that we didn't commit: Fuck you." (*Id.*, 14855; R. 2332, Opinion and Order, 33120).

With this perspective, what misconduct by the prosecutor during rebuttal do defendants now allege? It's pretty thin gruel.

*First:* Addressing defendant McKeoun's closing argument, the prosecutor said: "only in a case of this length, magnitude, and overwhelming evidence of guilt would someone actually be forced, with a straight face, to make the last-ditch argument that you should acquit the defendant because he is a sharing man." (R. 2451: Tr., 38669). There was no objection, so this remark is reviewed only for plain error. Defendants say that the prosecutor was implying that McKeoun's counsel knew he was guilty. (McKeoun brief, 44, 45; Vandiver brief, 42). If the prosecutor had, in fact, made that claim, it would have been improper, although not necessarily reversible error. *See United States v. Kirkland,* 637 F.2d 654, 656 (9th Cir.1980) (affirming conviction when curative instruction given after prosecutor's assertion in closing argument that defense lawyers knew their clients were "guilty as sin").

172

But that's not what the prosecutor was saying. She didn't say that defense counsel thought McKeoun was guilty. She merely pointed out the sheer weakness of defense counsel's argument that McKeoun was just someone who "shares what he has with his friends.… handing out the methamphetamine just like somebody else might be pouring drinks from a good bottle of whiskey, maybe Wild Turkey, for his friends." (R. 1232: Tr., 14916). It was not improper to firmly dismantle this argument, and doing so did not imply that counsel knew McKeoun was guilty. There was no plain error.

*Second:* Early in her rebuttal argument, the prosecutor said: "Now, I'm going to have to address defendant by defendant some of the points that were raised. And I want to talk about the different closings [sic] arguments. But bear in mind, ladies and gentlemen, that a lot of these arguments were just illusions. Okay? They were magic tricks." (R. 1233: Tr., 15117). Defense counsel's objection was overruled, and the prosecutor went on to give concrete examples of illusory arguments by the defense. (*E.g., id.*, 15117–24). Now, defendants advert to this remark as being misconduct, apparently because it was "insulting" to members of the defense team. (McKeoun brief, 44–45; Vandiver brief,

173

42–43). But the remark was not directed at counsel personally; it was aimed at their *arguments*. It was prefatory to more specific discussions of those arguments, and why they were wrong or misleading. That's what closing argument is about. There was nothing wrong with these remarks, particularly in the context of the arguments the defense had made.

*Third:* In the course of rebutting the closing argument for defendant Drozdowski, the prosecutor said:

> What else did Mr. Machasic gloss over? Well, the other more permanent admission of guilt. There was highly relevant and certainly strong evidence of intent and guilt. And you know, it just drove Mr. Machasic nuts, every time we showed photos and addressed them in court, of course it does. He would love for that to go away. What am I talking about? The tattoos of the brass knuckle -- the brass knuckles, and the "talk shit" on the fists of David Drozdowski. What could be more relevant to the charge of violent crime in aid of racketeering enterprise?

(R. 2451: Tr., 38665). Again, there was no objection, so this remark is reviewable only for plain error. Counsel now claim that this implied that counsel knew Drozdowski was guilty, and that it was based on facts not in evidence (that counsel was literally nuts?). (McKeoun brief, 46; Vandiver brief, 43). But as the context shows, that wasn't the point.

174

The point was that this evidence was concrete. It was permanent. It was tattoos on the defendant that tied him to the VICAR charge, through his use of one of the DDMC's mottos: talk shit, get hit. And it was photos of large rings he wore as weapons—one of which had flesh lodged in it after the New York New York assault. (R. 1115: Tr., 10548–49). If you were counsel, wouldn't this evidence have driven you nuts—at least figuratively—because you couldn't easily explain it away? It wasn't error, much less plain error, to let the prosecutor's argument on this point pass without further comment.

*Fourth*: The prosecutor, in rebuttal, talked about Allen Mancini, the meth cook who had worked with Mr. Bill in California and fled to Alabama after he was sentenced for cooking. She said: "And when he went there, what did he do? He cooked meth. And who did he cook with? Magoo, Jeff Arnold, members of the Devils Diciples." (R. 2451: Tr., 38627). McKeoun's counsel objected, saying this wasn't true. The court overruled the objection, observing—as it did repeatedly during the arguments—that the jury decides what the evidence supports, regardless of "quibbling by various attorneys about whether the evidence being referred to supports the argument being made." (*Id.*,

175

38628). Defendants now argue that this brief statement by the prosecutor was improper, because Mancini had said he cooked alone in the underground lab in Alabama. (McKeoun brief, 46–47; Vandiver brief, 43).

But the snippet they cite isn't all the evidence. When Mancini came to Alabama, McKeoun got him a place to stay at the Lois Lane trailer park where the meth lab was located; he vouched for him with the Devils Diciples; he offered tips and help for Mancini to cook meth, and knew about cooking; and Mancini saw McKeoun and Jeff Arnold, the other meth cook, going in and out of the underground lab from time to time. (R. 1075: Tr., 6586–88, 6591–96). And Jeff Arnold testified that he had cooked Red P meth with McKeoun in the underground lab for over a year, that when Mancini showed up he made better quality meth, "with us, with me," and that he (Arnold) had purchased meth-making material such as ephedrine for "all of us." (*Id.*, 6511–14, 6521, 6528–29). So there were plenty of grounds to say, at least in general, that Mancini cooked "with" the other cooks who used that lab. To claim otherwise is quibbling.

176

The prosecutor also properly contended, later in the argument, that Mancini's batches of Red P meth were over a pound of pure meth each. (R. 2451: Tr., 38686–87). That observation was not tied directly to McKeoun; it was part of a broader argument that the quantities attributable to the conspiracy as a whole exceeded 500 grams. There was no misconduct in the prosecutor's remarks.

*Fifth:* In addressing the defense argument that this case was just too complicated to decide, the prosecutor said:

> The glittering jewel of Mr. Daly's argument about his desire to avoid confusion doesn't make a lot of sense, incredibly, because basically he says the RICO conspiracy law is too confusing. It's too complicated. No one can understand it. Good luck, he says, and then he walks away, throws his hands up in the air. He did this to confuse you, to play on your emotions and concerns that this process is too hard.

*     *     *

> Is RICO conspiracy too difficult to understand, as Mr. Daly suggests? Tell that to the jury that convicted Mad Anthony for the RICO conspiracy. Tell that to Iron Mike, who pled guilty to RICO conspiracy. And tell that to the countless federal juries in the courthouse and across the nation.

(R. 2451: Tr., 38641–62). Counsel objected, because there was no evidence of what happened in another case. The court advised the

177

prosecutor to avoid this argument, and the prosecutor complied and moved on. Counsel now say this was error, without saying exactly why or explaining why the defense did not contemporaneously request some other remedy. (McKeoun brief, 45; Vandiver brief, 43).

The prosecutor's statement was not reversible error, particularly given the district court's decision to sustain the objection to it. True, there was no evidence of the result in any other particular case. But the point made was a general one: juries are called upon to decide difficult cases. This fit with the more specific points, about RICO cases that were covered at trial. And it was responsive to the defense's claim that the case was too difficult for the jury to decide. In any event, the court sustained the objection. Even if there was some fleeting reference here to a matter not in evidence, it is no basis for reversing a conviction.

Five isolated assertions of misconduct in a rebuttal argument that took over three hours. (R. 1233: Tr., 15012–154; R. 2451: 38615–690). Two of them unpreserved by objection. None of them having any real substance. There is no basis for moving to an assessment of flagrancy. But if the Court must: (1) these remarks did not mislead the jury or prejudice the defendants; (2) they were isolated; (3) they were not

178

deliberately misleading or improper; and (4) the overall evidence of defendants' guilt was overwhelming.

For similar reasons, any isolated error during the rebuttal argument, in a case of this length and complexity, could not have "substantially swayed" the jury's consideration of the case, and would be harmless.

## VI.    The prosecutor reviewed the terms of cooperating witnesses' plea agreements during their testimony. This was not vouching for their credibility, nor was it plain error. (Witort)

It is improper for a prosecutor to vouch for the credibility of her witnesses. Where vouching happens, it is usually in the course of closing argument. But the claim here is that the prosecutor improperly vouched, solely in the course of examining certain witnesses, by asking them about the terms of their plea agreements. (Witort brief, 53–57). Like other misconduct claims, a vouching claim gets a two-step analysis: was there impropriety, and was it flagrant? *United States v. Francis*, 170 F.3d 546, 549–50 (6th Cir. 1999). But further, if there was no objection, review is for plain error. *United States v. Owens*, 426 F.3d 800, 806 (6th Cir. 2005). Vouching occurs when the prosecutor asserts her personal belief in a witness's credibility, or implies that she has

179

personal knowledge of facts unknown to the jury that establish the credibility of the witness. *Francis,* 170 F.3d at 550.

Here, defendant Witort points to three instances that he claims were improper vouching. (Witort brief, 54–57). All involve the examination of witnesses, not a statement by the prosecutor in closing argument. And none involve any vouching for the witness's credibility: they are all simply explications of the terms of the witnesses' plea agreements. With Danny Burby, the testimony covered the facts that under his agreement he had to tell the truth, that he could be further prosecuted if he didn't, that his sentence was up to the judge, and that the government could make a recommendation as to his sentence. (R. 1077: Tr., 7118–19). With Dean Tagliavia, the testimony covered the fact that under his pretrial diversion agreement, he had promised to tell the truth. (R. 1095: Tr., 8328–29). With Jaime Franks, the testimony on direct examination covered the fact that, under her plea agreement, if she told the truth "they would consider asking for a lesser sentence than ten years." (R. 1094: Tr., 8053). On cross examination, counsel explored her cooperation agreement, focusing on her motivation to help the government. (*Id.*, 8068–69). The prosecutor in turn revisited

180

carefully the terms of the plea agreement, without claiming that her promise to be truthful guaranteed that it had happened. (*Id.*, 8091–97). There was no contemporaneous objection to this testimony, only a motion for mistrial—filed seven days later. (R. 1091: Defendants' Motion for Mistrial, or in the Alternative, Motion to Strike Improper Governmental Vouching of Danny Burby's and Jamie Franks' Plea Agreements, and Preclude Any Future Governmental Vouching for Government Witnesses That Have Negotiated Plea Deals in Exchange for Testimony, 7222–34).

Regardless of whether the defense refers to a witness's plea agreement, the government is entitled to use it within reason to explore the witness's motivations and potential biases during his or her testimony. *United States v. v. Owens*, 426 F.3d 800, 806 (6th Cir. 2005). This proper use includes revealing the terms of the plea agreement—including the witness's obligation to tell the truth—so long as the prosecutor doesn't offer her personal observation or opinion of the veracity of the witness or put the prestige of the government behind his credibility. *Id.* at 806–07 (citing *United States v. Trujillo*, 376 F.3d 593, 608–09 (6th Cir. 2004)). In fact, the terms of a cooperating defendant's

181

plea agreement are very much a two-edged sword: while the prosecutor may bring out the obligation to tell the truth, the defense can point to the terms of the agreement, including especially the government's power to decide whether to recommend a downward departure, as providing a motive to testify as the witness believes the government wishes. *See United States v. Tocco*, 200 F.3d 401, 416 (6th Cir. 2000) (citing *United States v. Townsend*, 796 F.2d 158, 163 (6th Cir. 1986)). And that is what the defense did here, in cross-examining Jaime Franks (R. 1094: Tr., 8068–69), in cross-examining numerous other cooperating defendants, and, as discussed above, in extensive closing argument. If anything, the terms of these plea agreements cut against the government, not in its favor, so there was nothing wrong with "drawing the sting" by revealing those terms on direct examination. *See United States v. Thornton*, 609 F.3d 373, 377–78 (6th Cir. 2010).

This case is unlike cases such as *Francis* and *United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994). In *Carroll,* the prosecutor blatantly stressed in closing and rebuttal arguments that government witnesses were truthful because any lies or half-truths would void their plea agreements and subject them to greater sentences. *Id.* at 1382–83.

182

In *Francis*, the prosecutor's direct examination of a critical witness made it clear that he only got a plea agreement after she believed him; she bolstered his testimony by improperly examining the case agent about corroboration; in her opening argument she "made it clear that her [sentencing] recommendation would depend on whether she personally believed" the witness; and she improperly called the defendant a liar and con man in her closing, without reference to the evidence. 170 F.3d at 550–52. Based on the accumulated improprieties, this Court found it necessary to order a new trial. *Id.* at 552–53.

This case comes nowhere close. The prosecutor's examination of these three witnesses about their plea agreements did not put her or the government's say-so behind their credibility. There was no vouching, and no impropriety, much less flagrant impropriety under the test enunciated in *Henry*, 545 F.3d at 376. And even further, as there was no timely objection, this claim would have to meet the plain error standard. *Vonner*, 516 F.3d at 386. It doesn't. Nor would any error on any of these snippets of testimony justify reversal, given how isolated they were and the strength of the evidence here.

183

## VII.  The government provided discovery materials fully and timely to the defense. (Vandiver, Witort)

This case involved a broad and lengthy investigation, and a large volume of evidence. So a large volume of discovery had to be provided to the defense. The government and the district court took extraordinary measures to make discovery available to the defense, in a usable form. Very early on, the defense requested and the court ordered the appointment of a discovery coordinator, to facilitate and organize the delivery of discovery. (R. 516: Order Appointing Emma M. Greenwood as Coordinating Discovery Attorney, 1916–18). The government provided over 25,000 pages of early discovery, which the discovery coordinator provided to counsel and their clients in searchable form. (R. 888: Hearing Tr., 4004–07). Because defendants were incarcerated and there were genuine concerns about the security of discovery material and the safety of witnesses, the government supplied iPads for defendants to use to examine discovery material. The district court also appointed a technical assistant, Michael Naughton—also an attorney—who advised counsel and defendants on effectively using these tools and materials. (*Id.*, 4000, 4004–05). (Naughton also later assisted the

184

defense throughout the trial. (R. 2443: Tr.,, 37844; R. 1096: Tr., 8355–56)).

Under the law, the government was not required to provide Jencks material—prior statements of a witness—until after the witness's testimony at trial. 18 U.S.C. § 3500; *United States v. Presser*, 844 F.2d 1275, 1283–84 (6th Cir. 1988). This rule is designed to protect witnesses from tampering or intimidation—a concern that permeated this entire investigation and case, given the Devils Diciples' previous conduct and attitudes toward cooperating witnesses. Nonetheless, the government allowed counsel to review Jencks material, if they chose, well in advance. (R. 888: 4006). The government also agreed to provide most of the Jencks material no later than four weeks before trial, which it did, while holding back some materials until shortly before trial due to security concerns. (R. 1133: Government's Response and Brief, 10935–06).

Defendants Vandiver and Witort now broadly assert that a mistrial should have been declared because of the timing of the disclosure of additional discovery materials. This Court reviews the district court's handling of discovery matters for abuse of discretion.

185

*United States v. Richards*, 659 F.3d 527, 543 (6th Cir. 2011). The Court reviews the denial of a motion for a mistrial for abuse of discretion. *United States v. Ursery,* 109 F.3d 1129, 1133 (6th Cir.1997). A new trial is not required unless "substantial rights" are affected. *United States v. Clark*, 385 F.3d 609, 621 (6th Cir. 2004) (citing *United States v. Bonds,* 12 F.3d 540, 554 (6th Cir.1993)).

Vandiver claims that the district court should have declared a mistrial "due to the huge volume of material and the disorganized manner in which it was presented to the Defendant's [sic]." (Vandiver brief, 50). He accuses the government of using "gamesmanship" in its discovery practice, by "hid[ing] the evidence" through use of a "discovery dump. (*Id.*, 50–51). He suggests that the district court should have ordered the government to specify which documents it intended to use at trial (*id.*, 52–53), while complaining about the government's extensive exhibit list that did just that (*id.*, 55). He suggests that the government should have been ordered to meet with defense counsel to agree on search terms to use and a "method of organization." (*Id.*, 56). He also complains that the government provided a recording from Billy Wadd's bar, and then didn't use it at trial (*id.*)—while failing to mention

186

that if the government hadn't turned this recording over, the defendants might have claimed it was a *Brady* or Jencks Act violation. Defendant Witort makes similarly broad allegations of a "discovery dump" to intentionally hide information from the defense (Witort brief, 60–61), while suggesting that if the court had declared a mistrial early on it would have only led to a slight delay (*id.*, 61). Never mind that counsel had earlier noted that this defendant was insisting on a speedy trial. (R. 888: Hearing Tr., 4019–20).

These appellants do not identify any particular prejudice from the way in which they received discovery. Now, almost six years later, they name no evidence or material that was hidden from them, and point to no avenue of cross-examination or trial strategy that was hampered. They only list numbers of pages of documents provided, using questionable math. Yes, there was a considerable volume of Jencks-type material that had to be provided in the run-up to trial: prior statements of the witnesses, interview reports, and impeachment material for testifying witnesses such as their plea and cooperation agreements and updated criminal histories. And yes, some of it was produced during trial, either because it was generated by interviews conducted during

187

trial or was only recently discovered. But all of those disclosures complied with the government's obligations to disclose impeachment material and provide prior statements of testifying witness under the Jencks Act.

When defendants identified real difficulties during trial, the court and the government accommodated them. So, as Vandiver acknowledges, when jury selection was complete the court adjourned the trial for two weeks to facilitate examination of discovery materials. (Vandiver brief, 54). And when, on the first day of trial, the government provided late discovery of Jencks material regarding two witnesses, the government volunteered to bring them back later for further cross-examination or to delay their testimony altogether. (R. 2443: Tr., 37737–40). That's what happened: Billy Wadd, a significant witness, was scheduled to testify early on in October, but his appearance was delayed a month to accommodate counsel. (R. 1112: Tr., 9590). Similar accommodations were made with other witnesses. (*E.g.*, Lori Maday: R. 1148: Tr., 11763–66). And, as Vandiver acknowledges, the government made best efforts to give the defense ongoing notice of upcoming

188

witnesses—a difficult thing to do in a long trial with many incarcerated and out-of-state witnesses.

More fundamentally, however, these defendants' argument misconceives the nature of our adversary system of justice. The government is obligated to provide certain things to the defense: Rule 16 discovery, statements of witnesses, impeachment information, *Brady* material, and such. But the government does not have to collaborate with the defense, or assist the defense in crafting its trial strategy. That's defense counsel's job, and here they were given the materials and the tools to do their job.

This Court has previously reached the same conclusion in circumstances that were far more difficult for defense counsel. In *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010), the government produced millions of pages of discovery, amounts that this Court described as "prodigious" and "titanic." 631 F.3d at 295. The defense claimed error in allowing the government to produce this evidence in formats that were "disorganized and unsearchable," without providing indices. *Id.* The Court noted that Rule 16 "is entirely silent on the issue of the form that discovery must take; it contains no indication that

189

documents must be organized or indexed." *Id.* at 296. Finding that the defense was not unduly hampered, the Court found no abuse of discretion. *Id.* at 296–97. The *Warshak* defendants further claimed the government had "abdicated" its *Brady* obligations by burying exculpatory information in the voluminous discovery. Finding no evidence that the government had "larded its production with entirely irrelevant documents" and "no indication that the government deliberately concealed any exculpatory evidence in the information it turned over," this Court said "[t]his argument comes up empty." *Id.* at 297–98.

The same reasoning applies here, in spades. The volume of evidence was large but not "titanic." It was provided in searchable formats. The district court took extraordinary measures to facilitate access by the defense. And even today, the defense has not identified a single piece of information or evidence that was hidden from them or for which the disclosure process somehow hampered their defense. The district court did not abuse its discretion in its management of discovery, or in denying defendants' motions for mistrial.

**VIII. Defendants made a perfunctory motion for new trial. It was denied by the district court. Defendants' appeal of this ruling is similarly perfunctory, and should be rejected. (Vandiver, +McKeoun, +Smith, +Darrah, +Witort)**

After the guilty verdicts were returned, defendant Drozdowski moved for a new trial on behalf of all defendants. (R. 1287: Defendants' Joint Motion for New Trial Pursuant to Federal Rule of Criminal Procedure 33, 15737–41). The motion was bare bones: it simply listed 22 items—motions and objections, 18 written, 4 oral—that had been denied, either expressly or implicitly, during trial. (*Id.*, 15739–40). Two of the items listed weren't even motions or objections by the defense. (R. 1141: Memorandum opinion, 10995; R. 1265: Jury instructions, 15435). The motion made no developed argument as to why the denial of any of the listed motions or objections might warrant a new trial under the standards of Rule 33.

The district court gave this motion short shrift, as it deserved, remarking that "[d]efendants point to no specific allegation of error or articulate any form of reasoned analysis giving context to their motion. … The court is neither required nor inclined to ferret through all of the referenced documents to decipher what argument Defendants may be

191

trying to advance at this late stage of the litigation." (R. 2332: Opinion and Order, 33116). The court suggested that to be taken seriously, the defendants might file "a proper, timely motion for reconsideration." (*Id.*, 33117). No such motion was filed.

This appeal makes no further effort to develop an argument in support of granting a new trial. It simply relists the items from the motion below (Vandiver brief, 58–59), and then quibbles with the district court for not respecting the brevity of the motion. (*Id.*, 60–61).

The district court was not required to craft the defense's arguments for them, and this Court is not required to do so either. "[I]t is a 'settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). This principle extends to efforts to incorporate by reference, on appeal, arguments made in the district court. *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir. 2003). That tactic violates Fed. R. App. P. 28(a)(8), which requires the argument component of a brief to "*contain* … [the] appellant's contentions and the

reasons for them…." *Id.* In *Northland* the appellant "invite[d] [the Court] to unearth its arguments lodged here and there in the joint appendix, leaving it to [the Court] to skip over repetitive material, to recognize and disregard any arguments that are now irrelevant, and to harmonize the arguments in the various documents." *Id.* Observing that, among its other defects, this tactic was a transparent effort to evade page limits, this Court declined to entertain the offending arguments. *Id.* at 453.

And so should the Court do now.

IX.    **The district court reasonably accommodated Witort's right to his counsel of choice by permitting the lawyers his family retained just two months before trial to join his defense, but not to replace the appointed counsel, and Witort waived any objection to that resolution. (Witort)**

A defendant who does not need appointed counsel has a Sixth Amendment right to choose who will represent him. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006). But the right to counsel of choice "is circumscribed in several important respects." *Id.* at 144. And in this case, Witort *did* require appointed counsel—he requested it and established his financial eligibility, and the court appointed Kimberly Stout to represent him. (R. 375: Order, 1455). It was not until two years

later, and only two months before trial here was scheduled to begin (R. 716), that attorneys Byron Pitts and Phillip Comorski presented a proposed substitution of counsel to the district court. (R. 888: Hg. Tr., 4001, 4003; R. 878-1: Supp. Br., 39647).

A defendant's right to counsel of choice must yield to a trial court's responsibility to manage its docket and to the need for fairness to all litigants. *Gonzalez-Lopez*, 548 U.S. at 152. Accordingly, a trial judge's decision to deny a motion to substitute counsel is ordinarily reviewed only for abuse of discretion. *United States v. Powell*, 847 F.3d 760, 778 (6th Cir. 2017). When a defendant indicates serious dissatisfaction with his counsel's performance, the trial court has a duty to inquire into the source and nature of the conflict. *Id.* at 778–79. Here, though, Witort gave no sign that he was not satisfied with Stout's representation.

Because the district court had serious reservations about permitting a change of counsel so close to the trial date, it summoned Witort, Stout, Pitts, and Comorski to court on July 9, 2014. (R. 888: Hg. Tr., 4001). At the beginning of that hearing, Pitts volunteered that he and Comorski "would have no problem working with" Stout if the court decided to allow them to appear in addition to Stout. (*Id.*, 4001–4004).

194

Stout said that during the two years in which she had been representing Witort, she had met with him in custody 19 times and had discussed defense strategy with family members he authorized; she had reviewed 25,000 pages of initial discovery and a CD with an additional 7200 pages of discovery in the past week; she had met with the prosecutors to preview 3500 pages of Jencks material that had not yet been released; she had learned a new computer program to manage the discovery material; and she had already prepared her closing argument. (*Id.*, 4004–4007). Her work to date had already cost the CJA fund more than the $35,000 she originally estimated. (*Id.*, 4007–4008, 4011). Stout advised the court that she and Witort had disagreed occasionally, particularly about stipulating to any trial delay, but she did not think they had irreconcilable differences and had had no idea that he wanted to change counsel. (*Id.*, 4009–10, 4019).

Both the prosecutor and the court expressed concerns about how substitute counsel could replicate in just two months the amount of trial preparation Stout had accomplished in two years. (*Id.*, 4016, 4018). The court also expressed concerns about the source of the funds used to retain counsel and whether Witort should be required to repay the costs

195

of Stout's services under 18 U.S.C. § 3006A(f). (*Id.*, 4011–12). Pitts

claimed that they could be ready to try the case without Stout in two

months, but he acknowledged they had not yet reviewed any of the

voluminous discovery. (*Id.*, 4012). The court then asked Pitts to file a

brief explaining in greater detail how he and Comorski proposed to

become prepared for trial in time, whether there were sufficient funds

to see the case through to completion, whether Witort should be

required to repay amounts already expended for Stout's representation,

and whether the source of the funds raised any questions about conflict

of interest. (*Id.*, 4017–18; R. 875: Order, 3941–43).

The prospective attorneys' brief represented that Witort's son was

paying their fees from an inheritance on which Witort had no claim.

(R.878-1: Supp. Br., 39649). The court was satisfied that the funds were

legitimate and ruled that Witort would not be required to repay the

amounts already paid to Stout. (R. 882: Order, 3977–78). But Pitts and

Comorski admitted that, because they had not reviewed any of the

discovery in the case: (1) they could not assure the court that the family

had sufficient funds to pay their fees through the end of the case; (2)

they could not guarantee that they would be prepared for trial in two

196

months; and (3) that couldn't promise they would not need to request a continuance. (*Id.*, 3979–80). The only promise they would make was that they would represent Witort "to a conclusion" in the case. (*Id.*, 3980). As the district court noted, that commitment was already required by E.D. Mich. L. Cr. R. 57.1(a), but retained counsel will still sometimes attempt to withdraw or ask for CJA appointment when a defendant depletes his funds before a criminal case is completed. (*Id.*, 3978 n.2). In the end, however, the district court did not cite the financial arrangements as a reason for partially denying the motion to substitute Pitts and Comorski.

Instead, the court observed that counsel made only a "lukewarm assertion of trial readiness." (*Id.*, 3979). While it was sympathetic to new counsel's difficulty in estimating the time the case would require, the court concluded that it would be "nearly impossible" for Pitts to prepare to lead Witort's defense in the limited time available. (*Id.*, 3980). The court also observed that Witort had not alleged any specific dissatisfaction with Stout's performance. Rather, "[i]t seems that he, or his family members, simply desire additional, or fresh, help." (*Id.*). Balancing the court's need to manage its docket and to ensure a fair

197

trial for all of the defendants with Witort's right to choice of counsel, the court allowed Pitt and Comorski to enter the case as counsel of record, but required Stout to remain as lead counsel. (*Id.*, 3980–81). The court also said that only Stout would be allowed to sit at counsel table "due to space limitations." (*Id.*, 3981).

Pitts moved for reconsideration, asserting that Witort would be denied his right to choice of counsel if his retained attorneys were prohibited from sitting at counsel table and "participating in the case at trial." (R. 885: Motion for Reconsideration, 3986). He did not ask the court to reconsider its decision to have Stout continue as lead counsel; he only argued that space limitation was not a sufficient reason to refuse to allow at least one of his retained counsel to sit at counsel table and participate fully in the trial. (*Id.*, 3986–88). The district court denied the motion for reconsideration, explaining that space before the bar was already "at, or even beyond, capacity" because the court was trying to accommodate the prosecutors, nine defendants, nine defense counsel, a defense technology attorney, and the deputy marshals assigned to courtroom security. (R. 895: Order, 4074). But the court assured Witort that if space became available, at least one of his

retained counsel could be seated at the table. (*Id*.). The court also said it would entertain a renewed motion to substitute counsel at any time before the September 29th trial date if Pitts and Comorski could assure the court "that they had reviewed all of the electronic discovery, had thoroughly analyzed the case, and were prepared to take over the case at any moment without reservation or qualification." (*Id*.).

Pitts and Comorski represented Witort along with Stout from that time forward. They did not object to working with her, much less request to substitute for Stout entirely. They did not represent that they had reviewed the discovery and analyzed the case sufficiently to take over from Stout. And, although the record doesn't reflect exactly how the problem was resolved, Witort admits that Pitts was seated at counsel table for the trial. (Witort brief, 31 n. 1). He also acknowledges that Pitts made the closing argument and questioned many of the witnesses. (*Id*., 32). So Witort got all of the relief he requested from the district court. *Cf. United States v. Smith*, 749 F.3d 465, 494 (6th Cir. 2014).

Witort therefore waived the argument that he now makes on appeal. Witort's original request to replace his court-appointed counsel

199

entirely was waived when his retained counsel told the court that they would have "no problem" working with Stout if that is what the court wished. (*See* R. 888: Hg. Tr., 4001–4004). When counsel "agree in open court with a judge's proposed course of conduct," they are not allowed to argue on appeal that the court erred in following that course. *United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002). By making that statement at the initial hearing and by failing to request later that Stout should be removed from the case entirely, Witort relinquished any objection to having Stout remain in the case and work alongside his retained counsel. He thus waived his argument that the district court violated his Sixth Amendment rights by requiring his retained counsel to work with his appointed counsel. *United States v. Olano*, 507 U.S. 725, 733 (1993); *United States v. Tasis,* 696 F.3d 623, 625 (6th Cir. 2012) (defendant waived argument for mistrial when court invited him to seek one, and he declined). And his one remaining objection to the district court—that his retained counsel should be permitted to sit next to him at trial—was resolved in his favor. Because Witort waived the argument he now makes on appeal, it is

"extinguished" and not reviewable at all. *United States v. Noble*, 762 F.3d 509, 528 (6th Cir. 2014).

But even if Witort were entitled to appellate review of the decision to retain Kimberly Stout as lead counsel in this case and permit Pitts and Comorsky to participate alongside her, Witort has not shown that the district court abused its discretion. Witort has identified no specific areas of disagreement with Stout, much less demonstrated "that the attorney-client relationship had so deteriorated that it resulted in a total lack of communication preventing an adequate defense." *United States v. Sullivan*, 431 F.3d 976, 981 (6th Cir. 2005).

The court also had strong reasons for concern that Pitts was likely to seek an adjournment if he and Comorsky had to prepare for trial without Stout, and Witort himself had objected strenuously to any further trial delay. (*See* R. 888: Hg. Tr., 4019-21). A trial court has "wide latitude in balancing the right to counsel of choice … against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152 (citing *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983)). Even if Witort had agreed to delay, the court had to consider the demands of the Speedy Trial Act, the effect on all of the other defendants, and the difficulty of rescheduling a trial

201

with so many participants. It was also appropriate for the court to consider whether an attorney new to the case, who admitted he had other trial and client commitments (*id.*, 4014–15), could prepare adequately in the time available. The district court's compromise ruling fairly accommodated all parties' interests, and Witort has not identified a single thing that Pitts and Comorsky would have done differently if Stout had been removed from the trial team.

## X.    The district court imposed procedurally and substantively reasonable sentences. (Smith, Darrah, Witort, McKeoun)

This Court reviews sentences for reasonableness, using an abuse-of-discretion standard. *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018). "Reasonableness review has both substantive and procedural components." *Id.* (quoting *United States v. Keller*, 498 F.3d 316, 322 (6th Cir. 2007)). In the procedure component, the Court examines whether the district court: (1) calculated the guideline range correctly; (2) considered the other § 3553(a) factors and arguments for variance; and (3) explained its sentence adequately. *Id.* In judging procedural reasonableness, the Court reviews factual findings for clear error and legal conclusions de novo. *Id.,* (citing *United States v. Angel*, 576 F.3d

202

318, 320 (6th Cir. 2009)). A factual finding is clearly erroneous when the reviewing court, after reviewing all the evidence, has a definite and firm conviction that a mistake has been committed. *Id.* (citing *United States v. Charles*, 138 F.3d 257, 262 (6th Cir. 1998)).

Substantive reasonableness is reviewed under a deferential abuse-of-discretion standard. *United States v. Solano-Rosales*, 781 F.3d 345, 355–56 (6th Cir. 2015). A sentence is substantively reasonable if it is "proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a)." *Id.* (quoting *United States v. Vowell,* 516 F.3d 503, 512 (6th Cir. 2008)). Where the district court imposes a sentence within a properly calculated guideline range, this Court gives the sentence a presumption of reasonableness. *See, e.g., United States v. Thompson,* 515 F.3d 556, 561 (6th Cir.2008); *see also Rita v. United States,* 551 U.S. 338, 341 (2007).

## A.    Relevant conduct

Each of these defendants, as well as the defendants in Trial 2, was convicted of RICO conspiracy. The RICO conspiracy was a wide-ranging crime that involved a multitude of racketeering acts from 1992 through

203

2012, including drug trafficking, violent crimes up to and including murder, motorcycle theft and extortion, illegal gambling, and obstruction of justice. The district court presided over two lengthy trials in which the organization, management, operations, and actions of the DDMC enterprise were revealed through a wide array of evidence, including testimony from many former members and participants in the enterprise. So the court was well familiar with the relevant facts, and the roles that each of the trial defendants played in the DDMC.

After the convictions in both trials, it fell to the district court to determine the scope of relevant conduct for which each defendant should be held accountable. The judge took a careful and deliberate approach. He invited briefing on general sentencing issues, and then issued an order resolving those issues while reserving individual issues for separate determination. (R. 2127: Order, 30765–74). The judge made a preliminary observation that, to decide which racketeering acts a defendant would be accountable for, the judge would start with the date the defendant became a prospective or fully-patched member of the DDMC, and would hold him accountable for all acts within the scope

204

and in furtherance of the conspiracy following that date. (*Id.*, 30772–73).

The judge also addressed here a threshold issue: the statutory maximum sentence. The maximum sentence for RICO conspiracy is 20 years—or life, "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." 18 U.S.C. § 1963(a). Under *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), a fact (other than a prior conviction) that increases the maximum penalty for a crime must be proved beyond a reasonable doubt. Here, the jury had returned a general verdict on Count 1, the RICO conspiracy, so its verdict on that count did not specify which of the many racketeering activities it had found. In the absence of a jury finding on a racketeering activity that allowed a life sentence, the maximum would ordinarily have remained 20 years.

However, one—indeed the primary—racketeering activity was trafficking in controlled substances in violation of 21 U.S.C. §§ 841, 846. And this racketeering act corresponded to the charge in Count 3, conspiracy to manufacture and distribute controlled substances. Each of the trial defendants was also convicted of Count 3, with a special

finding by the jury that the offense involved 500 grams or more of a mixture or substance containing methamphetamine—a life offense under 21 U.S.C. §§ 841(b)(1)(A)((viii) and 846. This Court has held that the "other verdicts of the same jury may serve the function of a special verdict on the predicate acts, where those other verdicts necessarily required a finding that the RICO defendant had committed the predicate acts." *United States v. Corrado ("Corrado II")*, 304 F.3d 593, 608 (6th Cir. 2002) (quoting *Callanan v. United States,* 881 F.2d 229, 234 (6th Cir.1989)). Hence, the jury here made the special finding that was necessary to elevate the maximum sentence for Count 1 to life. And, regardless, the maximum sentence for Count 3 was also life, based on the verdicts. (R. 2127: Order, 30770).

The government submitted a comprehensive memorandum to assist the court, which listed in detail all of the racketeering acts under consideration and assessed the accountability, in the view of the government, of each defendant for those acts. (R. 2142: Government's Memorandum Specifying Racketeering Activity a Particular Defendant is Accountable for as Relevant Conduct in Count One, 30828–31167). After further briefing and a hearing (R. 2421: Motion hearing, 35223–

316), the judge issued a further order addressing general issues, while reserving final decisions for the sentencing of individual defendants. (R. 2268: Order Resolving Common Objections for Trial Defendants, 31867–83).

USSG § 2E1.1 governs sentencing for RICO conspiracy convictions. It provides that the base offense level for a RICO conviction is the greater of 19 or "the offense level applicable to the underlying racketeering activity." In *United States v. Tocco ("Tocco I"),* 200 F.3d 401 (6th Cir. 2000), this Court established that the test for whether conduct qualifies as an "underlying racketeering activity" for sentencing purposes is the relevant conduct test, found in USSG § 1B1.3. *Id.* at 430; *see also United States v. Corrado ("Corrado I"),* 227 F.3d at 528, 542 (6th Cir. 2000) ("[T]he underlying acts of racketeering in a RICO conspiracy are ... simply conduct that is relevant to ... participating in a criminal enterprise."). Under § 1B1.3(a)(1), relevant conduct includes: (A) "all acts or omissions" that the defendant "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused"; and (B) "all acts and omissions of others" that were within the scope of,

207

in furtherance of, and reasonably foreseeable in connection with jointly undertaken criminal activity.

The existence of relevant conduct is determined by a preponderance of the evidence. *Corrado II,* 304 F.3d at 608 (citing *United States v. Voyles,* 995 F.2d 91, 93 n. 3 (6th Cir. 1993)). Whether conduct constitutes "relevant conduct" under § 1B1.3(a)(1)(B) is reviewed *de novo,* while the underlying factual findings regarding whether that conduct is "within the scope" of, "in furtherance" of, and "reasonably foreseeable" are reviewed for clear error. *Donadeo,* 910 F.3d at 893 (citing *United States v. Tocco ("Tocco II"),* 306 F.3d 279, 284 (6th Cir. 2002)). In determining the scope of a defendant's agreement, "the district court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.* at 289.

In its order resolving the defendants' common objections, the district court found that each trial defendant could be held accountable for all of the distribution and manufacture of methamphetamine from the time that defendant became a fully "patched" member of the DDMC. (R. 2268: Order, 31872–74). It did so based on its assessment of the

208

evidence, which established that: (1) manufacturing and distributing meth was a primary and fundamental activity of the DDMC; (2) each trial defendant knew that; (3) the DDMC's meth distribution activity was notorious, attracting associates who wanted into the meth business; (4) the DDMC used indoctrination techniques that assured that members understood and followed its rules and culture of confidentiality; and (5) the DDMC's use of back rooms and closed doors for drug distribution showed only a design to avoid detection. Based on these and other observations, the court concluded that by the time each defendant was fully "patched," it was reasonably foreseeable to him that all ensuing meth trafficking activity was within the scope and in furtherance of the conspiracy that he had joined. (*Id.*).

The judge also addressed, in general, whether membership in the DDMC would automatically make one accountable for all conduct of other members, and whether defendants could be accountable for violent crimes of others based on their RICO conspiracy convictions. Again, based on his experience in the two trials, and the way in which the enterprise worked and indoctrinated its members, the judge found provisionally that those in leadership roles—including these

209

defendants—knew of, or could reasonably foresee, virtually all of the racketeering activity of the DDMC, including the violent crimes alleged and proven. (*Id.*, 31875–78).

## B.    Smith: offense level 57, criminal history I

On a guideline range of life, the district court sentenced Smith to life. (R. 2424: Sentencing Tr., 35510). This was based on an offense level 57, well in excess of the level 43 necessary to support the life guideline range. (PSR ¶¶ 279, 282). In establishing this offense level, the court took into account the fact that Smith had been "patched" in 1978, and had been National President of the DDMC since the late 1980s. (PSR ¶¶ 16, 22). Accordingly, based on Smith's long-term membership and leadership role, the court confirmed its earlier written finding that Smith should be held accountable for all of the racketeering activity that had been alleged and proven. (R. 2424: Tr., 35433–34). This factual conclusion, that the racketeering activity was within the scope and in furtherance of the DDMC enterprise and was reasonably foreseeable to Smith, was not clearly erroneous.

Since the sentence was within the guideline range, it is presumed to be substantively reasonable. The court took into account Smith's

history and characteristics, including the history of his role in the DDMC and its criminal activity, together with the sentencing factors of individual and general deterrence. (*Id.*, 35507–09). It also considered, but found unpersuasive, Smith's argument for a lesser sentence due to medical conditions. (*Id.*, 35509–10). The judge had harsh words for Smith and the criminal enterprise that he led, but those words were justified by the evidence. He did not abuse his discretion by imposing a guideline sentence of life imprisonment.

### C.    Darrah: offense level 56, criminal history III

On a guideline range of life, the district court sentenced Darrah to life. (R. 2425: Sentencing Tr., 35645–46). This was based on an offense level 56, well in excess of the level 43 necessary to support the life guideline range. (PSR ¶¶ 275, 278). In establishing this offense level, the court took into account the fact that Darrah had been "patched" in 1994, and had been National Vice-President of the DDMC since in or about 2004. (PSR ¶¶ 20, 26). The court also took into account Darrah's leadership activities before becoming VP, such as setting up and leading the DDMC's Blue Water chapter. (R. 2425: Tr., 35531–33). Also significant was Darrah's close advisory relationship with Smith, as

211

demonstrated in the wiretapped calls between them. (*Id.*, 35639). Accordingly, based on Darrah's long-term membership and leadership role, the court confirmed its earlier written finding that Darrah should be held accountable for all of the racketeering activity that had been alleged and proven, from 1994 forward. (R. 2425: Tr., 35541–43). This factual conclusion, that this racketeering activity was within the scope and in furtherance of the DDMC enterprise and was reasonably foreseeable to Darrah, was not clearly erroneous.

In reaching this conclusion the court expressly considered Darrah's assertion, now pressed on appeal, that he should not be held accountable for the murder of William Bausch in November 1995. It found that, regardless of whether Darrah had been formally "patched" as of that date, he was sufficiently involved in and familiar with the nature and scope of the criminal enterprise for this act to be foreseeable to him, and thus to be held accountable for it. (*Id.*).

The court also expressly considered Darrah's argument that he should not be held accountable for more than 15 kilograms of methamphetamine, as was necessary for a base offense level 38 for the racketeering activity involving drugs. The jury's verdict specifically

found Darrah responsible for at least the amount necessary to enhance the statutory maximum sentence, but this was a floor, not a ceiling. It fell to the district court to determine for sentencing purposes, by a preponderance, the amount for which Darrah was responsible. This it did, relying on a sentencing exhibit tailored to Darrah, which the government derived from the comprehensive factual summary it had previously filed. (R. 2553: Darrah sentencing exhibit 1: 43012–023; R. 2142: Government's Memorandum Specifying Racketeering Activity, 30828–31167). The court concluded that the evidence showed Darrah to be responsible for at least three times the amount necessary to qualify for level 38. (R. 2425: Tr., 35582–94). This finding was not clearly erroneous.

Since the sentence was within the guideline range, it is presumed to be substantively reasonable. The court took into account Darrah's history and characteristics, including the history of his role in the DDMC and its criminal activity, together with the sentencing factors of individual and general deterrence. (*Id.*, 35641–44). It also considered Darrah's serious health concerns and his desire to remain close to his family. (*Id.*, 35637–40). As at Smith's sentencing, the judge's harsh

213

words for Darrah and his role and behavior in the criminal enterprise were justified by the evidence. He did not abuse his discretion by imposing a guideline sentence of life imprisonment.

### D.    Witort: offense level 48, criminal history I

On a guideline range of life, the district court sentenced Witort to life. (R. 2426: Sentencing Tr., 35740). This was based on an offense level 48, well in excess of the level 43 necessary to support the life guideline range. (PSR ¶¶ 262, 265). In establishing this offense level, the court took into account the fact that Witort had been "patched" in the mid-1980s, had been a chapter president in California, and commanded great authority and respect among DDMC members. (PSR ¶¶ 12, 18). The court characterized Witort as the DDMC's *"eminence grise."* (R. 2426: Tr., 35737–38). Based on Witort's long-term membership and leadership role, the court confirmed its earlier written finding that he should be held accountable for all of the racketeering activity that had been alleged and proven. (R. 2426: Tr., 35656–58). This factual conclusion, that this racketeering activity was within the scope and in furtherance of the DDMC enterprise and was reasonably foreseeable to Witort, was not clearly erroneous.

214

As with Darrah, the district court considered whether Witort should be held accountable for more than 15 kilograms of methamphetamine, as was necessary for base offense level 38 as to the drugs. This time, relying on a sentencing exhibit tailored to Witort, which the government likewise had derived from its comprehensive factual summary, the court concluded that the evidence showed Witort to be responsible for substantially more than the amount necessary to qualify for level 38. (R. 2553: Witort sentencing exhibit 1, 43024–035; R. 2426: Tr., 35667–70). This finding was not clearly erroneous.

Again, this guideline sentence is presumed to be substantively reasonable. The court took into account Witort's history and characteristics, including his long-term role in the DDMC and its criminal activity, together with the sentencing factors of deterrence. (*Id.*, 35735–36). The court considered the good works, and good words, expressed in Witort's allocution, while contrasting them with the darkness engendered by his important role in the DDMC. (*Id.*, 35736–38). It also considered Witort's health concerns and the regret he expressed in his allocution. (*Id.*, 35739–40). The judge expressed sorrow for the choices Witort had made, as exemplified by his role in the Box

215

Canyon assaults and attempted murders, but found those choices required a life sentence. (*Id.*, 35738–41). He did not abuse his discretion by imposing a guideline sentence of life imprisonment.

### E.    McKeoun: offense level 50, criminal history III

On a guideline range of life, the district court sentenced McKeoun to a term of 372 months. (R. 2427: Sentencing Tr., 35842). The offense level, 50, was well in excess of the level 43 necessary to support the life guideline range. (PSR ¶¶ 262, 265). In establishing this offense level, the court took into account the fact that McKeoun was a long time member who was "patched" in the mid-1980s, had been involved in several DDMC chapters around the United States, had held leadership positions in the club, and had close association with the national leadership, including Smith, Darrah, and Vandiver. (PSR ¶¶ 18, 19). The court observed, based on the evidence, that McKeoun was "everywhere"—in Arizona, in California, in Alabama, in Michigan—and that he was "one of Fat Dog's guys." (R. 2427: Tr., 35755–56). Further, McKeoun had formed the Decatur, Alabama chapter in 1999, had sponsored seven members there, and had been the president of that chapter. (*Id.*, 35757–79). Based on this evidence, the court confirmed

216

that McKeoun should be held accountable for all of the racketeering activity that had been alleged and proven. This factual conclusion, that the racketeering activity within the scope and in furtherance of the DDMC enterprise was reasonably foreseeable to McKeoun, was not clearly erroneous.

McKeoun places great weight on his claim that, when "Little Dog" and other Alabama DDMC members forcibly took Jeff Arnold's motorcycle from him, he unsuccessfully tried to stop them. There was abundant evidence at trial that if members left the club in "bad standing" their motorcycles would be taken, forcibly if necessary. (*E.g.*, R. 1077: Tr., 7067–70; R. 1115: Tr., 10393–96). McKeoun's argument seems to be that, because in the instance he tried the stop such a theft (probably because the victim had helped him, giving him a place to live while a fugitive), it was not foreseeable to him that the DDMC would do such a thing. But this incident actually shows quite the opposite: McKeoun knew, because he saw it happen, that his club would forcibly take a bike from a departing member when it chose to. And he stayed with the club.

217

A guideline sentence is presumed to be substantively reasonable; so should a downward variance from the guidelines. In imposing a sentence of less than life imprisonment, the district court took into account McKeoun's history and characteristics, including his role in the DDMC and its criminal activity, together with the sentencing factors of deterrence. (*Id.*, 35839–41). The judge considered McKeoun's claims of religious redemption, of family ties, and of employment opportunities. (*Id.*, 35838–39). He did not abuse his discretion by imposing a sentence of 372 months.

## XI.    Adoption has limits. (McKeoun, Smith, Darrah, Vandiver, Witort)

Rule 28(i) of the Federal Rules of Appellate Procedure permits the adoption of arguments. The Rule provides that "[i]n cases involving more than one appellant or appellee ... any appellant or appellee may adopt by reference any part of the brief of another." But this does not give carte blanche. This Court has held that "notwithstanding the permissive generalities in which the Rule is couched, there are definite limits on the ability of parties to adopt each other's appellate arguments by reference pursuant to Rule 28(i)." *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996). To be adopted, an argument must be

"readily transferrable"—that is, equally applicable to both parties. Critically, where an appellant's argument is fact-specific, another appellant's effort to adopt that argument fails. *Id.*

The defendants have taken free advantage of the rule's permission to adopt arguments from each other. In many cases those arguments are sufficiently transferrable. But some are clearly not. All Trial 1 appellants, save Drozdowski, attempt to adopt an argument from the brief for Trial 2 defendant Michael Rich: "The District Court Committed Reversible Error and Violated Appellant's Sixth Amendment Right of Confrontation by the Arbitrary Imposition Of a Blanket Rule Impairing Cross Examination and Preventing Cross Examination On Bias." This argument arises from a separate trial from the one in which these defendants were convicted. It is an evidentiary argument from that trial, based on objections and rulings made in that trial, not in this one. And a cursory look at Rich's brief shows that its arguments are bound to the particular facts and circumstances of the proceedings there. So any similar or parallel argument has not been made here, and should be deemed waived.

219

Similarly, Vandiver purports to adopt the sentencing arguments of Trial 2 defendant Rich, as well as his Trial 1 codefendant McKeoun. These arguments are not readily transferrable. Sentencing issues, such as the calculation of drug quantities, are an "individual, fact-specific exercise that requires individual, fact-specific briefing." *United States v. Hough*, 276 F.3d 884, 891 (6th Cir. 2002). Rich's and McKeoun's sentencing arguments are tailored to their particular circumstance. This Court is not obliged to cobble a codefendant's argument to fit the circumstances of another defendant seeking to adopt that argument. *United States v. Elder*, 90 F.3d at 118 (citing *United States v. Swingler,* 758 F.2d 477, 493 (10th Cir. 1985)).

This Court should reject the adoption of arguments that aren't readily transferrable.

# Conclusion

The judgments should be affirmed.

Respectfully submitted,

Matthew Schneider
United States Attorney

/s/ Sheldon N. Light
Sheldon N. Light
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9574
Sheldon.Light@usdoj.gov

Dated: September 21, 2020

221

## Certificate of Compliance with Rule 32(a)

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook. This brief does not comply with the type-volume limitation of Rule 32(a)(7)(B) because, excluding the parts of the brief exempted by Rule 32(f), it contains 43,405 words. The government has simultaneously moved for permission to file an overlength brief.

/s/ Sheldon N. Light
Assistant United States Attorney

Dated: September 21, 2020

# Certificate of Service

I certify that on September 21, 2020, I electronically filed this brief for the United States with the Clerk of the United States Court of Appeals for the Sixth Circuit using the ECF system, which will send notification of the filing to the following attorneys of record:

Mark A. Satawa
mark@satawalaw.com

Laura E. Davis
LawyerLEDavis@gmail.com

Sidney Kraizman
sidkraizman@sbcglobal.net

Patricia Maceroni
Pattymac63@hotmail.com

Craig Daly
4bestdefense@sbcglobal.net

Phillip D. Cornorski
cornorskiphillip@gmail.com

/s/ Sheldon Light
Assistant United States Attorney

223

## Relevant District Court Documents

The United States of America designates as relevant these documents in the district court's electronic record, Eastern District of Michigan case number 11-cr-20066; 11-cr-20129:

### Case No. 11-20066

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 3 | Indictment | 7–20 |

### Case No. 11-cr-20129

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 72 | Third Superseding Indictment | 590–675 |
| 375 | Appointment of Kimberly Winona Stout as Attorney for Vincent John Witort | 1455 |
| 461 | Order on Motion to Consolidate | 1671–73 |
| 516 | Order Appointing Greenwood as Coordinating Discovery Attorney | 1916–19 |
| 544 | Order Granting Designation as a Complex Case | 1994–95 |
| 716 | Opinion & Order extending filing dates and to continue ends of justice as to all defendants | 2748–50 |
| 822 | Motion to Suppress Title III Wire Intercept by Paul Anthony Darrah | 3464–68 |
| 823 | Motion to Suppress Six Extensions of Title III Wire Intercept by Darrah | 3469–73 |
| 824-1 | Sealed Motion to Suppress Title III Intercepts Issued Pursuant to the Six | 39877–40194 |

| Record No. | Document Description | Page ID Range |
|---|---|---|
|  | Extensions Authorized |  |
| 825-1 | Sealed Motion to Suppress Title III Intercept Order Issued March 20, 2008 | 40647–40827 |
| 875 | Order Requiring Additional Brief | 3941–3943 |
| 878-1 | Supplemental Brief Regarding Defendant's Request to Have Retained Counsel Substitute as Counsel of Record | 39647–56 |
| 882 | Order re: Request for Substitution of Counsel | 3976–81 |
| 885 | Motion for Reconsideration | 3985–90 |
| 888 | Motion Hearing Tr. 07/09/2014 | 3998–4022 |
| 895 | Order Denying Motion for Reconsideration | 4072–76 |
| 983 | Order Denying Motion For a Written Proffer and Hearing on Admissibility of Co-Conspirators' Statements | 4393–95 |
| 1001 | Response & Brief Opposing Motion in Limine | 4479–86 |
| 1013 | Joint Motion to Strike | 4763–79 |
| 1038 | Response to Joint Motion to Strike | 5046–55 |
| 1045 | Order Denying Motions to Suppress | 5128–32 |
| 1050 | Bench Order | n/a |
| 1070 | Jury Trial Tr., (Excerpts) 10/16/2014 | 5241–414 |
| 1072 | Jury Trial Tr., (Excerpts) 10/20/2014 | 5601–896 |
| 1074 | Jury Trial Tr., 10/23/2014 | 6178–460 |
| 1075 | Jury Trial Tr., 10/27/2014 | 6461–756 |

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 1076 | Jury Trial Tr., 10/28/2014 | 6757–939 |
| 1077 | Jury Trial Tr., 10/29/2014 | 6940–7152 |
| 1079 | Motion for Mistrial | 7174–81 |
| 1091 | Motion to Amend/Correct Motion for Mistrial | 7222–35 |
| 1092 | Jury Trial Tr., 11/03/2014 | 7236–545 |
| 1093 | Jury Trial Tr., 11/04/2014 | 7546–802 |
| 1094 | Jury Trial Tr., 11/06/2014 | 7803–8117 |
| 1095 | Jury Trial Tr., 11/10/2014 | 8118–338 |
| 1096 | Jury Trial Tr., 11/12/2014 | 8339–580 |
| 1097 | Jury Trial Tr., 11/13/2014 | 8581–881 |
| 1098 | Jury Trial Tr., 11/14/2014 | 8882–9101 |
| 1105 | Response  to Motion for Mistrial or Motion to Strike Government's Exhibit 16-15 | 9138–47 |
| 1111 | Jury Trial Tr., 11/17/2014 | 9163–469 |
| 1112 | Jury Trial Tr., 11/18/2014 | 9470–759 |
| 1113 | Jury Trial Tr., 11/19/2014 | 9760–981 |
| 1114 | Jury Trial Tr., 11/20/2014 | 9982–10275 |
| 1115 | Jury Trial Tr., 11/24/2014 | 10276–606 |
| 1116 | Jury Trial Tr., 11/25/2014 | 10607–837 |
| 1133 | Government's Response and Brief to Third Motion for Mistrial | 10934–972 |

226

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 1141 | Memorandum Opinion and Order addressing Objections to Special Agent Fleming's Testimony | 10995–11019 |
| 1146 | Jury Trial Tr., 12/08/2014 | 11032–318 |
| 1147 | Jury Trial Tr., 12/09/2014 | 11319–646 |
| 1148 | Jury Trial Tr., 12/10/2014 | 11647–839 |
| 1149 | Jury Trial Tr., Part B, 12/11/2014 | 11840–12012 |
| 1150 | Jury Trial Tr., 12/17/2014 | 12013–202 |
| 1151 | Jury Trial Tr., 12/18/2014 | 12203–498 |
| 1158 | Joint Memorandum of Law in Opposition to Including Overt Acts | 13184–188 |
| 1161 | Joint Defense Requested Jury Instructions | 13233–247 |
| 1165 | Drozdowski Motion for Judgment of Acquittal | 13291–315 |
| 1168 | Defendants' Proposed Jury Instructions | 13322–454 |
| 1169 | Proposed Jury Instructions by United States | 13455–657 |
| 1173 | Defendants' Joint Proposed Cautionary Instruction | 13666–667 |
| 1174 | Defendants' Joint Request for Special Verdict Forms | 13668–729 |
| 1179 | Memorandum of Law re: Enright Findings | 13751–775 |
| 1182 | Smith Motion for Judgment of Acquittal | 13781–795 |
| 1187 | Brief on Admissibility of Co-Conspirators' Statements | 13807–825 |
| 1188 | Darrah Motion for Judgment of Acquittal | 13826–842 |

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 1195 | Response to Supplemental Brief on JI 7.06B | 13862–869 |
| 1202 | Order Resolving Certain Objections | 13899–911 |
| 1203 | Corrected (R. 1073) Jury Trial Tr., 10/22/2014 | 13912–14192 |
| 1205 | Order Overruling "Addict-Informant" Jury Instruction Objection | 14203–205 |
| 1212 | Jury Trial Tr., 01/06/2015 | 14223–418 |
| 1218 | Objections to Jury Instructions Tr., 01/09/2015 | 14429–496 |
| 1232 | Jury Trial Tr., 01/22/2015 | 14769–964 |
| 1233 | Jury Trial Tr., 01/23/2015 | 14965–15161 |
| 1238 | Remark | 15336 |
| 1253 | Jury Verdict Form – Scott William Sutherland | 15397–398 |
| 1255 | Jury Verdict Form – David Randy Drozdowski | 15402–404 |
| 1256 | Jury Verdict Form – Jeff Garvin Smith | 15405–408 |
| 1257 | Jury Verdict Form – Cary Dale Vandiver | 15409–413 |
| 1258 | Jury Verdict Form – Paul Anthony Darrah | 15414–417 |
| 1259 | Jury Verdict Form – Patrick Michael McKeoun | 15418–419 |
| 1260 | Jury Verdict Form – Vincent John Witort | 15420–421 |
| 1262 | Remark | n/a |
| 1263 | Remark | n/a |
| 1265 | Jury Instructions | 15435–602 |

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 1284 | Jury Trial Tr., 02/05/2015 | 15663–695 |
| 1285 | Jury Trial Tr., 02/06/2015 | 15696–729 |
| 1287 | Defendants' Joint Motion for New Trial Pursuant to Fed. R. Crim. P. 33 | 15737–742 |
| 1338 | Response to Renewed Motion for Judgment of Acquittal and Joint Motion for New Trial | 15964–16046 |
| 2127 | Order Resolving General Sentencing Issues | 30765–774 |
| 2142 | Government's Memorandum Specifying Racketeering Activities a Particular Defendant is Accountable for as Relevant Conduct in Count One, RICO Conspiracy | 30828–31167 |
| 2268 | Order Resolving Common Objections for Trial Defendants | 31867–884 |
| 2332 | Opinion & Order Denying Trial Group One's Motion for New Trial | 33113–136 |
| 2337 | Judgment – Cary Dale Vandiver | 33222–229 |
| 2346 | Judgment – Patrick Michael McKeoun | 33413–419 |
| 2352 | Judgment – Jeff Garvin Smith | 33453–461 |
| 2357 | Judgment – David Randy Drozdowski | 33501–508 |
| 2358 | Judgment – Paul Anthony Darrah | 33509–517 |
| 2376 | Judgment – Vincent John Witort | 33723–729 |
| 2387 | Jury Trial Tr., Part A, 12/11/2014 | 33857–942 |
| 2421 | Motion Hearing Tr. 06/11/2018 | 35223–317 |
| 2424 | Sentencing Tr., 11/13/2018 | 35425–516 |

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 2425 | Sentencing Tr., 11/28/2018 | 35517–651 |
| 2426 | Sentencing Tr., 11/30/2018 | 35652–745 |
| 2427 | Sentencing Tr., 11/08/2018 | 35746–847 |
| 2438 | Motion Hearing Tr., 08/05/2014 | 36646–742 |
| 2439 | Sealed Voir Dire Tr., 09/29/14 | 36743–948 |
| 2442 | Sealed Voir Dire Tr., 10/14/2014 | 37448–715 |
| 2443 | Jury Trial Tr., 10/15/2015 | 37716–955 |
| 2444 | Jury Trial Tr., 10/16/2014 | 37956–38148 |
| 2445 | Jury Trial Tr., 10/17/2014 | 38149–342 |
| 2450 | Jury Trial Tr., 01/20/2015 | 38391–586 |
| 2451 | Jury Trial Tr., 01/26/2015 | 38587–721 |
| 2500 | Exhibits Filed for Appeal | 42045–047 |
| 2504 | Exhibits Filed for Appeal | 42055–152 |
| 2535 | Trial Documents Filed for Appeal | 42677–752 |
| 2553 | Exhibits Filed for Appeal | 43000–035 |
| n/a | Patrick Michael McKeoun Presentence Report | n/a |
| n/a | Jeff Garvin Smith Presentence Report | n/a |
| n/a | Paul Anthony Darrah Presentence Report | n/a |
| n/a | Vincent John Witort Presentence Report | n/a |

230